```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

PAUL STARY, individually and on
behalf of all others similarly
situated,

                Plaintiff,

     v.                                 24 CV 3849 (KMK)


TELADOC HEALTH, INC., JASON
NATHANIALL GOREVIC and MALA
MURTHY,

                Defendants.

------------------------------------x

ANDREW WAITS, individually and on
behalf of all others similarly
situated,

                Plaintiff.


     v.                                 24 CV 5339 (KMK)


TELADOC HEALTHY, INC., JASON
GOREVIC and MALA MURTHY

                Defendants.

------------------------------------x

                                        United States Courthouse
                                        White Plains, New York
                                        November 14, 2024


B e f o r e:  THE HONORABLE KENNETH M. KARAS,
                          District Judge
```

Angela O'Donnell - Official Court Reporter
(914)390-4025

A P P E A R A N C E S:


LEVI & KORSINSKY
          Attorneys for Paul Stary
ADAM M. APTON



ROBBINS GELLER RUDMAN & DOWD
          Attorneys for Joshua Marit
DAVID A. ROSENFELD



POMERANTZ LLP
          Attorneys for Andrew Waits
JOSEPH A. HOOD II



PAUL WEISS RIFKIN WHEATON & GARRISON LLP
          Attorneys for Defendants
AUDRA J. SOLOWAY

THE DEPUTY CLERK:  The Honorable Kenneth M. Karas presiding, Paul Stary verse Ali Touat, et al.

Counsel, please state your appearances.

MR. APTON:  Good morning, your Honor.  Adam Apton, Levi & Korsinsky for movant Ali Touat.

MR. ROSENFELD:  Good morning, your Honor.  David Rosenfeld, Robbins Geller Rudman & Dowd on behalf of lead plaintiff movant Joshua Marit.

MR. HOOD:  Good morning, your Honor.  Alex Hood, Pomerantz LLP, on behalf of plaintiff and lead plaintiff movant Andrew Waits.

MS. SOLOWAY:  Good morning, your Honor.  Audra Soloway from Paul Weiss Rifkin Wheaton & Garrison LLP for the defendants, and with me is my colleague, Emily Miller.

THE COURT:  Good morning to you all.  Please be seated.

We're here to consider a couple of motions, the motion to consolidate and appoint lead plaintiff and counsel. I have read the papers.

Let me ask defense before I hear from the competing plaintiffs, any views you want to offer or anything you want to say before I let them fight?

MS. SOLOWAY:  Your Honor, on consolidation we're obviously in favor of only having one case to defend.  On the issue of lead plaintiff, I mean, normally we would stay out of

this.  I think because the submissions ventured into the world of what can and can't be a corrective disclosure date, we waited, which we don't usually do.

THE COURT:  Right.

MS. SOLOWAY:  I think if your Honor is able to resolve this without prejudice to our arguments down the road about loss causation or any other substantive arguments, we're prepared to sort of be here in listening mode or answer any questions your Honor may have.  But otherwise I may ask to be heard at the end of all this.

THE COURT:  Okay, that's fine.  That's fine.

MS. SOLOWAY:  Thank you, your Honor.

THE COURT:  All right, who wants to go first then?

Ah, everybody stands up.

MR. APTON:  Your Honor, Adam Apton from Levi & Korsinsky.  My firm, and I personally, initially filed the case.  I represent Ali Touat on his motion for lead plaintiff.

It's our position that our client, Mr. Touat, should be appointed lead plaintiff, primarily being because he is the --

THE COURT:  One thing, by the way, you don't need to worry about leaning into the mic.

MR. APTON:  Oh, okay.

THE COURT:  Because otherwise your grandmother will criticize your posture.

MR. APTON:  I have three little kids, so my back is already tuned up.

THE COURT:  Fair enough.  Fair enough.

MR. APTON:  So our client with almost $70,000 in losses from investing in Teladoc securities, which he held throughout the class period, one purchase, no sales, is the most adequate plaintiff to serve as lead plaintiff here.  We objected in our papers to the inclusion of an additional corrective disclosure by Mr. Waits on the eve of the deadline.  That corrective disclosure, putting aside the merits of it, is not properly before the Court.  It was included into the pleadings or into the ether, again, one day for the deadline.  But for that corrective disclosure, Mr. Waits would have no losses.  In fact, he would have a gain.  And by the same token, Mr. Marit, who purchased many shares but also sold many shares, almost 90 percent of his holdings before the end of the class period, would also not have a financial interest that exceeds Mr. Touat's.

So for those reasons, your Honor, we think that our client should be appointed lead plaintiff.

THE COURT:  So can we all agree that the method of determining loss in terms of evaluating the purchases and sales of the stock is governed by the LIFO concept?

MR. APTON:  Yes, it would be LIFO, but with a little note there.  In the Southern District of New York, it's not

just LIFO, it's LIFO shares that were bought and held over a corrective disclosure.  So shares held and then sold before a corrective disclosure do not yield --

THE COURT:  Right, I get that.  That's a related but separate concept, right?  Because whether you use LIFO or some other method, the whole in-and-out thing is a separate argument.  Just in terms of valuing, you know, you buy X number of shares on January 1 at a certain price, and then you sell X number of shares on January 5 and there's no transactions in between, then LIFO would help you calculate the gain or loss, right, by those two transactions.

MR. APTON:  It would, yes.

THE COURT:  All right.  Because you see what Marit says in response.  Marit, and I went through all the charts, if you will, and in terms of trying to match up the trades under LIFO, Marit says, no, actually, I did loose more, and why is that wrong?

MR. APTON:  Your Honor, he, I believe, Marit is taking his trades, many of which were sold in a given day and ordering them in such a manner that it results in a different calculation, which gets to the next issue that your Honor flagged.

THE COURT:  Yes.

MR. APTON:  That being in and out, a potential adequacy or unique defenses.  I mean, if we're focusing on

Mr. Marit's trade order at this point in the case, it's going to be an issue later on in the case.  And why?  It shouldn't be.  It shouldn't be when we have Mr. Touat, who has his purchases, a substantial financial interest in the case, $70,000.

THE COURT:  Yes.

MR. APTON:  That doesn't present the same issues that would not have the effect of dogging the class, as the judge said, as the court said in *Rodriguez v. DraftKings*.

