**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PAUL STARY, Individually and on Behalf
of All Others Similarly Situated,

                        Plaintiff,

vs.

TELADOC HEALTH, INC., JASON
NATHANIALL GOREVIC, and MALA
MURTHY,

                        Defendants.

---

Case No. 7:24-cv-3849

 

# MEMORANDUM OF LAW IN SUPPORT
# OF DEFENDANTS' MOTION TO DISMISS THE
# <u>AMENDED CLASS ACTION COMPLAINT</u>

 

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000

*Attorneys for Defendants Teladoc Health,*
*Inc., Jason Gorevic, Mala Murthy*

Dated: June 20, 2025

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

    A.    Teladoc's Financial Reporting in 2023 .................................................. 4

    B.    Pre-Class Period Warnings About CAC .................................................. 5

    C.    April 2023: CAC "Deterioration" in Forecast ........................................ 7

    D.    July 2023: Teladoc Warns of Revenue "Deceleration" ........................... 7

    E.    October 2023: Teladoc Discloses CAC Deterioration That is "Likely to Persist" Through Year-End ................................................................... 8

    F.    February 2024: Teladoc and BetterHelp Meet Lower End of Guidance Reflecting CAC Deterioration .................................................................. 9

ARGUMENT ................................................................................................................ 9

I.    The Complaint Fails to Allege Any Materially False or Misleading Statements ............. 10

    A.    The Three July 2023 Statements Were Not Misleading ..................................... 10

    B.    The October 2023 Statements Were Not Misleading .......................................... 15

    C.    The November 2023 and January 2024 Statements Were Not Misleading ......... 17

II.    The Complaint Fails to Allege a Strong Inference of Scienter ....................................... 19

    A.    Plaintiff Identifies No Motive to Defraud, and the Non-Fraudulent Inferences Exceed Any Fraudulent Inferences ...................................................... 19

    B.    The Complaint Fails to Allege Conscious Misbehavior or Recklessness............. 21

III.    The Complaint Fails to Allege Loss Causation .............................................................. 26

IV.    The Complaint Fails to State a Control Person Claim..................................................... 28

CONCLUSION.............................................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Building Trades Pension Fund of Western Pennsylvania* v. *Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ......................................................12, 13

*C.D.T.S.* v. *UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .............................................................19

*City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021)..........................................................................20

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen.
Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...............................................................21

*City of Omaha Police & Firefighters Ret. Sys.* v. *Cognyte Software Ltd.*,
2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024).............................................................28

*Cox* v. *Blackberry Ltd.*,
660 F. App'x 23 (2d Cir. 2016) ....................................................................................24

*In re Diebold Nixdorf Inc. Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ..........................................................3, 26

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..........................................................................................10

*In re Ferroglobe PLC Sec. Litig.*,
2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020).............................................................12

*In re Focus Media Holding Ltd. Litig.*,
701 F. Supp. 2d 534 (S.D.N.Y. 2010)..........................................................................13

*In re Francesca's Holdings Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ............................................................27

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y 2013) ..........................................................................27

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................20

*Gru* v. *Waxsome Therapeutics, Inc.*,
2023 WL 6214581 (S.D.N.Y. Sept. 25, 2023).............................................................27

*In re Iconix Brand Grp., Inc.*,
2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017)..................................................................22

*In Duane Reade Inc. Sec. Litig.*,
2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)..............................................................24

*Johnson* v. *Siemens AG*,
2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011)................................................................21

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)..............................................................................19, 21

*Kleinman* v. *Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)..............................................................................9

*Lachman* v. *Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020) ..............................................................23

*Lasker* v. *N.Y. State Elec. & Gas Corp.*,
85 F.3d 55 (2d Cir. 1996) ..............................................................................19

*Lentell* v. *Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)............................................................................26

*In re Lululemon Sec. Litig.*,
14 F. Supp.3d 553 (S.D.N.Y. 2014)..................................................................10

*Martin* v. *Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ........................................................................16

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth*
*Cnty. Ret. Ass'n* v. *MDC Partners, Inc.*,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)..................................................25

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
423 F. Supp. 2d (S.D.N.Y. 2006)..................................................11, 12, 21, 24

*Okla. Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)..............................................................16

*Ong* v. *Chipotle Mex. Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)..............................................................14

*Paulsen* v. *Stifel, Nicolaus & Co.*,
2019 WL 2415213 (S.D.N.Y. June 4, 2019) ....................................................3

*Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Canadian Imperial Bank of Com.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................22

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017)..............................................................15, 26

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y.)............................................................................21

*Rein* v. *Dutch Bros, Inc.*,
    2024 WL 3105004 (S.D.N.Y. June 24, 2024) .......................................................12

*In re Renewable Energy Grp. Secs. Litig.*,
    2022 WL 14206678 (2d. Cir. Oct. 25, 2022).........................................................22

*Ret. Sys.* v. *YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)................................................................15, 28

*In re Riskified Ltd. Sec. Litig.*,
    2023 WL 3791653 (S.D.N.Y. June 2, 2023) .........................................................11

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. 2018).....................................................................19

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)......................................................................................3

*Rotunno* v. *Wood*,
    2022 WL 14997930 (2d Cir. Oct. 27, 2022)..........................................................24

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Co., Inc.*,
    75 F.3d 801 (2d Cir. 1996).....................................................................................15

*Schiro* v. *Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)...................................................................25

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020)...................................................................20

*Stadium Capital LLC* v. *Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)...........................................................24

*Steamfitters Loc. 449 Pension Plan* v. *Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019)...................................................................18

*Stratte-McClure* v. *Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)........................................................................................20

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008)...........................................................................19, 21, 23

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...................................................................................................19

*Tyler* v. *Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011).......................................................................26

*In re Veon Ltd. Sec. Litig.*,
  2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018)...........................................................28

*Woolgar* v. *Kingstone Cos., Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)........................................................................10

**Statutes**

Private Securities Litigation Reform Act of 1995 .................................................. *passim*

**Other Authorities**

Rule 9(b) ...............................................................................................................9, 10, 19

Rule 10b-5..................................................................................................................9, 10

Rule 10b5-1....................................................................................................................20

**PRELIMINARY STATEMENT**

Plaintiffs are shareholders in Teladoc Health, Inc. ("Teladoc" or the "Company"), a virtual healthcare company, which operates BetterHelp, a direct-to-consumer mental health platform. Plaintiffs identify stock drops following Teladoc's 3Q23 and 4Q23 quarterly announcements, in which Defendants disclosed an increase in BetterHelp's customer acquisition costs ("CAC"). They assert securities fraud claims, insisting that Defendants made misstatements about CAC during the quarters-in-progress, only to "correct" those misstatements on the quarterly earnings calls. Not only is such a fraud illogical, but no such fraud is factually alleged: Plaintiffs fail to explain what information was known to Defendants that contradicts any challenged statement *at the time it was made*. Nor do Plaintiffs plead facts describing *what* the purportedly contrary internal CAC data showed, *who* learned this information, *when* they learned it, *how* they learned it, or *why* they concealed it. Moreover, Plaintiffs ignore Defendants' repeated warnings—which are fundamentally inconsistent with intent to defraud—that Teladoc expected deceleration of revenue and deterioration in CAC during the second half of 2023. The Complaint fails to plead falsity, scienter, and loss causation, and should be dismissed.