So what is the correct chronology of the purchases and sales that Mr. Marit made on any given day or multiple days?  From our count, we have it right.  Counsel, for Mr. Marit has presented a different order, ordering of the trades that nets a different number.  I would say that that's not correct, because we took what was in the certification that was initially filed with the opening motion papers.

THE COURT:  Okay, all right, anything else you want to add to your papers?

MR. APTON:  Thank you, your Honor.

THE COURT:  All right.

MR. ROSENFELD:  Thank you, your Honor.

THE COURT:  Go ahead.

MR. ROSENFELD:  Just to repeat, with regard to Mr. Waits, I won't go into it too much, but at the end of the day he has not provided -- number one, the fact that he filed

the day before the lead plaintiff motion deadline certainly has been viewed by many courts as being gamesmanship to the extent that other lead plaintiff movants will not have the opportunity to file because they're not aware of that additional disclosure, which would give them a potential claim in the case.  So courts have looked upon that and said, in a circumstance such as that where you have a complaint being filed at the 11th hour, that is not going to be a typical or adequate lead plaintiff and those motions have typically been denied.  Especially where, here, where there have been no factual allegations as to how the drop disclosed any fraud.  In particular in the *Bensley v. FalconStor* case, your Honor, which was in the Eastern District of New York.  The Court there said that there was no disclosure in that announcement that was alleged as that additional disclosure.  There's no announcement there about disclosing anything related to fraud.  Here, it was simply a third quarter earnings announcement.  There was no complaint filed in response to the disclosure.  There was nothing that told investors that a fraud had occurred and there was no response from anyone.  The stock went down I think less than 4 percent.  So while it certainly wasn't a basis for securities fraud at that point in time, and defendants have argued that today, if the case proceeds with Mr. Waits I'm sure they'll argue that later on as well.

So we do not believe that there is any way basis for

Mr. Waits to get involved in this case because his complaint simply just alleges that there was an earnings announcement that investors were not happy with and stock declined slightly but that does not mean that there is a basis for fraud necessarily.

The fraud that was later disclosed had to do with marketing and advertising costs. There's no mention of that in the Waits complaint. We explained it, I think your Honor has heard a lot about it. If you want to hear more about that, we're happy to talk about it, but I think the cases that we've cited in our brief, that Mr. Apton has cited in his brief, and the defendants cited, make it clear that, in a circumstance such as this where you have a lead plaintiff movant who files a complaint just to make sure that his purchases are protected so he can be part of a case, have not been -- has determined to be gamesmanship and has not been allowed to proceed. And certainly, your Honor, if the case were to proceed and that disclosure were to go away, the entire case would go away because there would be no lead plaintiff left at that point in time.

Speaking to Mr. Apton, your Honor, with regard to the *Dura* issues that he discusses, so two points, your Honor.

First of all, there is a dispute in this circuit whether or not to apply *Dura* LIFO at this stage, and if your Honor looks at Mr. Apton's original lead plaintiff application

on his certification, he actually doesn't limit his financial interest calculation to *Dura* LIFO, but he specifically mentions regular LIFO as well.  I guess covering all his bases.  So to say today that this Southern District of New York only looks -- says in the SDNY not just LIFO, it has to be held through a corrective disclosure and has to be *Dura* LIFO.  That's simply inconsistent what he represented in his opening papers where he asserted losses both under regular LIFO and under FIFO.

I don't mean FIFO, I mean *Dura* LIFO, your Honor.

THE COURT:  Don't drop the "F" word in this courtroom.

MR. ROSENFELD:  Your Honor, with regard to his supplemental declaration where he includes a number of different calculations for *Dura* LIFO, that's inconsistent with the way that we have seen courts calculate *Dura* LIFO.  We came out on top with a higher number, in excess of $100,000 in losses as well.  Using that approach, we think we don't really understand Mr. Apton's calculation, and there is, your Honor, in the *Cook v. Allergan* case in front of Judge McMahon, there, too, the Court said that she was not going to apply *Dura* at the lead plaintiff stage, and one of the reasons she said was because the fact that the movant had used other types of calculating financial interests in his opening motion it "lends validity to the conclusion that the impact of *Dura* on the proposed lead plaintiff's loss calculations is, at best,

Angela O'Donnell - Official Court Reporter
(914)390-4025

uncertain and so should be discounted."

So your Honor, our client has a large financial interest under regular LIFO, under *Dura* LIFO.  There may be some way of reorganizing or restructuring the trades in a way to diminish or decrease my client's losses, but we don't see it.  We don't think that's supported.

And your Honor, if I can just direct your attention to I guess the exhibit, which would be document 39-2 attached to Mr. Apton's supplemental declaration?

THE COURT:  Yes.

MR. ROSENFELD:  And in it, your Honor --

THE COURT:  You've got to put your glasses back on to read.

MR. ROSENFELD:  I printed in super large.  If you want, I --

THE COURT:  I have it on my screen.

MR. ROSENFELD:  In 39.2, your Honor --

THE COURT:  Yes.

MR. ROSENFELD:  -- the way that *Dura* LIFO is calculated, you would take all the shares purchased on August 2nd and offset them by all the trades.  That's the first day.

THE COURT:  You mean November 2nd.

MR. ROSENFELD:  No.

THE COURT:  Which page are you on?

MR. ROSENFELD:  I'm on page 8 of 12.

THE COURT:  Okay.

MR. ROSENFELD:  Sorry, your Honor.  On page 8 of 12.

THE COURT:  Yes.

MR. ROSENFELD:  So August 2nd, for example, there were ten thousand shares of Teladoc sold by Mr. Marit.

THE COURT:  Yes.

MR. ROSENFELD:  On that day there were 10,046 shares purchased.  So under *Dura* LIFO, since this was the first day in consideration, those sales should have offset all those purchases.  Instead, if you look, your Honor, below the yellow highlighting.  See where it's white over there?  There are a number of trades there, as well as trades above it, that are not used to offset against the sales on that date.  So it's not a true application of *Dura* LIFO.  And as your Honor would calculate the entire spreadsheet that way, it would come out that it adds up the way we come up our number of over $100,000 in losses and not the number that Mr. Apton presented.

So I'm not sure how he came up with his numbers, but it's certainly not consistent with *Dura*, because you need to take the losses, the sales and offset against the purchase from that day, and he did not do that.

I think that's just consistent with the rest of his calculations it would come out that our client's losses are the highest under that analysis as well.