***First***, the Complaint fails to identify any misleading statements. Plaintiffs' fraud theory hinges on misrepresentations about CAC, but Teladoc did not report BetterHelp's CAC—and the Complaint does not identify any other financial information that was misstated. Instead, Plaintiffs attempt to reverse-engineer a fraud by locating ten statements that merely mention "CAC" or "advertising," claiming they were rendered misleading for failing to disclose CAC deterioration in 3Q23 and 4Q23. But Plaintiffs plead no facts showing that internal information was inconsistent with public statements, *i.e.*, that CAC deterioration exceeded the disclosed information. Moreover, as this Court has recognized, "[d]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." Under that

1

doctrine, Defendants' statement, for example, that CAC was "stable…through the first half of the year"—a pre-Class Period fact that is not in dispute—does not become false even if third quarter CAC worsens.  The Complaint also ignores Defendants' repeated warnings, both before and during the Class Period, about CAC deterioration—including that the lower end of BetterHelp's 2023 revenue guidance, which BetterHelp *met,* assumed CAC deterioration.  Defendants thus warned investors of precisely the CAC deterioration that Plaintiffs now claim was concealed.

*Second*, the Complaint fails to plead facts raising a strong inference of fraudulent intent.  While it relies on a theory that the CEO and CFO had access to internal information inconsistent with public statements, the Complaint does not identify that internal information.  It does not reference any internal meetings, calls, or reports discussing CAC, much less any facts showing any Individual Defendant's state of mind.  Instead, Plaintiffs rely on a theory that Defendants *must have known* of CAC increases because employees had "access to" and "monitored" the metric— without saying what the metric actually showed at the time.  The Second Circuit and this Court have rejected similar "access" theories where, as here, Plaintiffs fail to *specifically identify* what contrary information was learned, when it was learned, and whether it was shared with senior management.  On the pleaded facts, the non-fraudulent inferences are far more compelling: there are no allegations that either Individual Defendant profited from suspicious Company stock sales during the Class Period—and Murthy in fact *increased her holdings*; the Company warned investors about CAC deterioration; and Teladoc promptly disclosed CAC increases during 3Q23 and 4Q23 reports.

*Third*, the Complaint fails to plead loss causation.  Plaintiffs point to stock drops following Teladoc's 3Q23 and 4Q23 earnings reports, but while both may have revealed disappointing financial results, neither *corrected* information from the prior quarter.  Rather, both results

2

reflected materialization of the precise risk that Defendants had warned about—that CAC deterioration would likely persist such that BetterHelp would meet the lower end of its 2023 guidance, which is exactly what happened.

**STATEMENT OF FACTS[1]**

Teladoc is a telemedicine and virtual healthcare company. (¶ 19.)[2] Between July 26, 2023 and February 20, 2024 (the "Class Period"), Jason Gorevic was Teladoc's CEO and Mala Murthy was Teladoc's CFO (together, the "Individual Defendants"). (¶¶ 20-21.) Teladoc operated multiple businesses, organized in two reporting segments. The Integrated Care segment, which accounted for 56.4% of revenue and 58.5% of EBITDA in 2023, includes a suite of global virtual medical services including general medical, expert medical services, specialty medical, chronic condition management, mental health, and enabling technologies and enterprise telehealth solutions for hospitals and health systems, primarily on a business-to-business basis. Ex. 8 at 4, 66. The BetterHelp segment, which accounted for the balance of revenue and EBITDA, primarily consists of the direct-to-consumer BetterHelp platform, which in 2023 provided access to over 40,000 licensed mental health clinicians. *Id.* at 4, 66.

BetterHelp primarily generates revenue from users who pay a subscription fee. (¶ 31.) To attract users, BetterHelp advertises in various marketing channels, including social media. (Ex. 4 at 10-11; ¶ 58.) One way the Company measures the effectiveness of its advertising, or its "ad

---

[1]  These facts are accepted as true solely for this motion. To the extent that the Complaint quotes, cites, or references a document, it is considered part of the Complaint. *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *In re Diebold Nixdorf Inc. Sec. Litig.*, 2021 WL 1226627, at *10 n.14 (S.D.N.Y. Mar. 30, 2021). Similarly, a court can take judicial notice of SEC filings. *See Paulsen* v. *Stifel, Nicolaus & Co.*, 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019).

[2]  References to "Ex." are to exhibits to the attached Declaration of Audra Soloway. References to "¶" refer to paragraphs in the Complaint. "Pls.' Ltr." refers to Plaintiffs' letter dated April 2, 2025 (ECF No. 64). Unless otherwise indicated, all internal citations have been omitted from quotations and all emphases added.

spend yield," is by CAC, a non-GAAP financial metric that measures the amount the Company spends on average to acquire a new customer.  (¶¶ 60-61.)

### A. Teladoc's Financial Reporting in 2023

Teladoc did not publicly report BetterHelp's ad spend yield or CAC in 2023.  Indeed, the Complaint does not identify *any* quantitative financial information that was misreported or restated, whether CAC or ad spend yield (which were not reported) or earnings, revenue or amounts spent on advertising ("ad spend") (which were reported quarterly and annually).

Teladoc also did not provide forward-looking projections for CAC or ad spend yield in 2023.  Rather, Teladoc provided revenue and earnings guidance for the entire Teladoc business, which took into account internal projections for CAC and ad spend yield.  Teladoc met its projections for every quarter and the full year:[3]

|  | 1Q23 | 2Q23 | 3Q23 | 4Q23 | FY23[4] |
|---|---|---|---|---|---|
| Revenue guidance | $610-$625 million | $635-$660 million | $650-$675 million | $658-$683 million | $2.600-$2.625 billion |
| Revenue result | $629.2 million | $652.4 million | $660.2 million | $660.5 million | $2.602 billion |
| Adjusted EBITDA guidance | $42-$50 million | $60-$68 million | $72-$82 million | $107-$117 million | $320-$330 million |
| Adjusted EBITDA result | $52.8 million | $72.2 million | $88.7 million | $114.4 million | $328.1 million |

---

[3]  Guidance and results reported in Exs. 5 at 22; 6 at 22; 7 at 22-23; 8 at F-37; 9 at 3; 10 at 2; 11 at 3; 12 at 3; 13 at 1.

[4]  Teladoc's original FY23 revenue guidance was $2.550-$2.675 billion, and its FY23 adjusted EBITDA guidance was $275-$325 million. Ex. 9 at 3. This guidance was updated throughout the year, although Teladoc still met or beat both original ranges.

4

Teladoc also provided guidance for BetterHelp specifically, namely, projected year-over-year revenue growth, for each quarter and full-year 2023, which the Company also met or exceeded with the exception of the fourth quarter:[5]

|  | 1Q23 | 2Q23 | 3Q23 | 4Q23 | FY23 |
|---|---|---|---|---|---|
| Revenue growth guidance | "mid- to high-teens" | "mid- to high-teens" | "6% to 10%" | "low to mid-single-digit" | "low double-digit to mid-teen" |
| Revenue growth | 21% | 18% | 8% | 0% | 11% |

Plaintiffs do not identify financial misstatements, but instead cherry-pick snippets from qualitative statements about CAC and ad spend, and argue that the statements were misleading because CAC deteriorated in the second half of 2023. But the Complaint mischaracterizes what Defendants actually said, and ignores Defendants' repeated warnings about potential CAC deterioration, and their prompt disclosures of CAC deterioration contemporaneous with the challenged statements.