And in any event, given the fact that Mr. Marit has the larger losses under both FIFO and regular LIFO, to the extent there's a dispute regarding this *Dura* LIFO, I think it should weigh in favor of Mr. Marit.

THE COURT: Okay. Anything else you want to add?

MR. ROSENFELD: Does your Honor have any other questions about that?

THE COURT: I've got lots of questions. I think I want to hold off on some of the details on those questions because I want to resolve some of the bigger picture issues first.

MR. ROSENFELD: Okay.

THE COURT: Can we do that.

MR. ROSENFELD: Sure, I can I add one more point, your Honor?

THE COURT: Please, yes.

MR. ROSENFELD: I know there was a concern raised in the reply about the volume of the trades. Mr. Marit purchased his shares through Robinhood, which when they execute trades, you say I want to buy $400 worth of stock, they break it down into number of shares. That's why the volume is what it is, but it's really he monitored the stock, he kept wanting to get into it because he thought they were doing well, he would leave people out in the representations and he continually by throughout. He was not a day trader, not doing anything

unique, nothing out of the ordinary.  He was just an investor who liked the company, believed in what they were doing and what they were saying and he kept buying the stock and it was just broken up to different, weird transactions because that's how his broker does it.

THE COURT:  All right.  Thank you.

MR. ROSENFELD:  Thank you, your Honor.

THE COURT:  Everybody's ganging up on you.

MR. HOOD:  Indeed so, your Honor.  Hopefully were ready for it.

So there is no dispute that under any loss causation methodology that's being discussed my client, Mr. Waits, would have the largest loss, $310,000, if the October 24th disclosure is considered.  The dispute lies as whether it ought to be considered.  And there are two primary objections:  One, that it does not constitute an actual disclosure of the fraud alleged in the related actions here; and, two, separate from the merits, that the timing of the filing of Mr. Waits' complaint, which did occur on the last day of the 60-day notice period was too short notice -- pardon me, too short notice to give adequate notice to the class members and somehow smacks of gamesmanship bespeaking bad faith.  Clearly I disagree with both these points, and with the Court's permission, I'd like the address each.

THE COURT:  Of course.

Angela O'Donnell - Official Court Reporter
(914)390-4025

MR. HOOD:  Regarding the October 24th disclosure, it quite clearly is a disclosure of the same fraud that's alleged in the first filed Stary complaint.

So the first filed Stary complaint alleged only a single disclosure, February 20th, when the company filed its annual report/Q4 earnings report, among other things, that report disclosed that Teladoc was facing substantially increased advertising costs, as well as a significant decline in BetterHelp's membership numbers and revenue stock price fell on that case.

Now, Mr. Waits' complaint maintained that class period ending February 20th disclosure and also added one more disclosure partial corrected on October 24 alleging that the company's fraud actually began to come to light the previous quarter when it filed its Q3 earnings report which revealed a steep decline and BetterHelp membership numbers.

Now, BetterHelp's membership numbers, as articulated in both the Stary complaint and the Waits complaint forms a core part of the subject of the core allegations of fraud.  In other words, this is one of the subjects that the defendants were alleged to have been misleading investors on.  So it's simply not accurate to claim that there's factual basis or we pled some corrective disclosure that's unrelated to the original theory of the fraud.  If anything, it's slightly surprising the Stary complaint didn't allege the partial

corrective given that it occurred in the previous quarter and dealt with the same subject matter.

Now, I'll note that Mr. Apton's firm, his initial motion papers actually expressly adopted that corrective disclosure in their recitation of the relevant facts. They only changed posture and decided it wasn't relevant after seeing the competing numbers and realizing that it would be to their disadvantage.

Now, Mr. Rosenfeld, meanwhile, he takes issue with the October 24th disclosure because he says it did not expressly reference the company's advertising or marketing expenditures or the yields thereof. But that's only one of the issues as to which the company is alleged to have misled investors. Again, both complaints, even the first-filed Stary complaint, also included allegations that the investors were misled with respect to the company's BetterHelp membership numbers and revenues.

So we haven't interjected anything new and unrelated here, and that really distinguishes it from a number of the cases cited in support of this gamesmanship argument.

Now, coming in full to the games argument, the word is tossed around with some frequency in the briefing. The clear connotation is bad faith, that Mr. Waits has done something in an effort to gain undue advantage to the prejudice of other class members, but the circumstances simply don't bear

that out.

Regarding the timing, Mr. Waits did not decide well in advance that he was going to do this and then wait until hours before to deny the class members an opportunity.  Rather, after becoming aware that he had incurred significant investment losses, but that that theory of the complaint, as pled, those losses might not be considered recoverable as they weren't held through corrective disclosure, after determining he had a meritorious claim under based on the October 24th disclosure, Mr. Waits promptly determined to file a complaint and did so at the earliest opportunity that happened to be late in the game.

Now, I think the dates of his submissions bear this out.  He filed a certification authorizing the filing of his complaint on July 15.  Complaint was filed on July 15.  One of the cases cited the initial certification was dated weeks later, pardon me, weeks earlier than the complaint was initially filed, which suggested that a movant is sort of sitting on their hands and waiting to kind up spring out their new complaint at the last minute.  Again, that's not the case here.

As far as motivation, well there's nothing improper about Mr. Waits hoping that the theory of fraud in this case would include his investment losses alongside others.  And candidly, I think the posture taken by the competing movant

Angela O'Donnell - Official Court Reporter
(914)390-4025

here would seem to indicate that as they have expressed, at best, some reluctance to include this October 24th disclosure.

There's been no prejudice to other movants by doing this either. There is nothing about the October 24th disclosure that makes losses incurred in connection with the February disclosure any less actionable, any less recoverable. By contrast, in competing with this position would prejudice not only my client but other class members. At the outset of the case, they're taking the position that the October 24th disclosure categorically is not part and parcel of this fraud.

Now, if either one is appointed lead plaintiff, they're going to have every incentive to identify every actionable corrective disclosure to increase the class's compensable damages. If they filed an amended complaint with the October 24th disclosure, the defendants are absolutely going to remind the Court of the posture they've taken at this stage of the litigation. And indeed, the defendants have already seen fit to take the unusual step of filing a letter trying to adjudicate, again, at the outset, whether this is actionable.