### B.    Pre-Class Period Warnings About CAC

Teladoc routinely warned shareholders about the risks of CAC fluctuations. On March 1, 2023, the Company issued its 2022 annual report, and cautioned that "quarterly results of operations, including our revenue, gross profit, net loss, and cash flows, *have varied and may vary significantly in the future*" due to "variations in…the cost of BetterHelp customer acquisitions." (Ex. 4 at 31.) Teladoc further warned investors that "[o]ur BetterHelp marketing efforts may not be successful or may become more expensive either of which could increase our costs and adversely affect our business" and that "[a]ny decrease in the amount or effectiveness of our

---

[5]    Guidance and results reported in Exs. 5 at 30; 6 at 32; 7 at 33; 8 at 66; 13 at 8; 20 at 7; 21 at 7; 22 at 7; 23 at 7.

BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business." (*Id.* at 35.)

Teladoc also provided additional warnings about the seasonality of ad spending. BetterHelp traditionally reduces ad spending in Q4, when advertising is most expensive, resulting in higher margins and EBITDA in Q4. (¶ 75.) But, due to the lagging effect of lower customer acquisitions in Q4, BetterHelp expects lower revenues in Q1. (¶¶ 74-75, 78.) BetterHelp then increases its ad spend in Q1, resulting in lower EBITDA "as advertising spend is ramped up and the customer acquisition funnel rebuild[s]." (¶ 78.) Historically, this caused "the first quarter to be the low point of the year for BetterHelp margins," which then "progress[ed] over the course of" the year. (*Id.*)

In 2022, however, Teladoc disclosed an unexpected deviation from the typical seasonal pattern. In 1Q22, BetterHelp experienced a sudden increase in competitor advertising driven by "a rash of venture capital money," which caused "increases in [CAC] and a corresponding decline in revenue yield on our advertising dollar." (¶ 88.) CAC remained elevated in 2Q22, (¶ 91), but stabilized by 3Q22, (Ex. 18 at 5). To mitigate this CAC variance, BetterHelp pulled back on ad spend in 1Q22 and then steeply increased spending as conditions improved in Q2 and Q3. (*Infra* at 14; Ex. 17 at 9-10.) It then reduced ad spending again in Q4 in accordance with its typical seasonal pattern. (¶ 93.) During the 4Q22 Earning Call, Murthy said that BetterHelp expected to return to its typical seasonal spending approach for 2023. (Ex. 20 at 7-8.) Murthy also warned that BetterHelp was unlikely to experience the same "hyper growth" in 2023 as had occurred over the past several years. (*Id.* at 9.) Murthy provided FY23 BetterHelp guidance of "low double-digit to mid-teen" revenue growth." (*Id.* at 7.)

6

**C.      April 2023: CAC "Deterioration" in Forecast**

The Company released its 1Q23 results on April 26, 2023, reporting "stable" CAC and growth in the BetterHelp segment.  (Ex. 21 at 4; ¶¶ 124-25.)  Murthy cautioned, however, that it "wouldn't be prudent for us to assume that we can continue to perform at this level throughout the rest of the year."  (Ex. 21 at 10.)  Critically, Murthy also disclosed that "[t]he bottom end of the guidance" for BetterHelp's revenue growth in 2023 "assumes unfavorability or a deterioration in [ad spend] yield."  (*Id.*)  Indeed, when asked whether the BetterHelp guidance "assume[s] that [CAC] remain unchanged for the rest of the year," Murthy reiterated that BetterHelp's "revenue growth [guidance] for the full year…assumes at the low end that we will see some deterioration in [ad spend] yields."  (*Id.* at 14.)

**D.      July 2023: Teladoc Warns of Revenue "Deceleration"**

Teladoc released its 2Q23 results on July 25, 2023—the day before the Class Period begins—once again reporting strong growth in BetterHelp.  (Ex. 22 at 4-6; Ex. 11 at 1, 6.)  Notwithstanding the positive results, Murthy warned that even the *top end* of the BetterHelp revenue guidance implied a "*deceleration* in the second half [of 2023] versus the first half."  (Ex. 22 at 10.)  This was because BetterHelp expected ad spending to be balanced across Q1 to Q3 in 2023, as opposed to the steep ramp from Q1 to Q3 in 2022.  (*Id.*)

In discussing 2Q23 results, Defendants also reported "stable customer acquisition costs through the first half of the year," and that the "cadence of ad spending is more balanced across the first 3 quarters of the year" compared to 2022.  (¶¶ 179, 181.)  While Plaintiffs challenge these statements, the Complaint does not plead that CAC was not stable in the first half of 2023, or that spending was not more balanced in the first three quarters of 2023 than 2022, given the above-described anomalous spending pattern in 2022.

7

**E.      October 2023: Teladoc Discloses CAC Deterioration That is "Likely to Persist" Through Year-End**

On October 24, 2023, Teladoc announced its 3Q23 results, which included 8% revenue growth in the BetterHelp segment.  *Supra* at 5.  Murthy reminded investors that BetterHelp's FY2023 guidance "assumed a modest deterioration in the cost of customer acquisitions at the low end of the [guidance] range," and that BetterHelp was trending toward the "lower half of the range," meaning that CAC had deteriorated within the projected range.  (Ex. 23 at 7; ¶ 136)  Murthy cautioned that worsening CAC and BetterHelp revenue "trends [were] likely to persist in this range through year-end," (*id.*), causing Teladoc to revise the top end of company-wide revenue guidance downward from 2.675 billion to 2.625 billion.  (*Compare* Ex. 12 at 3 *and* Ex. 11 at 3.)  Murthy also reminded investors that the "change in ad spend cadence [from 2022 to 2023] results in quarterly year-over-year comparisons that favor the first half of 2023 to the detriment of the second half of the year."  (Ex. 23 at 7.)

Plaintiffs allege that this news was a "partial corrective disclosure" of the challenged July statements, citing a 3.9% stock decline.  (¶ 142.)

Notwithstanding the alleged corrective disclosure, Plaintiffs challenge other statements from the same investor call and in the following months, including Gorevic's descriptions of 3Q CAC as "near the midpoint of our outlook range" and "a little worse than expectations for the year," and Murthy's statement that BetterHelp margin improvement reflected the "more stable advertising environment compared to FY22."  (¶¶ 185-86, 187-88, 195-96.)  The Complaint, again, contains no factual allegations suggesting that CAC was not near the "midpoint" and "a little worse than expectations," or that the ad environment was not "more stable" than the aberrant pattern of 2022.