Again, our client has taken no actions that are prejudicial to any other class member here. If there is any concern about notice to the class, I submit that the adequate remedy here would not be denial of my client's motion but to ask Mr. Waits to issue a new notice expressly putting the class

on notice, ask the additional corrective, and granting --

holding these motions in abeyance during some briefing to see

if, in fact, any other class members similarly situated to

Mr. Waits do come forward after seeing the amended notice.

THE COURT:  Okay, thank you very much.

MR. HOOD:  Thank you.

THE COURT:  So for other would-be, lead plaintiffs,

you want to respond to that last point?  Which one of you wants

to go first?

MR. ROSENFELD:  Sure.  The last two points that were

made, number one, about new notice, your Honor, that would not

remedy the problem that there's no factual allegations in the

complaint of fraud or for disclosure of fraud.  So even if

there were to be new notice, it would not take a way from the

fact that there's nothing in the Waits complaint talking about

a basis for a claim for fraud based on the October 23rd

decline.

Going back to the next point, which is that

defendants would jump up and down at the motion to dismiss

stage if we were to include our additional allegation.  Your

Honor, in the *ABIOMED* case, the court there said very clearly

that plaintiff could still allege a drop later on but it's

premature at this point because it's not supported by the

alleged facts.  As your Honor knows, you have to look at the

complaint on file today, and right now that complaint, the

Waits complaint, has no allegation, no factual allegation supporting a claim for fraud based on the October 23rd decline because nothing was disclosed other than the fact that they reported earnings investors were disappoint with.

THE COURT:  Okay, thank you.

MR. APTON:  Your Honor, I'll just add that it's not how the PSLRA notice provisions work.  Someone files an additional complaint doesn't start the clock over again, because we could do as counsel suggests and lo and behold, 45 days from now someone can file additional complaint with additional corrective disclosures.  Start the notice period over again?  No, that's not how the PSLRA works.

Thank you, your Honor.

THE COURT:  Okay.

MR. HOOD:  Certainly, your Honor, to address some of those points.

I'm not sure I understand the point that there's been allegation of fraud in connection with the October 24th disclosure.  The Waits complaint quite clearly alleges that when the defendants made this announcement, the company's stock price fell causing the shares that class members had previously purchase at artificially inflated prices fall down in value. The allegation subsequently are identical to the fraud allegation regarding the February 2024 disclosure, this certainly is alleged as a corrective disclosure of fraud.  I'm

not sure I see it any other way.

Mr. Rosenfeld is correct, *ABIOMED* did stand for the proposition that a plaintiff can allege other allegations later on, but the defendants likewise can aggressively litigate those points using the position that lead plaintiff took at an earlier stage of litigation.  Whether they succeed is ultimately not the point.  The point is whether or not the lead plaintiff will have to spend considerable time and resources distancing themselves from another position litigating an issue that's self-inflicted and unique to them at the expense of their ability to litigate the class's fraud claims.

And with respect to Mr. Apton's point about the PSLRA and not contemplating additional notice period with some frequency.  If it would be helpful, we could submit additional briefing with examples of this.  But as to the suggestion that this might somehow indefinitely sort of spiral off into never ending additional complaints, I think that the Court's order could quite clearly contemplate and preemptively address that.  In other words, this could be structured in such a way that would not be a concern.

THE COURT:  Okay.

MR. ROSENFELD:  Your Honor, if I could point out one more case.  Going back to the *FalconStor* case, it's *Bensley v. FalconStor*.  And, there, the court pointed out that there was no disclosure in the announcement as to why the company was not

making its projections or that it had engaged in fraud. Because of that the court said we're not going to consider that claim for loss causation and the movant who had alleged that corrective disclosure was not appointed as lead plaintiff.

THE COURT:  Okay.  Want to weigh in at this point?

MS. SOLOWAY:  Your Honor, I've been in cases with Mr. Rosenfeld before and I've never had him make my arguments for me before, so this is really a unique experience.  But we also cited the *Bensley* case.

I'm just teasing him.

Look, I think here it's pretty clear when you look at the complaint that was filed, and in particular paragraph 35 of the complaint, that the theory that's being articulated in the complaint here --

THE COURT:  The Waits complaint.

MS. SOLOWAY:  No, the Stary complaint.

THE COURT:  Stary complaint.

MS. SOLOWAY:  Yes.  Has to do with -- and, again, we don't think fraud is pleaded here for any corrective disclosure date but --

THE COURT:  I understand.

MS. SOLOWAY:  It seems pretty clear that although this complaint is fairly bare bones that the theory here has to do with the expansion of marketing spend, increased marketing spend, I'm looking at paragraph 35.  Paragraph C is about

whether increase spend would be marginally inefficient due to market sturation. And even D, which is about the alleged long runway for membership growth still relates back to -- largely due to BetterHelp marketing. The theory that I understand this case to be asserting is there was somehow alleged misstatements made having to do with advertising spend.

So I don't see a basis to conclude that the October corrective disclosure date in any way relates for the reasons articulated in our letter and the cases that we cited.

And, your Honor, as I mentioned earlier, if there were a way to resolve this while allowing defendants to raise arguments on a -- presumably there will be different complaint going forward where the fraud will be -- the alleged fraud will be more clearly laid out, we would like to just sort of reserve all arguments for that time.

THE COURT: Of course.

MS. SOLOWAY: This would be without prejudice, obviously, to arguments at that time.

THE COURT: Sure, that makes sense.

MS. SOLOWAY: Thank you, your Honor.

MR. ROSENFELD: Your Honor, just to clarify.

THE COURT: You're going to continue the kumbaya moment?

MR. ROSENFELD: Just to clarify. We were careful in our papers to craft the argument as defendants will argue.

It's not our position, it's the position that defendants will argue, and in fact they did argue it, so we weren't that far off.

THE COURT:  Right.

MR. ROSENFELD:  Thank you, your Honor.

THE COURT:  All right, anything else from anybody?

MR. HOOD:  Your Honor, I'll simply note that the defendants filed two letters here.  The first letter they filed on July 25th where they took no position and reserved all rights.  Only after Mr. Ali -- pardon me, Mr. Touat and Marit raised these arguments, and the defense expressly acknowledged this in their letter, did they begin making these additional arguments.  I think the fact that these points are being litigated so aggressively at the outset already is giving the defendants a perceived window to start chipping away at the class' claims.