**F.    February 2024: Teladoc and BetterHelp Meet Lower End of Guidance Reflecting CAC Deterioration**

The Company announced its 4Q23 and FY23 results on February 20, 2024.  Gorevic explained that BetterHelp's full-year revenue growth of 11% was "in the lower part of our guidance range" of "double-digit to mid-teens," reflecting "some deterioration" in CAC, just as discussed in "our third quarter earnings call."  (Ex. 26 at 10.)  Gorevic also reported that BetterHelp's "revenue and margins were below our expectations in the [fourth] quarter as we saw lower yields on marketing spend," which he attributed to "returns on our social media advertising spend that were below target in the second half of the year." (*Id.* at 5; ¶ 155.)  Teladoc's company-wide revenue landed within the lower part of guidance.  *Supra* at 4.  Plaintiffs allege that these "corrective disclosures" revealed the falsity of Defendants' earlier challenged statements.  (¶ 165.)

On February 20, the Company also provided 2024 guidance for the first time.  It projected "flat to low single digit growth in [the] BetterHelp segment" based on anticipated continued lower ad spend yield.  (Ex. 26 at 7.)  Teladoc also announced a technical issue in the Integrated Care segment that "drove a $20M revenue headwind."  (Ex. 30 at 1.)  Teladoc's stock price declined 23.7% the following day.  (¶ 216.)

More than six weeks later, Teladoc announced that Gorevic was departing the Company.  (Ex. 14 at 2; ¶ 173.)  Analysts attributed Gorevic's departure to "lackluster long-term growth target guidance" for BetterHelp.  (¶ 175.)

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege, *inter alia,* (1) a materially false or misleading statement, (2) a strong inference of scienter, and (3) loss causation. *Kleinman* v. *Elan Corp., plc*., 706 F.3d 145, 152 (2d Cir. 2013).  The Complaint must satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of

1995 (the "PSLRA"), which require "that securities fraud complaints specify each misleading statement; …the facts on which a belief that a statement is misleading was formed; and…state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Woolgar* v. *Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 217 (S.D.N.Y. 2020).

## I. The Complaint Fails to Allege Any Materially False or Misleading Statements

Under Section 10(b) and Rule 10b-5, a speaker is liable for making an "untrue statement of material fact" or "omit[ting]…a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5. Rule 9(b) and the PSLRA require plaintiffs to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 196-197 (2d Cir. 2009). Plaintiffs also must plead that an alleged misstatement is material, *i.e.*, that a reasonable shareholder would consider it important. *Id.*

Further, Plaintiffs must plead that every "alleged material misstatement was false *at the time it was made*…[because] without *contemporaneous* falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp.3d 553, 571 (S.D.N.Y. 2014) (original emphases). The Complaint, therefore, must offer well-pleaded facts describing *what* contemporaneous inconsistent information Defendants had, *who* had it, *when* and *where* they learned it, or *how* the information contradicted any challenged statement. *See Woolgar*, 477 F. Supp. 3d at 220.

Applying these rigorous pleading requirements, none of the ten challenged statements are alleged to be false or misleading.

### A. The Three July 2023 Statements Were Not Misleading

**Statement #1: "Stable" CAC for 1H23**. Plaintiffs challenge Gorevic's statement on the 2Q23 Earnings Call, on July 25, 2023, that BetterHelp had "seen stable customer acquisition costs

10

through the first half of the year." (¶ 179)  Plaintiffs contend that this statement—which expressly concerned the "first half" of the year—misled shareholders about the *second half* of 2023.  (¶ 180.) This claim fails for three independent reasons:

**First**, Plaintiffs plead *no facts*, much less particular facts, showing that CAC had begun to deteriorate as of July 25.  Plaintiffs' entire theory hinges on Murthy's statement from February 2024—seven months later—that the Company "started observing the [ad] yields coming in lower than we had expected in the back half of [2023]." (¶ 158.)  Without factual support, Plaintiffs call this an "admission" that the decline "had begun by July 1, 2023," *i.e.*, the *first day* of the "back half" of 2023. (¶ 159.)  But "in the back half" does not mean "on the first day of the back half."

This exact argument was rejected in *In re Riskified Ltd. Securities Litigation*, 2023 WL 3791653 (S.D.N.Y. June 2, 2023).  Plaintiffs alleged that defendants concealed negative trends in the third quarter of 2021 when the issuer IPOed on July 28, 2021—four weeks into the third quarter.  *Id.* at *2.  Judge Cote rejected this theory because, although the CEO discussed negative third quarter trends during the earnings call following the quarter, the complaint contained *no facts* indicating that the negative trends had actually begun "at the time of the IPO in July of 2021." *Id.* at *7-8 & n.7.  The same pleading failure requires dismissal here.

**Second**, even if the Complaint did allege that CAC increased before July 25, the statement still would not be false.  Gorevic's statement expressly reported on CAC only for "the first half of the year," *i.e.*, *before* the third quarter.  (¶ 179.)  Under settled law, "[d]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 364, 395 (S.D.N.Y. 2006).  Numerous courts have rejected the argument that accurate historical information is misleading when offered at a time when results have deteriorated:

- In *In re Ferroglobe PLC Securities Litigation*, 2020 WL 6585715, at *7 (S.D.N.Y. Nov. 10, 2020), plaintiffs challenged defendants' accurate reporting of strong 2Q revenue and adjusted EBITDA. The 2Q results were reported in *September*, when worse results were internally known for the nearly-finished third quarter. *Id.* Judge Abrams rejected "the contention that omitting a *known deviation* from this trend rendered the [statement] misleading" because she "fail[ed] to see how discussion of a company's historical success would mislead a reasonable investor into any particular belief about that company's present or future performance." *Id.*

- In *Building Trades Pension Fund of Western Pennsylvania* v. *Insperity, Inc.*, 2022 WL 784017, at *4, 12 (S.D.N.Y. Mar. 15, 2022), plaintiffs argued that defendant's statement during a 2Q earnings call that "new sales were 101% of forecast over the first half of the year" were misleading when the defendant had information suggesting poorer results in 3Q. Judge Buchwald disagreed, explaining "[t]here is no inconsistency in Insperity having strong sales in the first half of the year…and then having a weaker second half of the year." *Id.* at 12.

- In *Rein* v. *Dutch Bros, Inc.*, 2024 WL 3105004, at *10-11 (S.D.N.Y. June 24, 2024), Judge Engelmayer rejected plaintiffs' theory that a "truthful statement" on an earnings call touting a "record" number of new shop openings in the prior quarter was misleading, despite knowledge that recent inflationary pressure would negatively impact shop openings going forward.

- And in *Nokia*, 423 F. Supp. 2d at 395, this Court dismissed claims premised on an issuer's statement that it had "doubled its share to the mid-teens from the same quarter last year" in a specific market. Plaintiffs alleged that, when the statement was made, Nokia "was not adapting as quickly as its competitors" to a change in demand, which this Court found did not "challenge the accuracy of the historical statement."

12

For these reasons, no reasonable investor would interpret Gorevic's accurate, historical statement about "stable" CAC in the first half of 2023 to make any representation about 3Q23. Indeed, it would upend the quarterly reporting system if public companies could be held liable for fraud by providing *accurate reporting* on the recently-completed quarter simply because the results for the early days of a new quarter are different. Courts have consistently refused to impose an obligation "to disclose financial data for a fiscal quarter in progress," which would be "unworkable and potentially misleading." *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010).