That's all for me your Honor.  I rest.

THE COURT:  Okay.

All right, so I'm going to give you a partial ruling today, and just in terms of the overview and the background that's relevant to the pending motions.

So Stary and Waits have brought actions against Teladoc Health, Inc., and other defendants that allege violations of 10(b) of the '34 Act by making false or misleading statements about Teladoc's profitability and plans

to attain profitability.  There are two operative complaints at this point; there's 24CV3489, which is the Stary case, and then 24CV5339, which is the Waits case.

Stary filed a complaint on May 17th of this year and that same day Stary's counsel published a notice of action in the *GlobeNewswire*.  And on July 15th, Waits filed a substantially similar complaint.  And that led to a whole flurry of activity on the docket in the Stary case on July 16th.  So then what happens at that point is that Touat files a motion to consolidate the two cases and appoint Touat as the lead plaintiff, and to have Levi & Korsinsky approved as lead counsel.  That started a whole chess match.  Marit countermoved to be appointed lead plaintiff and to have Robbins Geller appointed as lead counsel.  Waits also moved for consolidation and appointed as lead plaintiff and to have Pomerantz as lead counsel.  And then there was another movant, but then that person withdrew because they conceded they didn't have the largest financial interest or today would have been even more fun.

And then on July 30th, everybody responded to everybody else.  There were replies filed in early August, and then there's another letter that came in August 8th.  So there we are in terms of the procedural history.

The Waits complaint alleges at paragraph 26 that it sort of describes Teladoc Health's business model, and among

Teladoc's offerings is this "BetterHelp," in quotes, which is the largest national online mental health counseling platform, with as of Q1 2014 415,000 paying users.  At a healthcare conference on November 30, 2022, the Waits complaint alleges at paragraphs 29 and 31 that Teladoc's CFO, Mala Murthy said that Teladoc planned "a sequential pullback in ad spending" because Teladoc "found the ROIs for the ad spend to be suboptimal."  At that same conference the Teladoc CEO described "doing more in larger media sort of mass media outlets.  And some of that's just in response to the fact that the price of advertising in those mass media channels have come down."  That's from paragraph 32.

On a February 22, 2023, earnings call, the Waits complaint describes how Murthy noted that while "hyper growth" in membership was unlikely, "the tail winds for this business are still very strong."

Then we get to October 24, 2023, a day that will live in infamy, Teladoc announced its Q3 2023 earnings of $660.24 million that had missed the consensus estimates by $2.82 million.  That's paragraph 37 of the Waits complaint. And in an investor presentation that same day, Teladoc noted that BetterHelp revenue had declined from $292 million to $286 million from the second and third quarter, and the number of paying users have also declined from 476,000 to 459,000. That's paragraph 38.

Soon thereafter, on October 24 and 25, Teladoc's stock price fell approximately 3.9 percent from the 24th to the 25th.

On February 20, 2024, Teladoc announced Q4 2023 earnings and held a call, noting that that revenue was a million less than Q4 of 2022, and was 10 million lower than Q3 2023 revenue. That's discussed at paragraphs 40 to 42. Teladoc also announced that the number of paying users had decreased from 476,000 in Q2 2023 to 425,000 to Q4 2023. The closing price fell approximately 23.6 percent from February 20 through February 21 of 2024.

And then on February 23, 2014, Teladoc filed a 10-K, which revealed that advertising and marketing spend had increased from $623.5 million in '22 to 688.9 million in '23. This is discussed in paragraph 49. And the 10-K noted that "this increase was substantially driven by higher digital and media advertising costs related to BetterHelp."

In terms of consolidation, in the PSLRA context, "if more than one action on behalf of a class asserting substantially the same claim or claims arising under [the Exchange Act] has been filed," the Court is the first to decide the motion for consolidation before discussing or evaluating the lead plaintiff. That's straight from 15 U.S.C. Section 78u-4(a)(3)(B)(ii). "Rule 42(a) of the Federal Rules of Civil Procedure empowers the trial judge to consolidate actions for

trial when there are common questions of law or fact to avoid unnecessary costs or delay."  That's from *Villare v. ABIOMED Inc.*, 2020 WL 3497285, at *3.

Now in determining whether consolidation is appropriate, the Court should consider "both equity and judicial economy" and ensure that "confusion or prejudice does not outweigh efficiency concerns."  That's also *Villare* at *3.

"Consolidation of multiple actions alleging securities fraud is appropriate where those actions relate to the same public statements and reports and where consolidation would not prejudice the defendants."  That's from *May v. Barclays PLC*, 2023 WL 5950689, at *5.  It's a Southern District decision.  Courts should "not make any binding determination regarding the proper class period as part of the lead plaintiff analysis."  That's from *Ragan v. AppHarvest, Inc.*, 2021 WL 5909116, at *7.

However, that the complaints at issue propose different class periods does not defeat consolidation because "actions need not be identical to allow consolidation."  *Turpel v. Canopy Growth Corp*, 704 F.Supp. 3d 456, 464.  That's another Southern District decision.  Courts have found consolidation warranted where the proposed class periods differ as much as three years.  That's discussed in *Schaeffer v. Depaolo* 2023 WL 5153481, at *3, also discussed in the *Turpel* case at page 464.

Finally, the fact that "all movants support consolidation reflects a consensus that the cases have a common core." That's *Turpel* at page 464.

So Touat and Waits move for consolidation of the Stary and Waits actions. Marit doesn't move, but it seems as though the briefing anticipates consolidation. And I've obviously heard from defense.

Consolidation is warranted here, in my view, because of the complaints in the two actions involve overlapping facts and common questions of law, which is the classic reason to consolidate as discussed in the *May* case at page 6. Both actions make claims under the Exchange Act in connection with same statements, they rely on the same statements by the defendants. Right at paragraph 1 of both complaints. In fact, apart from the alleged corrective disclosure discussed in *Waits*, both complaints are almost identical and with sort of nonsubstantive differences between the two. And both complaints allege that class members relied on similarly materially false or misleading statements. The Waits complaint is 36, 55-60; and Stary is 35, 53-58.

And the fact that the class periods differ by one day really is not a reason to deny consolidation and nobody is opposing it. So I'm going to grant the motion to consolidate the cases.