***Third,*** even if Statement #1 concerned Q3, it is not misleading because Defendants expressly warned about CAC deterioration during the second half of 2023. After 1Q23, Murthy *rejected* the idea that CAC would "remain unchanged for the rest of the year," and twice explained that "[t]he bottom end of the [2023] guidance assumes…deterioration in [ad spend] yield." (Ex. 21 at 10, 14.) Teladoc's forecast expressly included the very deterioration that Plaintiffs now complain about, and BetterHelp revenue *fell within that guidance*. *Supra* 4. CAC deterioration thus was precisely in line with Defendants' warnings and financial projections both before and during the Class Period, and investors were not misled about 3Q CAC. *See Insperity*, 2022 WL 784017, at *8 (rejecting similar theory where plaintiff did not allege that defendants "ever misreported the number of BPAs [Business Performance Advisors] it employed" and "ignore[d] the bottom-line fact that Insperity met its guidance on BPAs").[6]

---

[6] Plaintiffs allege that analysts were confused by this statement. (¶¶ 130-33.) But none of the cited reports from July 2023—which all discuss *2Q23* results—suggest any analyst understood this statement to apply to *3Q23* CAC. (Exs. 27 & 28.) The Complaint also cites a report from October 2023 (¶ 134, Ex. 29) *predicting* 3Q23 results and noting that CAC dynamics "continue to alleviate"—a clear comparison to the unexpected 2022 CAC variance that Plaintiffs acknowledge, *supra* 6.

13

**Statement #2: "Cadence of Ad Spending"**.  Plaintiffs next challenge Murthy's statement on July 25 that "this year, the cadence of ad spending is more balanced across the first three quarters of the year in contrast to the steep ramp over the same period last year."  (¶ 181)  This statement is not false or misleading for the same reasons as Statement #1, and also because it concerns ad spending cadence—not CAC.  And the "cadence" of ad spending in 2023 was indisputably "more balanced across the first three quarters" as compared to 2022, when spending ramped up from 1Q to 2Q to 3Q for the reasons described, *supra* 6:[7]

|  | Q1 Ad Spend | Q2 Ad Spend | Q3 Ad Spend | Q4 Ad Spend |
|---|---|---|---|---|
| 2022 | $133,600,000 | $164,574,000 | $178,920,000 | $146,443,000 |
| 2023 | $176,790,000 | $178,756,000 | $186,152,000 | $147,156,000 |

**Statement #3: "No Material Changes" to "Risk Factors"**.  Plaintiffs also challenge the July 28, 2023 statement in Teladoc's 2Q23 10-Q that there were "no material changes to the risk factors previously disclosed" in the 2022 10-K.  (¶¶ 183-84.)  Plaintiff does not identify any new and material risk that Teladoc did not already disclose.  The 10-K warned that CAC variance had and could impact quarterly results and Defendants warned that investors should expect revenue "deceleration in the second half [of 2023]," and provided guidance that *assumed* CAC deterioration.  *Supra* 7.  Plaintiffs thus identify no new and material "changes" that would render the earlier risk disclosures misleading.  *See Ong* v. *Chipotle Mex. Grill, Inc.*, 294 F. Supp. 3d 199, 229-30 (S.D.N.Y. 2018) (identical language was not misstatement because issuer "was under no duty to disclose any further information than it had already provided, as [p]laintiffs allege[d] no facts showing any appreciable uptick in the [c]ompany's disclosed risk profile").

---

[7] Exs. 10 at 4; 11 at 5; 12 at 5; 13 at 6.

### B.      The October 2023 Statements Were Not Misleading

**Statement #4: 3Q23 CAC "Near the Midpoint"**.  The Complaint challenges Gorevic's statement on the 3Q23 Earnings Call, on October 24, 2023, that CAC "remain near the midpoint of our outlook range."  (Ex. 23 at 5; ¶ 185.)  But no pleaded facts suggest that third quarter CAC was *not* "near the midpoint" of the unspecified "outlook range."  *See San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Co., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) ("Plaintiffs have made no showing that defendants' descriptions of [company's] performance were not based on the facts available to the company at the time the statements were made.").  Moreover, contemporaneous with Statement #4, Defendants disclosed "modest deterioration in [CAC]" which was "likely to persist" such that BetterHelp would meet the "lower half" of its revenue guidance for the year.  (Ex. 23 at 7; ¶ 136.)  This contemporaneous disclosure of the very CAC trend Defendants supposedly concealed renders Plaintiffs' theory untenable.  *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017) (dismissing fraud claim where "the same documents on which the SAC relies for the purported misstatements disclose the information Plaintiffs claim Pretium to have omitted").

Plaintiffs *concede* that this simultaneous "partial corrective disclosure" "disclos[ed]" BetterHelp's CAC deterioration (¶¶ 142, 213), but argue that it did not reveal "the other consequences of this issue," (Pls.' Ltr. at 5.)  Nonsense.  That same day, Teladoc expressly reduced its top-end guidance because of the 3Q23 CAC deterioration, dropping its company-wide FY23 revenue guidance by $50 million, *supra* 8, and thus *did* disclose the "consequences" of the issue.  Having disclosed the precise information that forms the core of Plaintiffs' case, Defendants were not required to spell out in detail the consequences of this information, which "would have been obvious to any reasonable investor."  *Monroe Cnty. Emps.' Ret. Sys*. v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355 (S.D.N.Y. 2014).

15

**Statement #5: "Stable Advertising Environment"**.  On that same call, Murthy disclosed "[t]hird quarter BetterHelp adjusted EBITDA was $26 million, resulting in a margin of 9.1%.  This represents a 490-basis point increase over the last year's third quarter, a reflection of the more stable advertising environment compared to FY22 as well as sustained gross margin improvement."  (Ex. 23 at 7; ¶¶ 187-88.)  Murthy thus attributes improved margins in 3Q23 as compared to 3Q22 in part to the "stable" advertising environment, a reference to the above-discussed anomalous spending pattern for 2022, which was more balanced through the first three quarters of 2023 than in 2022.  *Supra* 14.  Plaintiffs do not dispute the accuracy of the reported EBITDA, margin, or smoothing of ad spend in 2023.  These accurate statements of past performance communicate nothing new about CAC and are not misleading.  And, as discussed above, Murthy contemporaneously disclosed "modest deterioration" in CAC.

**Statement # 6: "Scale"**.  Plaintiffs also challenge Murthy's statement, "unlike many of our smaller peers, scale enables us to drive and earn strong returns on our [ad] spend, and that gives us a real advantage."  (Ex. 23 at 10; ¶ 189.)  Nowhere do Plaintiffs allege that scale did not enable BetterHelp to drive strong returns compared to its smaller peers.  Statement #6 thus is not alleged to be false.  Moreover, statements touting a "competitive advantage" are inactionable puffery because no reasonable investor would rely on them.  *See Okla. Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018).  Additionally, Statement #6 reflects Murthy's *opinion* that scale gives BetterHelp a "real advantage" over "smaller peers" which can mislead only if "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor."  *Martin* v. *Quartermain*, 732 F. App'x 37, 40 (2d

16

Cir. 2018). Plaintiffs do not allege that Murthy did not believe this opinion or identify any embedded fact that was untrue. Nor do Plaintiffs identify any omitted facts that would render her stated belief misleading. This statement was not about CAC at all, and to the extent Plaintiffs claim CAC was somehow omitted, Murthy disclosed 3Q23 CAC deterioration on that same earnings call.