In terms of lead plaintiff appointment, the PSLRA, of

course, as you all know, establishes a framework to select lead plaintiff in class actions under federal securities laws.  So first, the plaintiff has to publish notice of the action within 20 days of the filing of the complaint.

Next, any member of the purported class who wishes to serve as lead plaintiff has to file a motion for appointment within 60 days of the notice.  And in choosing a lead plaintiff, the court is to -- and this is all from section 78:

"Shall adopt a presumption that the most adequate plaintiff in any private action arising under [the PSLRA] is the person or group of persons that has either filed a complaint or made a motion in response to a notice [of the action within 60 days of the notice's publication]; in the determination of the Court, has the largest financial interest in relief sought by the class and otherwise satisfies the requirements for Rule 23.

The presumption may be rebutted "only upon proof... that the presumptively most adequate plaintiff...will not fairly and adequately protect the interest of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  And that's from 78u-4(a)(3)(B)(iii)(II).

"If the Court finds that the movant with the largest financial interest in the class action is otherwise ineligible for appointment as lead plaintiff, the Court applies the

criteria of the PSLRA to the movant with the second highest financial interest."  That's from *May*, at *4.  And then that process continues until the Court can find a suitable lead plaintiff.

So May 17th of this year is when Levi & Korsinsky filed or published the requisite notice of action.  Touat, Waits, and Marit filed their motions on July 16th, within the statutory deadline of 60 days.  And there's some rumbling about how close to the end and so forth, but given that timing, I think all three have satisfied the first requirement.

In terms of financial interest, this is where it gets a little sporty.  "The PSLRA does not specify a method for calculating which plaintiff has the largest financial interest, and neither the Supreme Court or the Second Circuit has articulated such a method."  That's from *May*, at *7.  To determine which movant has the largest financial interest, courts in the Second Circuit "have traditionally applied a four-factor test first set forth in *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5.  It's a Northern District of Illinois case.

That four-factor test is discussed, in among other cases, *Crass v. Yella Group Limited*, and in fact there are certain of our courts follow it.  2021 WL 5181008, at *5.

The four factors are:  First, the total number of shares purchased during the class period; second, the net

shares purchased during the class period; third, the net funds expended during the class period; and, fourth, the approximate financial losses suffered.  That's from *Choi v. Coupang, Inc.*, 2023 WL 28585979, at *3.  Of the four factors, financial loss is considered the most significant factor.  Also from the *Choi* case.

"While there is no prescribed method for calculating financial loss, courts in the Southern District have a strong preference for the last-in, first-out methodology, LIFO. That's from *May*, at *7; another court, *Rodriguez v. DraftKings Inc.*, 2021 WL 5282006, at *4 said "the overwhelming trend in this district and nationwide has been to use LIFO."

Under LIFO, of course, stocks acquired most recently are assumed to have been the first sold, as discussed in the *Rodriguez* at *4, and the LIFO method excludes, however, and this is important, in-and-out trades which occur when one purchases and sells all of their holdings during the class period, i.e., after the stock price was fraudulently inflated and before it dropped due to corrective disclosure.  That's *Rodriguez*, at *4.

The exclusion of LIFO is compelled by the Supreme Court's holding in *Dura* that plaintiffs in securities fraud cases can only recover losses actually caused by the fraud. Also discussed in *Rodriguez*, at *5, noting that "consistent with *Dura*, courts consider only recoverable losses when

calculating financial loss for the purpose of selecting lead plaintiff."  The application of *Dura* leads to the exclusion of pre-corrective action losses only and not gains.  That's from *Skeels v. Piedmont Lithium*, 2022 WL 1236797, at *5.  *Rodriguez* discussed the same at *4.

Now in terms of Waits.  Waits doesn't really explicitly address the LIFO, his LIFO recoverable losses, or even the sort of *Dura* losses, but maintains, nonetheless, that his losses amount to $310,032.  This is at page 10.  And Waits' trading activity based on the exhibit that was filed in support of Waits' motion stretches from April 28, 2023, to February 13, 2024.  And there's no question that Waits bought and sold Teladoc shares regularly, opening and closing positions throughout the time period.  And Waits' position in Teladoc peaked at 90,000 shares on September 22nd, 2023, and then from October 23, through December 6 of all of 2023, Waits slowly sold off the shares until ultimately he had none remaining, and the last relevant active was the purchase and sale of 2,000 shares, both of which occurred on February 13 of 2024.

At the time of Teladoc's corrective disclosure on February 20, 2024, Waits held no Teladoc shares.  So in the normal course, this would disqualify Waits from being a plaintiff because he was a complete in-and-out trader who sold out all the shares before the February 20, 2024, disclosure.  This is discussed in another case, *Topping v. Deloitte Touche*

*Tohmatsu CPA, Limited*, 95 F.Supp. 3d 607, 617.

Of course Waits says, that's not the end of the story, and in fact argues that the Q3 earnings announcement constitutes the partial corrective such that he did not benefit from selling at inflated prices and so should be appointed a lead plaintiff.  This is also discussed on page 10.  And, you know, discussed also in the case *Foley v. Transocean, Limited*, 272 F.R.D. 126, 132, where the court there appointed as lead plaintiff a class member who sold all shares after the partial corrective.

All right.  So there's a bunch of arguments that are made against Waits' position here.  And this is August 6th of this year, the defense actually sent a letter regarding the Waits complaint and arguing that the Q3 corrective mentioned in the complaint was mentioned in the Waits' complaint and not in the Stary complaint "is not adequately alleged by Waits."

Waits responded, arguing that the Court should disregard the letter because the Court's assessment of whether the partial corrective was adequately alleged as premature, but also argued that the PSLRA's lead plaintiff appointment process does not contemplate any role for the defense.

So actually, that's not true.  In the Second Circuit "defendants both have standing to challenge the appointment of a lead plaintiff," and "to be heard during the appointment process."  That's from *City of Ann Arbor Employment Employees*

*Retirement System v. Citigroup Mortgage Loan Transfer Inc.*, 2009 WL 10709107, at *2; *Bosch v. Credit Suisse Group AG*, 2022 WL 4285377, at *6, where the Eastern District held that "no provision of the PSLRA prohibits a defendant from opposing" a motion for appointment of lead plaintiff.  Same ruling in a case called *Yates v. Open Joint Stock Co.*, 2005 WL 1018428, at *2, and there are others, but I think that sort of makes the point.