**Statement #7: "No Material Changes" to "Risk Factors"**. Plaintiffs challenge the statement in the 3Q23 10-Q that "[t]here have been no material changes to the risk factors previously disclosed." (¶ 191.) This statement is not misleading for the same reasons as Statement #3, and the additional reason that Murthy disclosed CAC deterioration that was likely to persist, *supra* 8, 14.

**C.      The November 2023 and January 2024 Statements Were Not Misleading**

**Statement #8: "A Little Worse"**. At an industry conference on November 28, 2023, Gorevic reminded investors that "we've seen challenges in the customer acquisition costs…we've been pretty public about this," and that the "[b]ottom end of the [guidance] range means [CAC] stays sort of stubbornly a little bit worse than our expectations for the year. And that's where it's been, right? It's just stayed a little worse than our expectations for the year." (Ex. 24 at 10; ¶ 195.) Plaintiffs contend this misled investors about the extent of CAC deterioration. (¶¶ 186, 196.) Once again, however, the Complaint contains *no facts* suggesting that CAC was not "a little worse than [management] expectations" in November 2023. To the contrary, Gorevic's statement was proven true by the alleged corrective disclosure in February: Defendants projected that the bottom end of BetterHelp's 2023 revenue guidance assumed "deterioration" in CAC—and BetterHelp then *met the bottom end of its revenue guidance* for 2023. *Supra* 4.

**Statement #9:  Pull Back on Ad Spend**. During the same conference, Gorevic also said that BetterHelp "always pull[s] back on ad spend at this time of the year," *i.e.,* 4Q. (Ex. 24 at 9; ¶

17

193.)  Yet again, this statement is *true*.  Plaintiffs *concede* that "Teladoc purposely lowers the advertising and marketing expenditure for BetterHelp in Q4 of each year because ad spending is more costly during the holiday season."  (¶ 75.)  Teladoc did, in fact, significantly lower its BetterHelp ad spend according to this pattern before and during the Class Period.  *Supra* 14.  No factual allegations render this statement false.

**Statement #10: 2024 Growth**.  Finally, Plaintiffs challenge Gorevic's January 9, 2024 statement: "I've had investors ask me, 'Hey, is [BetterHelp] running out of growing room? Is it going to shrink next year?' I don't think there's any scenario where we believe that's the case." (¶ 197.)  Plaintiffs allege that this statement is misleading because, six weeks later, on February 20, Teladoc forecasted negative BetterHelp revenue growth *for 1Q24*.  (¶ 198)  Plaintiffs ignore that, on the same day, Teladoc forecasted "flat to low single digit growth in [the] BetterHelp segment" *for FY24*. (Ex. 26 at 7.)  Statement #10 opining that BetterHelp would not "shrink next year"—that is, in 2024—was thus consistent with 2024 guidance.

Gorevic's opinion is also not actionable because the Complaint contains zero allegations suggesting that, on January 9, 2024, he did not truly believe it.  *Supra* 16-17.  This forward-looking statement is also protected by the PSLRA safe harbor, 15 U.S.C. § 78u-5(c), because Plaintiffs do not allege Gorevic had "actual knowledge" of falsity, *infra* 22 n.9, and also because it was accompanied by meaningful cautionary language, including repeated warnings about CAC deterioration, and that forward-looking statements were based on "management's beliefs and assumptions and on information currently available to management" (Ex. 25 at 2).  Gorevic's optimism about growth prospects is also inactionable puffery.  *Steamfitters Loc. 449 Pension Plan* v. *Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019) ("demand keeps growing" is

18

puffery); *Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) ("business strategies [will] lead to continued prosperity" is puffery).

## II.    The Complaint Fails to Allege a Strong Inference of Scienter

The PSLRA and Rule 9(b) require that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with…a mental state embracing intent to deceive, manipulate, or defraud." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). A "strong" inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* This inquiry is "inherently comparative" and requires the court to consider nonculpable explanations advanced by defendants. *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007). Further, "[s]cienter must be separately pled and individually supportable as to *each defendant*; scienter is not amenable to group pleading." *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at \*6 (S.D.N.Y. Dec. 13, 2013).

The required strong inference of fraudulent intent may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

### A.    Plaintiff Identifies No Motive to Defraud, and the Non-Fraudulent Inferences Exceed Any Fraudulent Inferences

Plaintiffs offer **no motive**, much less any explanation for **why** Defendants would mislead shareholders about deteriorating CAC in 3Q23 and 4Q23.

**Increased Stock Holdings Undermines Scienter**. The Complaint does not plead that either Gorevic or Murthy made suspicious stock sales at inflated prices or otherwise benefited financially from the alleged fraud. *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at

19

*12 (S.D.N.Y. 2018) ("[T]he absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders."). To the contrary, Murthy *increased* her holdings of Teladoc common stock during the Class Period by more than 10%, (Exs. 3, 16), which "raises precisely the contrary inference from the one suggested by plaintiffs," *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011).[8]

**Repeated Warnings and Risk Disclosures Undermine Scienter**. That Defendants repeatedly warned investors to expect CAC deterioration in the second half of 2023—and even incorporated it into the low end of BetterHelp's 2023 guidance, and then reduced guidance to account for CAC deterioration—also undermines any inference that Defendants intended to mislead shareholders. *City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*, 565 F. Supp. 3d 478, 490 (S.D.N.Y. 2021) ("[A] defendant's decision to make significant disclosures about the exact risk he or she is purportedly trying to hide is inconsistent with" scienter).

**Prompt Disclosure During Quarterly Earnings Calls**. When CAC rose in the second half of 2023, Defendants promptly disclosed this to investors as part of the 3Q quarterly report, and again in the 4Q quarterly report. Plaintiffs can hardly refute that: they rely on these revelations of the "truth" as purported "corrective disclosures." An executive who intends to conceal worsening CAC does not promptly update shareholders on quarterly earnings calls. *See Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (regular reporting inconsistent with fraudulent intent). This simple non-fraudulent inference is cogent, and far more compelling, than

---

[8] Gorevic's stock holdings were essentially flat and also do not support scienter: he ended the Class Period with 0.7% fewer shares than the beginning due to sales to fulfill tax obligations and pursuant to a Rule 10b5-1 trading plan—which, along with the small size and lack of suspicious timing, do not support a fraudulent inference. *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523-25 (S.D.N.Y. 2020); *Glaser*, 772 F. Supp. 2d at 593; *see also* (Exs. 2, 15.). It further undermines an inference of scienter that Gorevic sold 52% fewer shares during the Class Period than in the seven preceding months. *Id.*

Plaintiffs' nonsensical inference that Defendants were simultaneously revealing and concealing a fraud. *See Johnson* v. *Siemens AG*, 2011 WL 1304267, at \*19 (E.D.N.Y. Mar. 31, 2011) ("The amended complaint suggests no reason for Siemens management to have concealed the costs of the legacy projects in November 2007, and to have fraudulently announced only a fraction of those costs in January 2008, only to disclose their full magnitude just several weeks later in March 2008.").