As the issue is properly raised, both from the defendants' standpoint and from Touat and Marit's standpoint, the question is what is the impact of the Q3 corrective.

"A corrective disclosure is an announcement or series of announcements that reveals to the market a falsity of a prior statement."  That's from *Jiang v. Chirico*, 2024 WL 967084, at *6, quoting the Second Circuit's decision in *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc.,* 879 F.3d 474, 480 n.3.  A partial disclosure "somehow reveals to the market that a defendants' prior statements were not entirely true."  That's also from the *Jiang* case, at *6.

Now the Q3 earnings announcement on October 24th reported that Teladoc's revenue for the quarter had missed the consensus estimates by $2.82 million, as I mentioned earlier, and that Q4 2023 revenue was projected between $658 and $683 million, below the consensus estimates of $686.56 million. This is in the Waits complaint at paragraphs 8 and 37.  And the

statement that went along with this corrective was that the company would "undertake a comprehensive operational review of the business to further improve our efficiency."  And this is also quoted in the Waits complaint at page 37.  At an investor presentation that day, Teladoc announced that the BetterHelp revenue declined from $292 to $286 million and its membership had declined, as I mentioned earlier, from 476,000 to 459,000. Soon after that, the price fell 3.9 percent by closing the next day, so by October 25th.

But the Q3 announcement doesn't contain any reference to advertising and marketing as it related to BetterHelp or even such topics that relate to Teladoc as a whole.  Now Waits argues that "the October 24 disclosure, which laid bare declining revenues and memberships in BetterHelp fits squarely within the core theory of the fraud alleged in both complaints."  This is in the Waits reply at page 5.  But I'm not really sure that's right.  In fact, I'm sure it's not. Because as both complaints, plainly read, focused on allegedly false and misleading statements made with respect to BetterHelp's advertising and marketing spend, so this is paragraph 24 through 35 of the Stary complaint and 28 to 36 of the Waits complaint.  To the extent the Q3 announcement does not "reveal the truth with respect to the specific misrepresentations alleged," in the Court's view, it does not constitute a corrective disclosure.  That's from *Jiang*, at *8.

And so, in the Court's view, because the Q3 earnings statement was not a partial corrective, that, in my view, makes Waits a complete in-and-out trader who sold out the entirety of his Teladoc position prior to the end of the proposed class period on February 20, 2024. So in my view, Waits cannot be appointed lead plaintiff because he didn't suffer any recoverable losses.

All right. So that leaves us with Touat versus Marit. So I'm going to go with the one-day-longer class period in the Stary class period, so it's November 2, 2022, to February 20, 2024.

Touat says that the LIFO recoverable losses of $67,130.96, which Marit doesn't dispute, and this is at page 1 of Marit's reply.

Now Marit traded Teladoc stock at three different accounts. In account 2, the recoverable losses are calculated to be $46,168.80, and in account 3, it's $3,684.45. Apart from some slight variations, Touat doesn't dispute these calculations.

But there is a dispute over account 1, Marit's account 1, which contains more trading volume than the other accounts. So what Touat says is that Marit's losses in account 1 amount to a $6,487.27, while Marit counters and says that the losses amount to $54,504.05.

And this is where I have to say it gets even more sporty, because Marit sort of in a very conclusory fashion says

that Touat "uses an arbitrary and self-serving matching sequence to artificially decrease Marit's losses."  This is in the reply brief at page 4.  Touat basically relies on the spreadsheet calculation and says "that applying *Dura* and disregarding any losses attributable to in-and-out trades result in Marit's recoverable loss in the action totaling approximately $56,000.

Now in trying to parse through the exhibits, for example, it seems like it's possible that Touat has sliced Marit's trades in a way to sort of recalculate the loss.  So Marit, for example, has trading on January 5, 2022, when he makes two purchases of Teladoc shares, 44 and .66 at $22.39.  And this is at the Rosenfeld Declaration, Exhibit A, page 12, Apton declaration, Exhibit B, page 5.

Marit matches these trades with sales of the same amount of shares on January 27.  This is at page 12 of the Rosenfeld Declaration, and page 5 of Exhibit A of the declaration.  And then page 5 of Exhibit B of the Apton Declaration.  But it doesn't look to me like Marit had any sales of 44 and .66 shares on January 12; looking at pages 11 and 12 of Exhibit A of the Rosenfeld Declaration.

There's another series of transactions on November 4 of 2022, where Marit buys 35.99 shares at $27.32 and .62 shares at $27.31.  This is page 15.  Marit's briefing explained that he sold out of this position on November 10, so six days later

at $35.05.  Touat says that Marit sold out of this position at $30.13.  They both agree that Marit sold out of 3,000 shares on November 10th, at $30.13, but there's a difference in how the sale of those 3,000 shares is subdivided in individual trades and which purchases those sales are matched to.

So, like I said, based on the sort of sparse arguments that are made in my sort of culling through the exhibits, much to your chagrin, I'm going to ask for a little bit more briefing.

So we'll continue this boxing match into extra time. We'll talk about that at the end, okay?

You're raising your hand.

MR. APTON:  I was going to -- well, I was going to make a suggestion, your Honor.

THE COURT:  Go for it.

MR. APTON:  With the supplemental briefing.

THE COURT:  Yes.

MR. APTON:  In fact, I can make it later, too, your Honor.

THE COURT:  You're standing, go ahead.

MR. APTON:  Okay, I appreciate it.  So it's complicated.

THE COURT:  Yeah.

MR. APTON:  Sporty, as your Honor says.  And I thought, as I was sitting here listening to you, I have an

idea.  It has the advantage of being practical, also supported by the law.

THE COURT:  Okay.

MR. APTON:  The PSLRA allows for discovery in context like these, and I think what could resolve the matter definitively is if we receive trade confirmations from Mr. Marit.  They have timestamps.  That way the trades can be organized chronologically and matching can be done with finality, no two ways about it.  That would be my suggestion, your Honor, just trade confirmations.

MR. ROSENFELD:  Your Honor, I think the issue we have is the way Mr. Apton has offset certain sales against certain trades, certain purchases, so I'm not sure that would be necessary or even beneficial in any way.  It wouldn't resolve our concern.

THE COURT:  So why don't we do this, why don't' we, at the end, why don't we talk about a schedule for the supplemental briefing.  You can make that argument and explain in particular why you think you need discovery.  You can make your argument why you think discovery is unnecessary.