### B. The Complaint Fails to Allege Conscious Misbehavior or Recklessness

Because Plaintiffs do not plead a motive and opportunity to commit fraud, "the strength of the circumstantial allegations [of recklessness or conscious misbehavior] must be correspondingly greater." *Kalnit*, 264 F.3d at 142. In other words, the "uphill battle to plead a strong inference of scienter becomes that much steeper." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at \*11 (S.D.N.Y. Jan. 21, 2021). "[A]n allegation that a defendant merely 'ought to have known' [about contrary information] is not sufficient." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009). Where, as here, "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *Dynex*, 531 F.3d at 196, and "plead with the requisite specificity…*when* Defendants had the [information]," *Nokia*, 423 F. Supp. 2d at 407.

Plaintiffs' allegations are plainly deficient. Although they say that Defendants concealed information about rising CAC, they never actually identify *what* information was concealed. Nor are there *any* factual allegations describing *when* or *how* this information was communicated to, or otherwise reviewed by, Gorevic or Murthy. Indeed, Gorevic and Murthy are barely discussed in the Complaint, aside from their alleged misstatements. Plaintiffs do not identify *any* internal meeting or call where CAC was discussed with Gorevic or Murthy. They do not identify *any*

21

internal report discussing CAC trends, much less one circulated to senior management.  And they offer no allegations sourced from former employees that might provide insight into any Defendant's state of mind.  Dismissal is required where, as here, "the Amended Complaint cites no internal reports, documents, or communications that shed light on Defendant's knowledge of or conduct concerning" the alleged wrongdoing, nor "statements of confidential witnesses addressing these issues."  *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, \*18 (S.D.N.Y. Oct. 25, 2017); *see Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (scienter not pleaded where complaint "ma[de] no reference to internal [company] documents or confidential sources discrediting [d]efendants' assertions").

Against this paucity of factual allegations supporting scienter, Plaintiffs offer four arguments, and all fail:

*First*, Plaintiffs claim that the Court may draw the inference that the Individual Defendants had knowledge of internal information that was inconsistent with their public statements.  (*See* ¶¶ 199-210.)[9]  This is based principally on a purported admission by Murthy in November 2022—eight months before the Class Period—when she was asked "where" BetterHelp spent ad money in 4Q22, and she responded "we have a wide diversity of [advertising] channels, and we continue to optimize within the channel and across different channels…[and] we look at this hourly and daily."  (Ex. 19 at 11; ¶¶ 117, 205.)  Murthy's statement concerned real-time optimization across advertising channels, not CAC or yield.  Plaintiffs also point to Gorevic's post-Class Period statement that "as we increase our ad spend, we're constantly looking at the marginal return on the

---

[9] Assuming Plaintiffs rely on a recklessness theory, it is not available for forward-looking statements (*see* ¶ 197), because the PSLRA requires "actual knowledge" of falsity.  *In re Renewable Energy Grp. Secs. Litig.*, 2022 WL 14206678, at \*4 (2d. Cir. Oct. 25, 2022).

-- on each incremental dollar." (¶ 160.) Neither statement suggests it was Gorevic's or Murthy's job *personally*—as the CEO and CFO overseeing Teladoc's many businesses and 5,600 employees—to optimize "hourly and daily" within BetterHelp's channels or "constantly" look at marginal return. *See Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 138 (E.D.N.Y. 2020) (allegations that it was executives' "job to monitor [company's] internal controls," insufficient absent "specific facts to suggest that these defendants were actually aware of" contrary information).

But even if the Complaint adequately alleged that the Individual Defendants personally monitored CAC data, it is still insufficient to show that Murthy and Gorevic obtained contemporaneous inconsistent information. What CAC information did they obtain and when? For example, Plaintiffs say that CAC must have been elevated by July 25, 2023, when the first alleged misstatements were made. But what was CAC on that day? Had it materially changed from late June? The Complaint does not answer these questions.

These types of "monitoring" allegations have been repeatedly rejected by the Second Circuit and courts in this district. To rely on "access" or "monitoring" allegations, Plaintiffs must identify the specific information Individual Defendants would have seen, and what that information showed, at the time of the alleged misstatements. In *Dynex*, for example, plaintiffs alleged that defendant executives "had access to 'collection data'" that would have revealed "the true reason[s]" behind poor performance for the issuer's home loans. 531 F.3d at 196. The Second Circuit rejected this theory because plaintiffs did not "specifically identify the reports or statements containing this information," and merely pointed to data access without "an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance." *Id.* The Second Circuit again rejected this scienter

23

theory in *Cox* v. *Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016), holding that "although the Complaint alleges that [individual defendants] monitored the sales and returns of the BlackBerry Z10, the Complaint fails to allege any particularized facts suggesting that defendants actually possessed information contradicting their public statements about the release of the Z10." *Id.*  In *Nokia*, plaintiffs alleged that a CEO overstated financial optimism for the first quarter on March 25, 2004—*six days* before the end of the quarter, and *12 days* before the company reported disappointing 1Q results—based on his "admitted access to weekly reports, or order books, that detailed Nokia's revenue and market share."  423 F. Supp 2d at 406-07.  This Court rejected this theory because it did not specifically identify what the data showed and therefore "amount[ed] to unsubstantiated speculation that Defendants knew their public statements were inaccurate."  *Id.* at 407; *see In Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003) (former employee recollections that defendants "had access to and generally reviewed interim sales data" contradicting financial projections "insufficient" for scienter).[10]

**Second**, Plaintiffs point to the Company's entry into an FTC consent order before the Class Period, resolving allegations that it improperly shared customer health data with third parties between 2013 and 2020. (¶¶ 102, 110-14, 207.)  That conduct was unrelated to the alleged fraud and was "voluntarily stopped…in 2021," years before the Class Period.  (¶ 7.)  The existence of this FTC settlement adds nothing to the scienter analysis.  *See Rotunno* v. *Wood*, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) ("references to an unrelated SEC investigation and the

---

[10] Plaintiffs' pre-motion letter cites *Stadium Capital LLC* v. *Co-Diagnostics, Inc.*, 2024 WL 456745 (S.D.N.Y. Feb. 5, 2024).  The court there reasoned that defendants necessarily would have seen a 2Q revenue decline by May 12 where revenue had declined *over 75%* and the CEO admitted "we certainly saw the [fallout] as the second quarter progressed."  *Id.* at *2, 5. There are no comparable allegations here, plus Defendants here warned about and predicted CAC deterioration in the 2H23. *Supra* 7.

resignations of executives d[id] not add to the plausibility of the scienter allegations" because the investigation "concern[ed] unrelated conduct that occurred prior to the [c]lass [p]eriod").