MR. ROSENFELD:  Sounds good, your Honor.

THE COURT:  And if I obviously agree we should have discovery, we'll set a schedule --

MR. ROSENFELD:  Thank you.

THE COURT:  Fair enough?

MR. APTON:  Thank you, your Honor.

THE COURT:  At this point I take it your agnostic.

MS. SOLOWAY:  I am, your Honor.

THE COURT:  Just want to make sure.  Just want to make sure you're still awake.

All right, in terms of Rule 23 I don't think, in my view, however I come out on the Touat versus Marit battle, I think that the evaluation of the factors is the same because I don't think either one of them has an in-and-out problem. Obviously, the four factors are numerosity, commonality, typicality, and adequacy.  At the PSLRA lead plaintiff stage only the last two factors are really pertinent, said the *Rodriguez* case at page 6.

Typicality is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove defendants' liability.

Both Touat and Marit contend that they are typical. Touat argues that Marit is atypical because he engaged in in-and-out trading, which exposes him to unique defenses. Touat also asserts that Marit's appointment as lead plaintiff would present a risk that "class certification will be denied or even that there will be an expensive and lengthy distraction litigating their statuses as in-and-out traders."  That's page 5 of the reply brief.

And I do think that the discussion of the unique defenses is more appropriately addressed in the rebuttal phase, and that's what the Court discussed in *Batter v. Hecla Mining*, 2020 WL 1444934, at *4. In my view, I think both Touat and Marit make the preliminary showing of typicality by explaining that they purchased the Teladoc shares within the class period, relied on the alleged misrepresentations, and suffered damages as a result. Again, the quantity of damages we're going to haggle over a little bit later on. So I think that both movants are typical.

In terms of adequacy, adequacy is satisfied where the class counsel is qualified, experienced, and generally able to conduct the limitation, there's no conflict between the proposed lead plaintiff and the members of the class, and the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy. This is discussed *Bricklayers*, 2022, WL 1515451, at *3.

Both Touat and Marit assert that they are adequate.

Taking the sort of adequacy factors backwards, the courts simply inquire as to whether the movants have losses and determine those losses ensure that the movants have sufficient interest in the outcome. And that I think we have here. Again, we'll calculate who has a greater financial interest from the losses, but certainly they both have an interest to vigorously pursue the lawsuit. Neither one appears to have

conflict.  There's nothing in the record that suggests that. And in terms of counsel, you're all awesome, so I'm not worried about that.

In terms of rebuttal, to rebut the presumption in favor of the movant with the greatest financial loss there must be proof of a nonspeculative risk, that the movant is subject to unique defenses that render them incapable of adequately representing the class.  That's *Rodriguez*, at *9.  And so a court, at this stage, doesn't have to find that a unique defense is likely or will succeed, but rather it only must find "at least a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses."  That's from *Batter*, at *7.

Touat says that both Waits and Marit were in-and-out traders such that it's unclear.  Marit counters that he's not because he held Teladoc shares after the corrective disclosure. And I think Touat correctly cites cases where courts had rejected a movant because they were in-and-out trader, those cases concern "total in-and-out traders" or traders who bought and sold all of their shares prior to the corrective disclosure.  So page 4 of the Touat reply brief there's citation to the *Bensley* case, *Bensley v. FalconStor Software*, 277 F.R.D. 231, 241, and *In re Veeco Instruments*, 233 F.R.D. 330-334.

But, as I said, based on the charts and the

arguments, I don't see Marit as a total in-and-out trader, and I think it's pretty clear that Marit held Teladoc stock through the corrective disclosure and then sold that stock at a loss. At this stage, I don't see that Touat has rebutted the presumption as to Marit.  I've already explained my ruling with respect to Waits.

So I'm going to grant the motion to consolidate.  And in terms of the lead plaintiff sweepstakes, my ruling disqualifies Waits at this point.  We'll discuss Marit and Touat, and then the question is when do you all want to do your supplemental briefing?

MR. APTON:  Well, your Honor, I think the question perhaps we should address is whether we should do this small little discovery and I can explain why.

The ordering of the trades, so Mr. Marit has many trades, buys, and sales in a given day, and how you match those up depends on when those trades were actually made and processed and settled and so we had confirmations that show the timestamps.  Both our firms could respectively organize the trades properly and get a number and there will be no two ways about it; cut and dry.  And so with just those trade confirmations we can resolve the issue of who has a greater financial interest in the case.

MR. ROSENFELD:  Your Honor, I disagree, I'm happy to are articulate that in our brief.

THE COURT:  Yes, I thought you were going to brief it.

MR. APTON:  Oh.

MR. ROSENFELD:  If we could have I guess till -- I don't know the date.  The 14th?

THE COURT:  Today is the 14th.

MR. ROSENFELD:  Two weeks from Thanksgiving.

THE COURT:  We don't want to ruin Thanksgiving.

MR. ROSENFELD:  I'd say three weeks, three or four weeks, whichever is better.

MR. APTON:  So your Honor would like the request for discovery in the supplemental briefing?

THE COURT:  Right.

MR. APTON:  Okay, that's fine.

THE COURT:  The question is when do you want -- I'm not interested in ruining anybody's holidays.  Two weeks is Thanksgiving.  So you tell me what you want to do.  You want to do three weeks, you want to do four weeks?

MR. ROSENFELD:  Three or four weeks.

MR. APTON:  May I just check my calendar?

THE COURT:  Of course.

MR. APTON:  The 28th is Thanksgiving?

THE COURT:  28th, so it would be the 5th or the 12th.

MR. APTON:  December 12.

THE COURT:  Okay, and then you want to just have a

week to respond to each other and that way we avoid getting into late December.

So the 12th will be the opening salvo, the 19th will be the responses. I'll probably just do an order. If I agree that we should have discovery, I'll say we should take discovery and let you all figure out the timing of that discovery. If I don't think we need of discovery, we'll figure out where we go from there. Okay.

MR. ROSENFELD: Thank you very much, your Honor.

MR. APTON: Thank you.

THE COURT: All right, anything else, then, from your perspective?

MR. ROSENFELD: No. We appreciate your time.

THE COURT: From defense's perspective?

MS. SOLOWAY: No, thank you, your Honor.

THE COURT: All right, we are adjourned.

Thank you everybody.

o0o