*Third*, Plaintiffs allege that Gorevic's termination "less than two months after" the Class Period supports scienter.  (¶ 208.)  Courts routinely reject this theory where, as here, there are no facts linking the departure to the alleged fraud.  *See Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (executive departures cannot establish scienter without "independent evidence corroborating" inference) (collecting cases).  Moreover, the delay between the alleged corrective disclosure and Gorevic's departure undermines any inference of a connection.  *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n* v. *MDC Partners, Inc.*, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) (resignations approximately two months after class period did not support an inference of fraud).  Further, Gorevic received post-employment benefits available only for separation "without cause," (Ex. 14 at 1; Ex. 32 at 3.), and Plaintiffs themselves cite analyst reports attributing Gorevic's departure to the "lackluster long-term growth target guidance" for BetterHelp—not fraud or misrepresentations (¶ 175, Ex. 31 at 1), further undermining their requested inference. *See Hawes* v. *Argo Blockchain plc*, 2024 WL 4451967, at *19 (S.D.N.Y. Oct. 9, 2024) ("[T]erminations and resignations are at least as consistent with punishing those at the helm for their poor judgment and leadership as with their relating to concocting a scheme to defraud shareholders.") (collecting cases).

*Finally*, Plaintiffs invoke the disfavored "core operations" doctrine and allege that scienter can be inferred merely because "[c]ustomer acquisition costs and yield on ad spend were critical financial metrics."  (¶ 202.)  The Second Circuit and courts in this district have "expressed doubt as to whether the core operation doctrine has survived" the enactment of the PSLRA, which,

contrary to the doctrine, "requires facts supporting the scienter inference to be stated with particularity." *In re Pretium*, 256 F. Supp. 3d at 473-74 (collecting cases).

Even if the core operations theory is viable, it fails. It is not reasonable to infer that the CEO and CFO of Teladoc had daily knowledge of a single metric—CAC—in one of Teladoc's business units—BetterHelp. BetterHelp CAC does not constitute a "core" operation. *See Tyler* v. *Liz Claiborne, Inc*., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) ("[C]ourts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'") And even if BetterHelp's CAC were somehow a "core operation" of Teladoc, "at best [it] constitutes supplemental support for alleging scienter but does not independently establish scienter." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021).

\*   \*   \*

The non-fraudulent inferences drawn from the Complaint are far stronger than Plaintiffs' fraudulent inferences: Defendants had no motive to defraud (and Murthy *increased* her stock holdings), issued warnings about CAC deterioration, and promptly updated shareholders about CAC deterioration on earnings calls. By contrast, Plaintiffs' fraudulent inference is based on the unsupported allegation that Defendants had access to and monitored unidentified internal data that was somehow inconsistent with public statements. The Complaint fails to plead a strong inference of scienter.

## III.    The Complaint Fails to Allege Loss Causation

Under the PSLRA, the "subject of the fraudulent statement or omission" must be "the cause of the actual loss suffered." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Plaintiffs must plead that "their share's price fell significantly after the truth became known through an express, corrective disclosure, or through events constructively disclosing the fraud

26

like the materialization of the risk concealed." *Gru* v. *Waxsome Therapeutics, Inc.*, 2023 WL 6214581, at *4 (S.D.N.Y. Sept. 25, 2023).

Plaintiffs allege that Murthy's statement on October 24, 2023, that BetterHelp's revenue was trending in the "lower half" of yearly guidance due to a "modest deterioration" in CAC, was a "partial corrective disclosure." (¶¶ 140-42, 213-14.) But the only challenged statements that predate it are the July 2023 statements, which did not address or predict CAC for the full year, or second half, of 2023. *Supra* 11-13. While the 3Q23 disclosure may have "revealed disappointing financial results, it did not "reveal[] to the market the falsity of the prior statements." *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *19 (S.D.N.Y. Mar. 31, 2015). Indeed, as Lead Counsel previously argued at the lead plaintiff appointment hearing, "[t]here was nothing that told investors that a fraud had occurred…. [T]here was an earnings announcement that investors were not happy with and stock declined slightly." (ECF No. 64-1 at 8:15-21; 9:2-5.) *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388-89 (E.D.N.Y 2013) (dismissing loss causation allegations based on "negative earnings announcements" that did not "contain any disclosure of the alleged fraud, despite reporting reductions in full-year revenue guidance and earnings expectations").

For the same reasons, the Court should dismiss the second alleged corrective disclosure on February 20, 2024, when Defendants attributed disappointing "revenue and margins" in 4Q23 to "below target" ad spend yield during the second half of 2023. (¶¶ 155-65, 214-16.) The new and disappointing Q4 results did not "correct" any prior statement challenged in the Complaint.

Additionally, both "corrective" disclosures fail to plead loss causation for the independent reason that they represent the materialization of disclosed risks. Before and during the Class Period, Defendants warned that the low end of BetterHelp's revenue guidance reflected CAC

deterioration. *Supra* 6-8. That is *precisely* what the October 24 disclosure revealed: CAC deterioration placing BetterHelp in the low end of its full-year revenue projection of "low double-digit to mid-teen" revenue growth. *Supra* 5-6, 8. Likewise, prior to the February 20 disclosure, Murthy had warned that CAC deterioration was "likely to persist" at the low end of FY23 revenue guidance. *Supra* 8, 15. Again, that is *precisely* what Teladoc announced on February 20 when it disclosed 11% BetterHelp revenue growth. *Supra* 9. The disclosure of CAC deterioration in line with earlier projections "represented the materialization of a known risk, rather than the disclosure of a concealed one." *YPF Sociedad Anonima*, 15 F. Supp. 3d at 358. Plaintiffs "cannot now point to the materialization of those known risks to show loss causation." *City of Omaha Police & Firefighters Ret. Sys.* v. *Cognyte Software Ltd.*, 2024 WL 4349289 at *9 (S.D.N.Y. Sept. 30, 2024).

## IV.    The Complaint Fails to State a Control Person Claim

Plaintiffs fail to state a Section 20(a) claim because they plead no primary violation of Section 10(b), and they fail to allege either Individual Defendant's "culpable participation" in the alleged fraud. *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *22 (S.D.N.Y. Aug. 30, 2018).

## CONCLUSION

Defendants respectfully submit that the Complaint should be dismissed. Because Plaintiffs declined the opportunity to further amend in response to Defendants' pre-motion letter, Pls.' Ltr. at 1, dismissal should be with prejudice.

28

Dated: June 20, 2025
New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: /s/ Audra J. Soloway
Daniel J. Kramer
Audra J. Soloway
Daniel Sinnreich
Emily Miller
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
dkramer@paulweiss.com
asoloway@paulweiss.com
dsinnreich@paulweiss.com
emiller@paulweiss.com

*Attorneys for Teladoc Health, Inc., Jason
Gorevic, and Mala Murthy*

29

**Electronic Word Count Certification**

Pursuant to 7.1(c) of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York and II.B. of Judge Kenneth M. Karas's Individual Rules of Practice, I certify that this brief complies with that rule because it contains 8,747 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and required certificates according to Microsoft Word's "Word Count" feature.

Dated: June 20, 2025
New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Audra J. Soloway*
Daniel J. Kramer
Audra J. Soloway
Daniel Sinnreich
Emily Miller
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
dkramer@paulweiss.com
asoloway@paulweiss.com
dsinnreich@paulweiss.com
emiller@paulweiss.com

*Attorneys for Teladoc Health, Inc., Jason Gorevic, and Mala Murthy*