# EXHIBIT 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PAUL STARY, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 7:24-cv-03849-KMK |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| TELADOC HEALTH, INC., JASON NATHANIALL GOREVIC, and MALA MURTHY, |  |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................................................................................1

JURISDICTION AND VENUE ...............................................................................5

PARTIES ..................................................................................................................5

SUBSTANTIVE ALLEGATIONS ...........................................................................9

    Teladoc and Its Business...............................................................................9

    BetterHelp's Revenue, Adjusted EBITDA, and Paying User Performance Was
        Highly Material to Teladoc's Investors Before and During the Class
        Period ................................................................................................9

    Teladoc's Investors Were Highly Attuned to BetterHelp's Customer Acquisition
        Costs and Related Ad Spend Yield Before and During the Class Period..............12

    Defendants Purposely Manipulated BetterHelp's Advertising Spend During FY23
        to Cause Revenue and Adjusted EBITDA to Perform in a Predictable
        Seasonal Pattern ..............................................................................16

    BetterHelp's Customer Acquisition Costs Temporarily Increased in the Social
        Media Channel During FY22...........................................................20

    In July 2023, the FTC Forced Teladoc to Stop Allegedly Stealing BetterHelp
        Customers' Confidential Health Information to Improve Social Media
        Advertising Effectiveness ...............................................................22

    Defendants Knew, or Recklessly Disregarded, That the Yield on BetterHelp's
        Social Media Advertising Had Materially Decreased Starting in 3Q23,
        Meaning That Increased CAC – Not Planned Seasonality – Was Driving
        BetterHelp's 3Q23 and 4Q23 Underperformance ...............................27

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
    DURING THE CLASS PERIOD ..................................................................39

ADDITIONAL SCIENTER ALLEGATIONS.........................................................45

LOSS CAUSATION/ECONOMIC LOSS ..............................................................48

CLASS ACTION ALLEGATIONS ........................................................................49

NO SAFE HARBOR ..............................................................................................51

APPLICATION OF PRESUMPTION OF RELIANCE:  THE *BASIC* AND *AFFILIATED*
    *UTE* PRESUMPTIONS..............................................................................52

**Page**

COUNT I ...........................................................................................................54

For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All
    Defendants ............................................................................................54

COUNT II ..........................................................................................................55

For Violations of §20(a) of the Exchange Act Against the Individual Defendants...........55

PRAYER FOR RELIEF ......................................................................................................55

JURY DEMAND ...............................................................................................................56

Lead Plaintiffs Joshua Marit and Ali Touat (collectively, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and all other persons similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' amended complaint for violations of the federal securities laws against Defendants (defined below), allege the following based upon personal knowledge as to Lead Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, the review and analysis of: (i) Securities and Exchange Commission ("SEC") filings made by Teladoc Health, Inc. ("Teladoc" or the "Company"); (ii) press releases, public statements, public letters, and other publications disseminated by, or concerning, Defendants; (iii) transcripts of investor conference calls with Teladoc senior management; (iv) information posted on Teladoc's corporate website; (v) securities analyst reports concerning Teladoc; (vi) the investigation conducted by the Federal Trade Commission ("FTC") into Teladoc; and (vii) news articles and media coverage concerning the events detailed herein.

The investigation of Lead Plaintiffs' attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers of Teladoc common stock between July 26, 2023 and February 20, 2024, inclusive (the "Class Period"). Lead Plaintiffs are asserting claims against Teladoc and certain of its senior executives and/or directors under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

2.      Teladoc is a virtual healthcare company that operated under two business segments during the Class Period.  Analysts and investors viewed one of those segments – BetterHelp – as the Company's principal driver of revenue and adjusted EBITDA growth in FY23.[1]

3.      BetterHelp sells virtual mental health services directly to consumers.  As such, BetterHelp heavily relied on advertising and marketing expenditure to achieve revenue, adjusted EBITDA, and paying user growth before and during the Class Period.  Because it was critically important for Defendants to understand the yield that BetterHelp was generating on its ad spend – which Defendants admit they tracked on a daily, and even hourly, basis – analysts and investors paid careful attention to BetterHelp's ad spend yield.  Teladoc assessed ad spend yield by calculating BetterHelp's customer acquisition costs before and during the Class Period.

4.      Before and during the Class Period, Defendants disclosed to analysts and investors that: (1) Teladoc purposely manipulated ad spending during each fiscal year so that BetterHelp would perform in a predictable pattern to account for increased ad expenses during the holiday season; and (2) BetterHelp's performance in FY23 would align with this planned seasonal pattern.

5.      According to Defendants, BetterHelp would maintain ad spending levels in Q2 and Q3 of each year, which led to predictable revenue, adjusted EBITDA, and paying user growth in those quarters.  But in Q4, because holiday season ads are more expensive, BetterHelp would reduce its ad spend.  This caused increased adjusted EBITDA in Q4 (since ad spend is a cost), and the same level of revenue and paying user growth as in Q3 due to the lag in time between the reduction in ad spending and new growth.  In Q1, BetterHelp would ramp ad spending back up to Q2 and Q3 levels, causing decreased adjusted EBITDA in Q1.  Revenue and paying user growth would also decrease in Q1 due to the lag between the acceleration in ad spending and new growth.

---

[1]   Capitalized terms used in this section are defined later in this complaint.

6.      BetterHelp's planned seasonality could be disrupted, however, if ad spend yield declined due to increased customer acquisition costs.  That is precisely what occurred at BetterHelp in FY22, when temporary increases in customer acquisition costs in the social media advertising channel (and another advertising channel) were caused by upstart competitors who were pursuing growth at all costs.  As a result, in FY22 BetterHelp did not follow the planned seasonal pattern in 1Q22 or 2Q22, which caused BetterHelp's adjusted EBITDA to materially decline in those fiscal quarters.  Because of the temporary increase in customer acquisition costs in FY22, analysts and investors were highly attuned to any increase in those costs in FY23.

7.      Indeed, BetterHelp's ad spend yield in the social media channel was particularly material to investors because twelve days before the Class Period began, on July 14, 2023, the FTC gave final approval to an order requiring BetterHelp to pay $7.8 million to its customers – individuals who sought mental health treatment – for allegedly stealing their private health data. The reason BetterHelp allegedly did this was to give that data to social media companies, like Facebook, to improve the effectiveness (thereby reducing the cost) of BetterHelp's ad spend in the social media channel, *i.e.*, to reduce BetterHelp's customer acquisition costs.  Although BetterHelp supposedly voluntarily stopped this practice in 2021 after it was uncovered by reporters, BetterHelp was not barred by the FTC from engaging in this misconduct until July 14, 2023.

8.      During the Class Period, Defendants made materially false and misleading statements and omissions to investors regarding BetterHelp's customer acquisition costs and planned seasonal performance.  Unbeknownst to investors, however, by the beginning of 3Q23, on July 1, 2023, BetterHelp's customer acquisition costs in the social media channel had materially increased because BetterHelp had saturated that channel.  Thus, BetterHelp's ad spend in the social media channel had become significantly more expensive, thereby materially reducing profits.

9. On October 24, 2023, Defendants presented Teladoc's 3Q23 financial results and acknowledged "a modest deterioration" in BetterHelp's ad spend yield and related declines in BetterHelp's paying users and adjusted EBITDA, which led to an approximate 3.9% decline in Teladoc's common stock price. Nonetheless, Defendants continued to mislead investors by falsely stating, among other things, that BetterHelp's purported minor decrease in ad spend yield (meaning increase in customer acquisition costs) in 3Q23 was not a material threat to BetterHelp's planned performance in 4Q23 or FY24 – and that BetterHelp's ad spend could still yield acceptable levels of profit – which was not true in the social media channel.

10. Defendants continued to make similar materially false and misleading statements and omissions to investors in November 2023 and January 2024.

11. On February 20, 2024, Defendants presented Teladoc's 4Q23 and FY23 financial results, and acknowledged the full extent of the negative impact caused by BetterHelp's materially increased customer acquisition costs. Defendants admitted that: (1) BetterHelp had started experiencing materially increased customer acquisition costs by the beginning of 3Q23, *i.e.*, July 1, 2023; (2) these materially increased costs were specific to the social media channel; and (3) BetterHelp's additional ad spend in the social media channel was causing significantly diminished profits. In response, Teladoc's common stock price declined by approximately 24%.

12. Shortly after the Class Period ended, on April 5, 2024, the Board fired defendant Gorevic as CEO. Analysts linked his firing to Teladoc's February 20, 2024 stock decline and BetterHelp's related financial underperformance in 3Q23 and 4Q23. BetterHelp's FY24 performance to-date has sharply diverged from the planned seasonal pattern, with revenue, adjusted EBITDA, and paying users significantly decreasing in the first three fiscal quarters of FY24 due to continued materially increased customer acquisition costs in the social media channel.

## JURISDICTION AND VENUE

13. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5.

14. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

15. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Dissemination of materially false and misleading information by Defendants occurred in this District.

16. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, telephonic communications, and the facilities of the national securities markets.

## PARTIES

17. Lead Plaintiff Joshua Marit purchased Teladoc common stock during the Class Period, as set forth in his certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby. *See* ECF No. 23-2.

18. Lead Plaintiff Ali Touat purchased Teladoc common stock during the Class Period, as set forth in his certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby. *See* ECF No. 18-1.

19. Defendant Teladoc is a virtual healthcare company focused on providing customers with healthcare access through telehealth visits. Teladoc's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "TDOC." According to Teladoc's Form 10-Q for the fiscal quarter ended June 30, 2023 ("2Q23"), which was filed on July 28, 2023 (the "2Q23 Form 10-Q"), the Company had 164,952,114 shares of common stock outstanding as of July 24, 2023.

20. Defendant Jason Nathaniall Gorevic ("Gorevic") served as Teladoc's Chief Executive Officer ("CEO") and a director on Teladoc's board of directors (the "Board") from June 2009 until he was fired by the Board on April 5, 2024. According to the Form DEF14A filed by Teladoc with the SEC on April 11, 2023 (the "2023 Form DEF14A"), defendant Gorevic was an executive officer of Teladoc during his tenure as CEO. Defendant Gorevic signed each of the Company's Form 10-Q's filed with the SEC during the Class Period. Defendant Gorevic spoke at numerous Teladoc investor conferences during the Class Period.

21. Defendant Mala Murthy ("Murthy") has served as the Company's Chief Financial Officer ("CFO") since 2019. According to the 2023 Form DEF14A, defendant Murthy has been an executive officer of Teladoc during her tenure as CFO, and "leads [Teladoc's] global finance organization, including accounting, financial planning & analysis and investor relations." Defendant Murthy signed each of the Company's Form 10-Q's filed during the Class Period. Defendant Murthy spoke at numerous Teladoc investor conferences during the Class Period.

22. Defendants Gorevic and Murthy are collectively referred to herein as the "Individual Defendants."

23. Teladoc and the Individual Defendants are collectively referred to herein as "Defendants."

24. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and

employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

25.     It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified in ¶¶19-21 above.  Each of the above officers of Teladoc, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

26.     As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and

accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions and/or Board membership with Teladoc, the Individual Defendants each had access to the adverse undisclosed information about Teladoc's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Teladoc and its business materially false and misleading.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

29.     Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Teladoc common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Teladoc's financial reporting, business,

operations and management and the intrinsic value of Teladoc's common stock; and (ii) caused

Lead Plaintiffs and the Class to purchase Teladoc common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Teladoc and Its Business

30.     Teladoc describes itself as a "global leader in whole person virtual care[.]"

Essentially, Teladoc contracts with a professional association, which in turn contracts with

physicians to provide virtual healthcare services through Teladoc's technology platform.

31.     The Company primarily generates revenue and profit (*i.e.*, adjusted EBITDA) by

selling access to virtual healthcare to its customers, which ranges from hospitals and health systems

(*i.e.*, business-to-business) to individual consumers (*i.e.*, direct-to-consumer).

32.     According to Teladoc's Form 10-K for the fiscal year ended December 31, 2023

("FY23"), which was filed with the SEC on February 23, 2024, and was signed by the Individual

Defendants (the "2023 Form 10-K"), during the Class Period the Company was organized into two

reporting segments: (1) BetterHelp, which is the Company's mental health direct-to-consumer

platform; and (2) Integrated Care, which is the Company's business-to-business division.

### BetterHelp's Revenue, Adjusted EBITDA, and Paying User Performance Was Highly Material to Teladoc's Investors Before and During the Class Period

33.     BetterHelp focuses on selling virtual mental health services directly to individual

consumers.

34.     Teladoc acquired BetterHelp in January 2015 for $3.5 million in cash and a $1

million promissory note.

35.     By January 1, 2023, BetterHelp accounted for a significant portion of the

Company's revenue and profit.  For this reason, analysts and investors paid careful attention to

BetterHelp's financial performance in terms of revenue, adjusted EBITDA, and paying users before and during the Class Period in FY23.

36.     Before FY23, Teladoc did not provide investors with segment-level reporting information on BetterHelp.  Thus, Teladoc's pre-FY23 SEC filings do not specify the precise amount of revenue, adjusted EBITDA, or paying users directly attributable to BetterHelp.

37.     That changed in FY23, which was confirmed by Teladoc's Form 10-K for the fiscal year ended December 31, 2022 ("FY22"), which was filed with the SEC on March 1, 2023, and was signed by the Individual Defendants (the "2022 Form 10-K").

38.     The 2022 Form 10-K stated that "[i]n the fourth quarter of 2022, [Teladoc] adopted a new organizational and reporting structure based on two operating segments, Teladoc Health Integrated Care ('Integrated Care') and BetterHelp."

39.     According to the 2022 Form 10-K, BetterHelp's revenue for FY22 was $1,012,574,000, which accounted for approximately 42% of Teladoc's revenue for FY22.

40.     According to the 2022 Form 10-K, BetterHelp's adjusted EBITDA for FY22 was $114,116,000, which accounted for approximately 46.3% of Teladoc's adjusted EBITDA for FY22.

41.     According to the 2022 Form 10-K, as of December 31, 2022, BetterHelp had 420,000 paying users.  This represented an increase of 37% versus December 31, 2021, when BetterHelp had 310,000 paying users.

42.     The 2022 Form 10-K explains that "BetterHelp paying users represent the global number of paid users who used our BetterHelp mental health services during the applicable period. *We believe that our ability to add new paying users and retain existing users is a key indicator*

- 10 -

of the increasing market adoption of BetterHelp, the growth of that business, and future revenue potential."[2]

43. According to Teladoc's Form 10-Q for the fiscal quarter ended March 31, 2023 ("1Q23"), which was filed with the SEC on May 2, 2023, and was signed by the Individual Defendants (the "1Q23 Form 10-Q"), BetterHelp's revenue for 1Q23 was $279,272,000, which accounted for approximately 44.4% of Teladoc's revenue for 1Q23.

44. According to the 1Q23 Form 10-Q, BetterHelp's adjusted EBITDA for 1Q23 was $17,638,000, which accounted for approximately 33.5% of Teladoc's adjusted EBITDA for 1Q23.

45. According to the 1Q23 Form 10-Q, as of March 31, 2023, BetterHelp had 470,000 paying users. This represented an increase of 22% versus the quarter ended March 31, 2022 ("1Q22"), when BetterHelp had 380,000 paying users.

46. According to the 2Q23 Form 10-Q – filed shortly after the Class Period commences – BetterHelp's revenue for 2Q23 was $292,356,000, which accounted for approximately 44.8% of Teladoc's revenue for 2Q23.

47. According to the 2Q23 Form 10-Q, BetterHelp's adjusted EBITDA for 2Q23 was $34,187,000, which accounted for approximately 47.8% of Teladoc's adjusted EBITDA for 2Q23.

48. According to the 2Q23 Form 10-Q, as of June 30, 2023, BetterHelp had 476,000 paying users. This represented an increase of 17% versus the quarter ending June 30, 2022 ("2Q22"), when BetterHelp had 408,000 paying users.

49. BetterHelp's 476,000 paying users in 2Q23 – just before the start of the Class Period – was the largest amount of paying users BetterHelp achieved in either FY22, or during or after the Class Period.

---

[2] Unless otherwise noted, all emphasis is added.

50.     Defendants emphasized that BetterHelp's financial performance was critical to Teladoc and, thereby, to the Company's investors.  For example, during a July 27, 2022 conference call with investors to present Teladoc's 2Q22 financial results (the "July 2022 Conference"), defendant Murthy stated that "as we have given you more color and transparency into [the] size of [BetterHelp] and the growth of [BetterHelp], *it is more material*."

51.     Likewise, before and during the Class Period, analysts routinely stated that BetterHelp was key to Teladoc's revenue and profit growth in FY23.  For example, RBC Capital Markets stated in a February 22, 2023 report on Teladoc that "BetterHelp should continue to drive the majority of growth and profitability in '23."

52.     In addition, Needham stated in a February 23, 2023 report on Teladoc that "BetterHelp represent[s] the growth and profit engine next year . . . growth will primarily come from BetterHelp."

53.     Accordingly, by the start of the Class Period, analysts and investors closely followed BetterHelp's revenue, adjusted EBITDA, and paying user performance, including the drivers of that performance – *i.e.*, BetterHelp's ad spend yield and the related customer acquisition costs.

**Teladoc's Investors Were Highly Attuned to BetterHelp's Customer Acquisition Costs and Related Ad Spend Yield Before and During the Class Period**

54.     Because BetterHelp is a direct-to-consumer business, before and during the Class Period, Teladoc expended significant sums on advertising and marketing costs designed to grow and maintain BetterHelp's business by attracting new customers, or "users."

55.     According to the 2022 Form 10-K, Teladoc "sell[s] our BetterHelp services principally through marketing our solution directly to potential users."

- 12 -

56.     The 2022 Form 10-K further states that Teladoc's spending on advertising and marketing increased 50% in FY22 versus the fiscal year ended December 31, 2021 ("FY21"), amounting to $623.5 million in advertising and marketing expenditure for FY22, which "was substantially driven by higher digital and media advertising in support of BetterHelp[.]"

57.     According to the 2023 Form 10-K, Teladoc's spending on advertising and marketing increased 10% in FY23 versus FY22, amounting to $688.9 million for FY23, which "was substantially driven by higher digital and media advertising costs related to BetterHelp."

58.     Defendants repeatedly told investors that advertising and marketing expenditures were made for BetterHelp through, among other channels, the social media channel, *i.e.*, Facebook and similar social media services.  For example, the 2022 Form 10-K explained that, as part of BetterHelp's advertising and marketing efforts, the Company "rel[ies] on relationships for our BetterHelp business with . . . social networking platforms such as Facebook[.]"

59.     According to the FTC Complaint (defined below), by 2021 BetterHelp was heavily using Facebook advertising, and was bringing in approximately 30,000 to 40,000 new users per quarter through Facebook advertising.

60.     Companies measure the effectiveness of advertising and marketing expenditure by tracking customer acquisition costs ("CAC"), which is a non-GAAP financial metric that represents the average cost to a company associated with acquiring a new customer.

61.     Customer acquisition cost is commonly understood to be calculated as: (1) advertising and marketing expenditure for a given period; divided by (2) new customers acquired in that period.  For example:

Total sales + marketing expenses / # of new customers = **Customer acquisition cost (CAC)**

Example: $250,000 expenses / 3,000 new customers = $833 CAC

62. Customer acquisition cost is a critical performance metric for growth businesses like BetterHelp because CAC measures the profitability of a business as it grows.

63. Lower customer acquisition costs indicate that a business is obtaining a good yield, or profit, on advertising and marketing expenditures.

64. Conversely, higher customer acquisition costs indicate that a business is generating a poor or low yield on advertising and marketing expenditures.

65. If a business is generating a low yield on advertising and marketing expenditure, then it must spend a greater amount on advertising and marketing expenditure to maintain or exceed the prior growth rate, thereby reducing profit.

66. In order for a business like BetterHelp to grow or maintain profitability, Teladoc had to ensure a high yield on the Company's advertising and marketing expenditure, meaning Defendants were focused before and during the Class Period on ensuring low customer acquisition costs for BetterHelp.

67. For this reason, before and during the Class Period, Defendants repeatedly linked BetterHelp's customer acquisition cost performance, and related ad spend yield, with BetterHelp's revenue and adjusted EBITDA performance.

68. For example, during the July 2022 Conference, defendant Murthy stated that "the dynamics through the year in terms of the ad spend [for BetterHelp] will have now on much more perceptible impact on [Teladoc's] overall margins."

69. Likewise, during the investor earnings call held by Defendants on April 26, 2023 to discuss Teladoc's 1Q23 financial results (the "April 2023 Conference"), defendant Gorevic stated that "[c]ustomer acquisition trends have remained stable year-to-date, resulting in solid margin pull-through[.]"

70. In addition, during the April 2023 Conference, defendant Murthy stated that "the cost of customer acquisitions remaining stable so far this year, that's actually allowed us to effectively deploy a little bit more capital over the course of the quarter of driving higher member acquisitions . . . and driving better revenue."

71. Analysts also linked BetterHelp's customer acquisition cost performance to BetterHelp's financial results. For example, Barclays stated in a February 23, 2023 report on Teladoc that "management expects to drive margin improvement through advertising spend efficiencies/improving marketing spend yield[.]"

72. Further, Truist stated in an April 26, 2023 report on Teladoc that "BetterHelp segment revenue increased 21% Y/Y . . . driven by growth in membership and stable customer acquisition cost."

73. Accordingly, at all relevant times before and during the Class Period, analysts and investors paid careful attention to BetterHelp's ad spend yield and related customer acquisition cost performance.

**Defendants Purposely Manipulated BetterHelp's Advertising Spend During FY23 to Cause Revenue and Adjusted EBITDA to Perform in a Predictable Seasonal Pattern**

74. As Defendants repeatedly explained to analysts and investors before and during the Class Period, Teladoc purposely manipulates the relationship between advertising and marketing expenditure for BetterHelp and BetterHelp's revenue, adjusted EBITDA, and paying users to follow a predictable yearly seasonal pattern, summarized as follows:

| Quarter | Ad Spend | Revenue | Adj. EBITDA | Paying Users |
|---------|----------|---------|-------------|--------------|
| Q1 | Increases following the purposeful deceleration in Q4 | Lower due to lag in ad spend increase | Lower due to increased ad spend causing increased costs | Lower due to lag in ad spend increase |
| Q2 | Similar to Q1 | Higher than Q1 | Similar to Q1 | Higher than Q1 |
| Q3 | Similar to Q2 | Similar to Q2 | Similar to Q2 | Similar to Q2 |
| Q4 | Purposely slows due to higher holiday ad costs | Similar to Q3 due to lag in ad spend decrease | Higher due to decreased ad spend causing decreased costs | Similar to Q3 due to lag in ad spend decrease |

75. Essentially, Teladoc purposely lowers the advertising and marketing expenditure for BetterHelp in Q4 of each year because ad spending is more costly during the holiday season. Increased ad costs during the holiday season mean that BetterHelp's customer acquisition costs will increase in Q4 if spending does not decrease. Stated differently, if BetterHelp maintained the same level of ad spend in Q4 as in Q3, then the Q4 ad spend dollars would result in the conversion of fewer new paying users compared to the same ad spend in Q3. BetterHelp's purposely lower ad spend in Q4 causes Q4 to have higher adjusted EBITDA because less spending increases profits,

and similar revenue and paying user growth to Q3 because of the lag in time between decreasing the ad spending and the realization of new business from the Q3 ad spending. Conversely, in Q1, Teladoc must ramp advertising and marketing expenditure back to Q3 levels, which causes adjusted EBITDA to decrease. Revenue and paying user growth also decreases in Q1 because of decreased ad spending in Q4, given that there is a delay between when less advertising dollars are spent (*i.e.*, Q4) and when those reduced dollars result in bringing in revenue from new paying users (*i.e.*, Q1). Q2 and Q3 see a continuation of the advertising and marketing expenditure from Q1, but revenue, adjusted EBITDA, and paying user performance stabilize as ad spending normalizes from the planned decrease in Q4.

76. Defendants frequently told investors during FY23 that BetterHelp's performance would align with the predictable seasonality described in ¶¶74-75 above. For example, the 2022 Form 10-K states:

> Due to the higher cost of customer acquisition during the end-of-year holiday season, our BetterHelp segment has historically reduced marketing activity during the fourth quarter. As a result of this dynamic, we have typically experienced fewer new member additions and the strongest operating income performance in the fourth quarter. Conversely, as marketing activity typically resumes at the start of the year we typically experience the weakest operating income performance during the first quarter as new customer acquisition and revenue growth lags marketing spend.

77. The same information recited above in ¶76 is repeated in the 1Q23 Form 10-Q, the 2Q23 Form 10-Q, and Teladoc's Form 10-Q for the fiscal quarter ended September 30, 2023 ("3Q23"), which was filed with the SEC on October 27, 2023, and was signed by the Individual Defendants (the "3Q23 Form 10-Q").

78. Likewise, during the investor conference call to discuss Teladoc's FY22 financial results that was held on February 22, 2023 (the "February 2023 Conference"), defendant Murthy

- 17 -

reiterated that it was "important" for investors to remember BetterHelp's planned seasonal performance, stating that:

> It's important to remind you of the seasonality dynamic in the BetterHelp business. As we have discussed throughout 2022, we typically see slower advertising spend in the fourth quarter during the holiday season. This drives lower customer acquisition in the back half of the fourth quarter and results in the strongest seasonal margin quarter of the year for BetterHelp. It also results in the seasonally weakest sequential growth and margins of the year in the first quarter as advertising spend is ramped up and the customer acquisition funnel rebuild[s]. As such, our guidance assumes the first quarter to be the low point of the year for BetterHelp margins, and we expect consistent margin progression over the course of 2023.

79. Shortly thereafter, during an analyst conference on March 6, 2023, defendant Murthy was asked by an analyst "[c]an you dive into why the BetterHelp business sees such a margin ramp throughout the year," and defendant Murthy responded that:

> ***I'm glad you asked the question because, frankly, we've been getting a ton of questions on that since our earnings call***. So it's a good opportunity for us to reinforce the margin progression . . . Let's start with Q4. So typically, in Q4 in this business, we essentially throttle back, pull back in our spend. The reason we do that is for a couple of dynamics going on. One, holiday pricing is more expensive. And two, it's the time of the year where consumers are thinking about the holidays, less about getting therapy service and me[n]tal health services. So conversion is just a little bit more inefficient at that time. Also, what happens since Q4 is you get the pullback in an ad spend and so you have the help on cost, but the revenue impact of that lag. So that is the combination of the 2 is what gets us to stronger margins very typically in Q4. Pulling back on ad spend, though means as we exit the year, there's fewer member acquisitions and that has an impact on revenue in 1Q, which is why you will find 1Q to be sequentially weaker typically in revenue growth. And also in 1Q, we are ramping up ad spend as we sort of build a book of business up for (inaudible). So you take the holiday from that. And so 1Q typically ends up being weaker and larger than revenue growth. So that's a little bit of what happens in a normal year in BetterHelp from a seasonality standpoint.

80. Defendants again addressed the planned seasonality in BetterHelp's performance during the April 2023 Conference, with the Individual Defendants variously stating as follows:

> Murthy: As discussed over the last several quarters, the first quarter is typically the seasonally weakest quarter as marketing expense ramps up following the fourth quarter holiday season. As such, we continue to expect the first quarter to be the low point of the year for BetterHelp segment margins. And as Jason [Gorevic]

- 18 -

mentioned, we expect consistent quarter-over-quarter margin improvement progression throughout the course of 2023.

\* \* \*

Gorevic: [W]e would expect to see a lower ad spend in the fourth quarter, reflecting the more expensive advertising market at that time of year.

\* \* \*

Murthy: We -- you saw in 4Q[22], we pulled back on ad spend quite significantly because that is typically the less efficient time for us to essentially spend. Consumers are distracted by other things and ad pricing is typically more expensive. What we had also said when we gave guidance, if you recall, is that we are ramping our ad spend in 1Q[23], and we also, therefore, expected 1Q[23] to be seasonally the lowest point from a margin perspective in the year for BetterHelp because of that. So as we have ramped up ad spend through the quarter, what you are seeing is essentially consumers, members coming on to the platform through the quarter, including right until the end of the quarter. And so if you think about the revenue capture from them, that will continue as we go through Q2[23] and the rest of the year, which is why I made the comment a few minutes ago that the exit point for 1Q[23] and the member acquisitions that we have had in the quarter that has performed above our expectations gives us incremental confidence about revenue as we go through Q2[23], et cetera.

81. Analysts also frequently commented on the planned seasonality for BetterHelp's performance before the Class Period. For example, Credit Suisse stated in a February 22, 2023 report on Teladoc that "[t]he guidance assumes the first quarter to be the low point of the year for BetterHelp margins, with constituent margin progression over the course of 2023."

82. Likewise, Truist stated in an April 26, 2023 report on Teladoc that "[t]he company highlighted that the first quarter is typically seasonally the weakest quarter as marketing expense ramps up following the fourth quarter holiday season. The company continues to expect Q1 to be the low point of the year for BetterHelp segment margins and expects consistent quarter-over-quarter margin improvement progression throughout the course of 2023."

83. In addition, Barclays stated in an April 27, 2023 report on Teladoc that "TDOC continues to expect BetterHelp ad spend to ramp down materially in 4Q23 creating a similar

EBITDA margin ramp trend that was projected and occurred in 2022 . . . TDOC continues to expect sequential BetterHelp margin improvement over the four quarters[.]"

84. Indeed, just two days before the start of the Class Period, BTIG stated in a July 24, 2023 report on Teladoc that "[t]he year is 4Q:23 weighted, and depends on BetterHelp. While this quarter's results will be important, full year EBITDA guidance is weighted heavily to 4Q:23 results."

85. Accordingly, by the start of the Class Period, Defendants told analysts and investors to expect similar adjusted EBITDA in 3Q23 as in 2Q23, a deceleration in advertising and marketing expenditure in 4Q23 accompanied by significant adjusted EBITDA gains, and for BetterHelp to perform in FY24 according to the expected seasonal pattern Defendants repeatedly articulated. Moreover, Defendants' intentional seasonal pattern for BetterHelp demonstrated that Defendants were closely monitoring the efficiency of BetterHelp's ad spend yield, and related customer acquisition costs, by the start of the Class Period.

**BetterHelp's Customer Acquisition Costs Temporarily Increased in the Social Media Channel During FY22**

86. Although Teladoc has a planned seasonality for BetterHelp's performance during each fiscal year, increased customer acquisition costs (meaning lower yields on ad spending) could disrupt the Company's plan.

87. That dynamic occurred during FY22 when temporary increased customer acquisition costs were caused by unusually increased competitor ad spending in the social media and paid advertising channels. In response, Teladoc was forced to decrease BetterHelp's ad spending in 1Q22 and 2Q22, which had a corresponding negative impact on adjusted EBITDA during those two fiscal quarters.

88.     According to defendant Gorevic when presenting Teladoc's 1Q22 financial results on April 27, 2022 (the "April 2022 Conference"):

> *[I]n March [2022] . . . we began to see increases in cost per acquisition and a corresponding decline in revenue yield on our advertising dollar.* There were 2 primary channels that drove that: number one is paid search, and *number two is paid social media*. I would say that we strongly attribute that to smaller private competitors who have been recently well funded with a rash of venture capital money flowing into that space and making what we would consider to be economically irrational decision[s].

89.     Defendant Gorevic's statements during the April 2022 Conference confirm that the Individual Defendants had the ability during the Class Period to quickly discern: (1) when customer acquisition costs increased in the social media channel; and (2) the source of increased customer acquisition costs in the social media channel.

90.     Defendant Murthy further explained during the April 2022 Conference that increased customer acquisition cost "is driving the reduced margin" expected for BetterHelp in 2Q22, demonstrating the importance that Defendants placed on constantly monitoring customer acquisition costs in the social media channel.

91.     The Individual Defendants continued to closely monitor customer acquisition costs for BetterHelp as 2Q22 progressed. During the July 2022 Conference, defendant Gorevic explained that increased customer acquisition costs had continued to negatively impact BetterHelp's performance, stating that:

> BetterHelp performance did come in towards the lower end of our expectations as we continued to experience the decline in yield on marketing spend that we discussed in April. We still see smaller private competitors pursuing what we believe are low or no return customer acquisition strategies to establish market share.

92.     Defendant Gorevic's statements during the July 2022 Conference confirm that Defendants were constantly monitoring BetterHelp's ad spend yield in the social media channel during the Class Period.

93.     By 3Q22, the temporary impact to customer acquisition costs caused by increased competitor advertising had stabilized, causing Defendants to declare that BetterHelp would resume the planned seasonality of decreased ad spending, and increased adjusted EBITDA, in 4Q22.

94.     During the October 26, 2022 conference with investors to present Teladoc's 3Q22 financial results (the "October 2022 Conference"), defendant Gorevic stated that "[w]hile yield on advertising spend remains below where we expected it to be at the beginning of the year, we've seen it stabilize as anticipated."

95.     Defendant Murthy confirmed during the October 2022 Conference that "[w]e continue to expect the typical seasonal slowdown in advertising spending during the holiday season in the direct-to-consumer market, and therefore, expect to see material acceleration in consolidated adjusted EBITDA margin in the fourth quarter."

96.     The predicted stabilization in customer acquisition costs for BetterHelp was favorably received by analysts.  For example, JP Morgan stated in an October 27, 2022 report on Teladoc that "[s]tabilization in customer acquisition costs is a welcome relief.  A relevant topic for BetterHelp in recent quarters has been customer acquisition costs."

97.     Accordingly, the increased customer acquisition costs experienced by BetterHelp during FY22: (1) confirmed that Defendants were capable of quickly discerning the existence and source of increased customer acquisitions costs for BetterHelp in the social media channel during the Class Period; and (2) caused analysts and investors to be highly focused on BetterHelp's ad spend yield and customer acquisition costs during the Class Period.

### In July 2023, the FTC Forced Teladoc to Stop Allegedly Stealing BetterHelp Customers' Confidential Health Information to Improve Social Media Advertising Effectiveness

98.     Since being acquired by Teladoc in 2015, BetterHelp was not content to passively make advertising and marketing expenditure in the social media channel.  Instead, BetterHelp

- 22 -

engaged in an alleged fraudulent scheme to use false pretenses to steal confidential health information from their customers – individuals suffering from mental health disorders – in order to boost the effectiveness of BetterHelp's social media advertising efforts. The FTC investigated BetterHelp's allegedly illegal practice, and Teladoc paid a first-of-its-kind $7.8 million settlement to compensate BetterHelp customers for allegedly compromising their private health data.

99. According to the complaint filed by the FTC on March 2, 2023 (the "FTC Complaint"), in signing up for BetterHelp's service, customers were asked to fill out a survey to determine which counselor to assign them to, which required customers to provide "certain information about their health status and histories – such as the fact that they are seeking or are in therapy, and whether they have previously been in therapy."

100. According to the FTC Complaint, by signing up with BetterHelp, customers also provided their email addresses and IP addresses, which allowed BetterHelp to link specific customers as being more inclined to seek or receive mental health treatment.

101. Recognizing the sensitivity of the information BetterHelp was receiving, the FTC Complaint explains that BetterHelp's website told customers that the private health information they provided would not be shared with anyone other than their counselor, and falsely implied that BetterHelp was complying with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as follows:

## Are you currently taking any medication?

**No**

**Yes**

 Rest assured - your health information will stay private between you and your counselor.

## Notes about the privacy of your email

- Your email address is kept strictly private. It is never shared, sold or disclosed to anyone. Even your counselor won't know your real email address.

- The content of all the messages between you and your counselor will appear only in our secure private system. We will only send you emails with alerts about new messages that are waiting for you.

- Your email address is used to log in to our private secure server. Make sure you type it correctly.

### D. Respondent's Deceptive HIPAA Seal

65.     From September 2013 to December 2020, Respondent displayed seals—in proximity to seals provided by third parties to Respondent—implying Respondent's purported compliance with HIPAA. These seals are circled in red below:

September 2013 – December 2015:



January 2016 – December 2020:



102.     According to the FTC Complaint, from 2013 to at least December 2020, BetterHelp was not protecting the confidential health information provided by its customers when seeking mental health treatment, nor was BetterHelp ever HIPAA compliant.

103.     Instead, according to the FTC Complaint, BetterHelp gave its customers' private health information to social media companies to improve BetterHelp's ad spend yield in the social media channel by allowing for more targeted advertisements.

104.     Specifically, according to the FTC Complaint, in advertising on Facebook, Snapchat, Criteo and Pinterest during this time period, BetterHelp gave these social media companies its customers' "email addresses, IP addresses, enrollment in [BetterHelp], and certain [questionnaire] responses[.]"

105.     According to the FTC Complaint, each disclosure violated BetterHelp's obligation to protect its customers' personal health information "because it both identified the individual (via

the IP address) and conveyed to the recipient third party that the [customer] was seeking and/or receiving mental health treatment via [BetterHelp]."

106. The FTC Complaint confirmed that BetterHelp disclosed personal information to Facebook for "*nearly 2 million in total*" customers – constituting "*all their current and former [customers]*," in order to allow Facebook to "target[] them all with advertisements to refer their Facebook friends to [BetterHelp]."

107. Likewise, the FTC Complaint stated that BetterHelp disclosed to another social media company, Snapchat, "the IP addresses and email addresses of approximately *5.6 million [visitors to BetterHelp's website]* to re-target them with advertisements for [BetterHelp]."

108. According to the FTC Complaint, BetterHelp purportedly stopped these allegedly illegal practices only after reporters "brought these practices to light and the FTC began investigating the practices[.]"

109. Essentially, the FTC Complaint alleges that BetterHelp was taking confidential, private health information that it falsely promised to keep private in order to improve the effectiveness of, and thereby the yield on, the advertising and marketing expenditure made by BetterHelp in the social media channel.

110. On July 14, 2023 – just twelve days before the Class Period starts – the FTC finalized an order requiring BetterHelp to pay $7.8 million to consumers (the "FTC Final Order"). According to the FTC, BetterHelp's alleged misconduct was so egregious that "*[t]his is the first [FTC] action returning funds to consumers whose health data was comprised*."

111. In addition to the monetary penalty, the FTC Order required BetterHelp to take numerous steps to protect customers' private health information from advertising companies by, among other things: (1) "ban[ning] BetterHelp from sharing consumers' personal information for

re-targeting"; (2) requiring BetterHelp to "obtain affirmative express consent before disclosing personal information to certain third parties for any purpose"; and (3) requiring BetterHelp to "direct third parties to delete the consumer health and other personal data that BetterHelp shared with them[.]"

112. The FTC Order also mandates that once per year for ten years "a senior corporate manager" of BetterHelp must certify to the FTC that BetterHelp is complying with the FTC Order and has not observed any noncompliance with the FTC Order.

113. In light of the FTC Complaint and the FTC Order, by July 14, 2023, Defendants understood that BetterHelp's advertising in the social media channel had become less effective, and therefore more expensive and less profitable, because they could no longer improve the effectiveness of BetterHelp's social media advertisements by allegedly stealing their customers' private health information. The FTC Complaint and the FTC Order also meant that Defendants had to increase their already robust oversight and monitoring of the social media advertising channel by the start of the Class Period.

114. Accordingly, by the start of the Class Period, Defendants necessarily understood that if BetterHelp's social media channel advertising yield decreased because of increased customer acquisition costs, that development would have an outsized negative impact on BetterHelp's revenue, adjusted EBITDA, and paying user growth performance in 3Q23, 4Q23, and FY24, because that would cause social media advertising to be even less effective, and even more expensive, following the FTC Order.

**Defendants Knew, or Recklessly Disregarded, That the Yield on BetterHelp's Social Media Advertising Had Materially Decreased Starting in 3Q23, Meaning That Increased CAC – Not Planned Seasonality – Was Driving BetterHelp's 3Q23 and 4Q23 Underperformance**

115. Defendants admitted during the February 2024 Conference (defined below) that they understood that increased customer acquisition costs caused by BetterHelp's saturation of the

social media channel had been negatively impacting BetterHelp's revenue, adjusted EBITDA, and paying user performance by July 1, 2023. Thus, at the start of the Class Period, Defendants knew, or recklessly disregarded, that increased customer acquisition costs, and not only the planned seasonality for BetterHelp's performance, was driving BetterHelp's revenue, adjusted EBITDA, and paying user metrics performance in 3Q23, 4Q23, and FY24.

116. For the reasons discussed in ¶¶33-114 above, Defendants were closely monitoring BetterHelp's ad spend yield in the social media channel by the start of the Class Period.

117. Indeed, during a November 30, 2022 analyst conference (the "November 2022 Conference"), defendant Murthy acknowledged that "[w]e look at this hourly and daily," with "this" meaning BetterHelp's ad spend yield across various channels, including the "social media" channel and, specifically, "Facebook."

118. Defendant Murthy's admission during the November 2022 Conference establishes that Defendants were constantly monitoring BetterHelp's ad spend yield in the social media channel. This means that Defendants knew by July 25, 2023, that BetterHelp's ad spend yield in the social media channel had materially deteriorated starting by July 1, 2023.

119. Thus, Defendants necessarily also understood by the start of the Class Period that increased customer acquisition costs, and not only the predictable planned cadence for BetterHelp's ad spending in 3Q23 and 4Q23, was driving the performance BetterHelp's revenue, adjusted EBITDA and paying user metrics during the Class Period.

120. Nonetheless, before and during the Class Period, Defendants told investors the opposite, *i.e.*, that BetterHelp would exhibit the expected seasonal performance pattern in FY23.

121. For example, during the February 2023 Conference, Defendants told analysts and investors that FY23 would mark a return to the predictable seasonal pattern for BetterHelp's

advertising and marketing expenditure and related revenue, adjusted EBITDA, and paying user growth performance.

122. In addition, because of BetterHelp's experience with a temporary increase in customer acquisition costs in FY22, and BetterHelp maturing into a $1 billion in revenue per year business by FY22, during the February 2023 Conference Defendants stated that they would prioritize adjusted EBITDA improvement over revenue growth for BetterHelp in FY23. Specifically, defendant Murthy stated that "we are making a choice this year to grow [BetterHelp] a little bit slower *and drive margin improvement*."

123. By focusing analysts and investors on BetterHelp's adjusted EBITDA performance in FY23, Defendants further enhanced the materiality of BetterHelp's ad spend yield and customer acquisition costs to investors during the Class Period because less effective ad spending directly reduces BetterHelp's adjusted EBITDA.

124. During the April 2023 Conference, Defendants reported that BetterHelp had followed the expected seasonal pattern in 1Q23, with "stable" customer acquisition costs "year-to-date," which allowed for slightly better adjusted EBITDA performance in 1Q23, "what is typically our seasonally weakest quarter."

125. Nonetheless, defendant Murthy stated during the April 2023 Conference that BetterHelp would still adhere to the expected seasonal pattern, stating that "we continue to expect [1Q23] to be the low point of the year for BetterHelp segment margins . . . we expect consistent quarter-over-quarter margin improvement progression throughout the course of [FY23]."

126. The Class Period begins on July 26, 2023, the day after the Individual Defendants held an investor conference call post-market close on July 25, 2023, to present Teladoc's financial results for 2Q23 (the "July 2023 Conference").

- 29 -

127. During the July 2023 Conference, defendant Gorevic assured investors that BetterHelp's customer acquisition costs remained stable, stating that "we've also seen stable customer acquisition costs through the first half of the year."

128. In addition, defendant Murthy reiterated to investors that BetterHelp would follow the expected seasonal pattern, stating that "the cadence of ad spending is more balanced across the first 3 quarters of the year . . . [and] the sequential revenue contribution is also going to be more balanced across the quarters[.]"

129. Defendant Murthy made this statement in response to an analyst question that presumed a then-present "stability in [CACs]," thereby indicating that Defendants' earlier statements during the July 2023 Conference had given analysts and investors the materially false and misleading impression that no change in BetterHelp's customer acquisition costs had occurred by July 25, 2023.

130. Indeed, analysts interpreted Defendants' statements during the July 2023 Conference to mean that BetterHelp would follow the expected seasonal pattern and that customer acquisition costs for BetterHelp were currently stable as of the July 2023 Conference.

131. For example, BTIG stated in a July 25, 2023 report on Teladoc that "*[i]t sounds like CACs are under control[.]*"

132. BTIG further noted in the same report that "management highlighted that ad-spend for BetterHelp will be more consistent from 1Q:23-3Q:23 this year[.]"

133. Likewise, William Blair stated in an July 25, 2023 report on Teladoc that "*[m]anagement also noted that the yield on DTC marketing spend for BetterHelp remains stable* . . . a clear reversal of the headwinds the division experienced throughout most of [FY22]."

134. In addition, over two months *after* the July 2023 Conference, Cowen stated in an October 5, 2023 report on Teladoc that "we believe TDOC should be able to grow BetterHelp Paying Users in 2023 and beyond, *particularly as CAC dynamics continue to alleviate*."

135. Thus, Defendants' statements during the July 2023 Conference misled analysts and investors into falsely believing that BetterHelp's customer acquisition costs had not experienced any material deterioration in the July 2023 to October 2023 time frame when, in fact, they had.

136. On October 24, 2023, the Individual Defendants held an investor conference call post-market close to present Teladoc's financial results for 3Q23 (the "October 2023 Conference"). During the October 2023 Conference, defendant Murthy admitted that BetterHelp's ad spending yield had experienced "a modest deterioration" in 3Q23 and that this trend was "likely to persist in this range through" 4Q23, but did not specify the social media channel as being impacted, or acknowledge that BetterHelp had reached a point of diminishing returns on ad spend in that channel.

137. Defendants also reported during the October 2023 Conference that paying users had declined to an average of 459,000, representing BetterHelp's first decline in paying users in FY22 and FY23. Thus, BetterHelp's paying user metric did not follow the planned seasonal performance for BetterHelp in 3Q23.

138. Analysts were surprised by BetterHelp's decline in paying users in 3Q23. For example, Guggenheim stated in an October 24, 2023 report on Teladoc that "[t]he q/q decline in paying users was surprising to us given the company spent $7M more on ads & marketing in 3Q than in 2Q, and the ad spend in the quarter was near the high historical watermark as a % of sales."

139. Likewise, Defendants reported during the October 2023 Conference that BetterHelp's adjusted EBITDA for 3Q23 was only $26 million, an approximate 24% *decrease*

from BetterHelp's adjusted EBITDA in 2Q23 of $34.2 million. Thus, BetterHelp's adjusted EBITDA metric also did not follow the planned seasonal performance for BetterHelp in 3Q23.

140. Defendants' admission that BetterHelp had experienced "a modest deterioration" in ad spend yield during 3Q23 means that Defendants knew by no later than October 24, 2023, that increased customer acquisition costs, and not only the planned cadence for BetterHelp's ad spending in 4Q23, was driving BetterHelp's revenue, adjusted EBITDA and paying user underperformance in 4Q23 and FY24.

141. Indeed, as demonstrated by Defendant Murthy's admission during the November 2022 Conference that Defendants were monitoring BetterHelp's ad spend yield in the social media channel on a daily and hourly basis, by disclosing "a modest deterioration" in BetterHelp ad spending yield as of October 24, 2023, this meant that Defendants were actively tracking – and therefore knew about – the true extent of the increase in BetterHelp's customer acquisition costs in the social media channel as of the October 2023 Conference.

142. In response to this partial corrective disclosure made after the market closed on October 24, 2023, the price of Teladoc common stock declined approximately $0.71 per share, or 3.9%, from a close of $18.12 per share before the announcement on October 24, to close at $17.41 per share on October 25, 2023.

143. Nonetheless, Defendants continued to mislead investors during the October 2023 Conference about the full extent of the deterioration in BetterHelp's ad spend yield. For example, during the October 2023 Conference, defendant Murthy falsely told investors that BetterHelp was experiencing a "more stable advertising environment compared to [FY22] as well as sustained gross margin improvement."

144. Unbeknownst to investors, however, BetterHelp's advertising environment was not "more stable" compared to FY22. Instead, BetterHelp's current advertising environment had significantly deteriorated because BetterHelp had saturated the social media ad channel and could no longer profitably make additional ad spend in that channel, whereas in FY22, BetterHelp's increased customer acquisition costs came from unsustainable temporary spending increases by competitors. Thus, BetterHelp's current advertising environment was not leading to "sustained gross margin improvement," but was instead currently harming gross margins and would continue to do so since the social media ad channel was providing diminishing returns on ad spend, *i.e.*, had become a less profitable source of growth.

145. As a result of Defendants' false and misleading statements made during the October 2023 Conference, analysts and investors were unable to discern the full scope of the deterioration in BetterHelp's ad spend yield as of 3Q23, or pinpoint it to the social media channel.

146. For example, Truist stated in an October 25, 2023 report on Teladoc that "while not necessarily a deterioration [in the yield on BetterHelp's ad spend], TDOC is not seeing the improvement to track towards the high end of its initial BetterHelp revenue guidance range."

147. Likewise, Evercore stated in an October 24, 2023 report on Teladoc that "management noted that the yield on the ad dollar still remains slightly below the midpoint of expectations."

148. Defendant Gorevic spoke to investors again on November 28, 2023 at an analyst conference (the "November 2023 Conference") about BetterHelp's performance. During the November 2023 Conference, defendant Gorevic falsely stated that BetterHelp was performing according to the planned seasonal pattern, stating that "we always pull back on ad spend at this time of the year [in 4Q23]."

149. In addition, during the November 2023 Conference, defendant Gorevic again falsely downplayed BetterHelp's ad spend yield decline in 3Q23, stating that "[i]t's just stayed a little worse than our expectations for the year . . . They're slightly worse than our expectations."

150. In response to defendant Gorevic's comments at the November 2023 Conference, Piper Sandler stated in a November 28, 2023 report on Teladoc that "[d]ue to the cadence of ad spend in 2023, we think 4Q23 BetterHelp revenue guidance understates the true growth rate of this business . . . *We model BetterHelp CACs approximately flat in 2023, 2024, and 2025[.]*"

151. By Piper Sandler modeling flat customer acquisition costs for 2023, 2024, and 2025, this demonstrates that Defendants had falsely convinced analysts that there had only been "a modest deterioration" in BetterHelp's customer acquisition costs and ad spending yield as of November 28, 2023.

152. Indeed, defendant Gorevic continued misleading investors after 4Q23 ended during a January 9, 2024 analyst conference (the "January 2024 Conference"). Defendant Gorevic falsely stated during the January 2024 Conference that "I've had investors ask me, 'Hey, is [BetterHelp] run out of growing room? Is it going to shrink next year?' I don't think there's any scenario where we believe that that's the case."

153. Unbeknownst to investors, however, and as Defendants belatedly admitted on February 20, 2024 when presenting Teladoc's financial results for 4Q23 and FY23 (the "February 2024 Conference"), because the ad spend yield in BetterHelp's social media channel had materially declined (and customer acquisition costs had materially increased), due to BetterHelp saturating the social media advertising channel, BetterHelp would materially shrink in FY24.

154. Thus, Defendants knew, or recklessly disregarded, by July 25, 2023, that the deteriorating yield on advertising spend in the social media channel meant that BetterHelp would

no longer follow the expected seasonal pattern. Instead, BetterHelp had saturated the social media advertising channel and BetterHelp was compressing its adjusted EBITDA by making additional advertising and marketing expenditure in this channel.

155. Defendant Gorevic admitted this during the February 2024 Conference, stating that "revenue and margins were below our expectations in [4Q23] as we saw lower yields on marketing spend. Specifically, *we experienced returns on our social media advertising spend that were below target in the second half of the year*, which was a departure relative to the first half."

156. In other words, defendant Gorevic confirmed during the February 2024 Conference that BetterHelp's decreased ad spend yield in the social media channel had begun by July 1, 2023.

157. Defendant Gorevic further admitted during the February 2024 Conference that decreased advertising yield in the social media channel for BetterHelp was so significant that it would persist into FY24, "and as a result, will [negatively] impact [BetterHelp's] year-over-year growth rates in the first half of 2024."

158. Defendant Murthy was asked during the February 2024 Conference by an analyst to pinpoint "*when you all first observe the declining ad yield in BetterHelp*," and she responded that "*[w]e had actually started observing the yields coming in lower than we had expected in the back half of the year*."

159. In other words, defendant Murthy admitted that BetterHelp's decreased advertising yield in the social media channel had begun by July 1, 2023.

160. Defendant Gorevic was asked during the February 2024 Conference by an analyst to "provide a little more detail on why those marketing yields remain depressed." In response, defendant Gorevic confirmed that BetterHelp had saturated the advertising market in the social media channel, stating that:

*[W]e don't see a significant competitor driving up the rates.* We do see a lot of advertisers in general going after a similar population. So I wouldn't say that it's a single competitor as opposed to the overall traffic in the ad space, so to speak. And then maybe the last thing I'll say is that we do see it certainly more as we spend more, right? *So as we increase our ad spend, we're constantly looking at the marginal return on the -- on each incremental dollar. And so we work hard to make sure that each incremental dollar is productive for us. And to the degree that we see the curve get to an inflection where we run out of room on where we can spend that money productively then we pull back rather than chasing growth at the expense of profitability.*

161.     Unsurprisingly, in conjunction with the February 2024 Conference, Defendants issued a press release on Form 8-K that provided FY24 adjusted EBITDA guidance for BetterHelp of "[f]lat +/- 50bps" versus FY23, indicating to investors that increased customer acquisition costs in the social media channel prevented BetterHelp from growing profit in FY24.

162.     During the February 2024 Conference, Defendants further disclosed that BetterHelp's paying users had again declined, down to an average of 425,000 paying users for 4Q23. Thus, BetterHelp's paying user metric did not follow the planned seasonal performance for BetterHelp in 4Q23.

163.     As demonstrated in the below chart,[3] even with the temporary customer acquisition cost increases in FY22, BetterHelp's paying user growth never declined quarter-over-quarter in FY22, and instead increased during each fiscal quarter in FY22. Thus, the declines in BetterHelp's paying users in 3Q23 and 4Q23 further demonstrate that BetterHelp's customer acquisition costs had materially and substantially increased by July 1, 2023, that this change was significantly worse than the FY22 temporary increases in customer acquisition costs, and that Defendants necessarily understood these realities by the start of the Class Period.

---

[3]     While Teladoc did not begin providing segment-level reporting information on BetterHelp until the beginning of FY23, the Company's Forms 8-K in FY23 that reported Teladoc's fiscal quarter financial results provided paying user comparisons between the same periods in FY22 and FY23. These Forms 8-K are the sources of the data reflected in this chart.



164. During the February 2024 Conference, Defendants also disclosed that the main profit driver for Teladoc in FY23 was Integrated Care, *not* BetterHelp, contrary to what analysts and investors had expected based on Defendants' representations. Specifically, Integrated Care's adjusted EBITDA grew by 42% in FY23, compared to an increase of only 19% for BetterHelp. In other words, BetterHelp's profit metric significantly underperformed in 3Q23 and 4Q23.

165. In response to the corrective disclosures made after the market closed on February 20, 2024, the price of Teladoc common stock declined approximately $4.85 per share, or 23.7%, from a close of $20.49 per share before the announcement on February 20, to close at $15.64 per share on February 21, 2024.

166. Analysts were stunned by Defendants' disclosures made during the February 2024 Conference. For example, RBC Capital Markets stated in a February 20, 2024 report on Teladoc that "Sustained Higher Customer Acquisition Costs Weigh on BetterHelp . . . Per TDOC, this was due to continued elevation of CACs, particularly in social media channels[.]"

167. Likewise, TD Cowen stated in a February 20, 2024 report on Teladoc that *"we were cautiously optimistic on the 2024 outlook given mgmt commentary at a conf in early January . . . What we find is a more challenging environment facing TDOC, with BetterHelp growth constrained by persistent elevated CAC . . . In 2H23, TDOC began to see pressure on BetterHelp customer acquisition costs, particularly in social media channels . . .* CAC pressure limits the amount of capital TDOC can deploy at an acceptable rate of return[.]"

168. In addition, Truist stated in a February 20, 2024 report on Teladoc that "*TDOC flagged returns from social media channels (primarily Facebook . . . ) were below target in 2H23 and the company expects those trends to persist in 2024.*"

169. Further, Barclays stated in a February 21, 2024 report on Teladoc that "*TDOC shares were down 18% after the call . . . which we note was largely attributable to declining yields in BetterHelp ad spend channels.*"

170. Evercore stated in a February 21, 2024 report on Teladoc that "[d]espite improvement earlier in FY23, customer acquisition cost trends have deteriorated and remain challenging."

171. JP Morgan stated in a February 20, 2024 report on Teladoc that "[t]he company did note that it isn't seeing competitors impacting acquisition costs, rather that traffic in the ad space is competitive in the demographics that TDOC is targeting with BetterHelp."

172. Needham stated in a February 21, 2024 report on Teladoc that "TDOC is seeing pressure on CACs in the social media channel in particular, and while the company employs an omnichannel approach, management does not expect a shift away from social media towards other channels to have a material impact until 2H24."

173.    Shortly following the February 2024 Conference, on April 5, 2024, the Board fired Gorevic from his position as CEO.  In response, Gorevic resigned from the Board that same day.

174.    A replacement CEO, Chuck Divita, was not hired until June 10, 2024.

175.    Analysts linked defendant Gorevic's termination to BetterHelp's materially increased customer acquisition costs.  For example, UBS stated in an April 8, 2024 report on Teladoc that "[w]e think that investors are most interested to see how a new CEO will decide to position its BetterHelp business given its lackluster long-term growth target guidance (LSD), and how to drive meaningful EBITDA margin expansion from here."

176.    As Defendants admitted during the February 2024 Conference, increased customer acquisition costs and decreased ad spend yield have wreaked havoc on BetterHelp's FY24 performance to-date.  During the first fiscal quarter of 2024 ("1Q24"), BetterHelp reported decreased revenue, decreased adjusted EBITDA, and decreased paying users.  During the second fiscal quarter of 2024 ("2Q24"), BetterHelp reported decreased revenue, decreased adjusted EBITDA, and decreased paying users.  During the third fiscal quarter of 2024 ("3Q24"), BetterHelp reported decreased revenue, decreased adjusted EBITDA, and decreased paying users.

177.    As of 3Q24, BetterHelp only had 398,000 paying users.  In other words, the increased customer acquisition costs in the social media channel that Defendants failed to disclose to analysts and investors during the Class Period caused BetterHelp to no longer perform according to the predictable seasonal pattern in FY24.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

178.    During the Class Period, Defendants made materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning BetterHelp's customer acquisition costs and expected seasonal performance.

179.    The Class Period begins on July 26, 2023.  After the market closed on July 25, 2023, during the July 2023 Conference, defendant Gorevic stated, in pertinent part, that "*[w]e've also seen stable customer acquisition costs through the first half of the year*."

180.    The statement made by defendants Teladoc and Gorevic in ¶179 was materially false and misleading when made because it created a materially false impression about customer acquisitions costs as of July 25, 2023.  Indeed, this statement caused analysts and investors to believe that BetterHelp had not experienced any deterioration in customer acquisition costs as of the July 2023 Conference, and failed to disclose that BetterHelp's adjusted EBITDA was being compressed by materially increased customer acquisition costs in the social media channel.  Once defendants Teladoc and Gorevic chose to use the July 2023 Conference to speak about BetterHelp's customer acquisition costs, they had a duty to speak completely and truthfully, including about the increase in customer acquisition costs for BetterHelp in the social media channel that began by July 1, 2023.

181.    During the July 2023 Conference, defendant Murthy was asked by an analyst to provide more detail about BetterHelp's planned seasonal performance "*[g]iven the stability in [CACs.]*"  Defendant Murthy did not correct the analyst's mistaken belief about BetterHelp's then-current customer acquisition costs, and instead stated, in pertinent part, that:

> So last year, we actually spent more in 3Q than we did in 2Q. And we saw that reflected in the BetterHelp margins last year, which declined over the course of 1Q to 2Q, 2Q to 3Q and then accelerated back up in 4Q. ***So this year, the cadence of ad spending is more balanced across the first 3 quarters of the year in contrast to the steep ramp over the same period last year.*** And so if you think about what the implication of that is, what it means is the sequential revenue contribution is also going to be more balanced across the quarters than last year.

182.    The statement in ¶181 by defendants Teladoc and Murthy that "the cadence of ad spending is more balanced across the first 3 quarters of the year" was materially false and misleading when made because increased customer acquisition costs in the social media channel,

and not only the planned seasonal pattern for BetterHelp, was dictating the cadence of BetterHelp's ad spending in 3Q23. By portraying BetterHelp's ad spending cadence as unchanged in 3Q23 and in line with the planned seasonal pattern for BetterHelp, defendants Teladoc and Murthy created a materially false impression about BetterHelp's then-current customer acquisition costs and ad spend yield.

183. On July 28, 2023, Teladoc filed the 2Q23 Form 10-Q, which stated, in pertinent part, as follows: "[t]here have been *no material changes to the risk factors previously disclosed* in [the 2022 Form 10-K]." The 2022 Form 10-K stated, in pertinent part, that "[w]e spend significant resources marketing [BetterHelp]. Any decrease in the amount or effectiveness of our BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business."

184. The statement in ¶183 by Defendants regarding "no material changes to the risk factors previously disclosed" was an inaccurate statement of material fact because BetterHelp's customer acquisition costs in the social media channel had significantly increased as a result of BetterHelp saturating that channel. This meant that the effectiveness of BetterHelp's marketing efforts had, in fact, decreased and was, in fact, negatively impacting BetterHelp's growth and profitability. Thus, instead of accurately describing the present risks to Teladoc posed by the significant increase in customer acquisition costs BetterHelp experienced, Defendants told investors that a previously issued hypothetical risk disclosure had not changed as of the filing of the 2Q23 Form 10-Q, falsely indicating that this risk disclosure remained hypothetical. As a result, Defendants' statement misled analysts and investors into falsely believing that BetterHelp's risk profile had not materially changed as of the filing of the 2Q23 Form 10-Q when, in fact, it had.

185. After the close of trading on October 24, 2023, Defendants held the October 2023 Conference, during which defendant Gorevic stated, in pertinent part, that "*[c]ustomer acquisition costs remain near the midpoint of our outlook range[.]*"

186. The statement made by defendants Teladoc and Gorevic in ¶185 was materially false and misleading when made because it created a materially false impression about customer acquisition costs as of October 24, 2023. Indeed, this statement caused analysts and investors to falsely believe that BetterHelp had not experienced a material increase in customer acquisition costs in 3Q23, or that the social media channel in particular was the cause of this material increase and had reached the point of diminishing returns, or profits, on ad spend, and failed to disclose that BetterHelp's adjusted EBITDA would be significantly compressed in 4Q23 and FY24 by materially increased customer acquisition costs in the social media channel.

187. Likewise, during the October 2023 Conference, defendant Murthy stated, in pertinent part, that BetterHelp was experiencing a "*more stable advertising environment compared to [FY22] as well as sustained gross margin improvement*."

188. The statement made by defendants Teladoc and Murthy in ¶187 was an inaccurate statement of material fact because the BetterHelp advertising environment in 4Q23 was not "more stable" compared to FY22. Instead, BetterHelp's then-current advertising environment had significantly deteriorated compared to FY22 because BetterHelp had saturated the social media ad channel, meaning this channel was providing diminishing returns on ad spend, whereas in FY22 BetterHelp's increased customer acquisition costs came from temporary ad spending increases from upstart competitors that were not sustainable. In addition, this statement was materially false and misleading because BetterHelp would not achieve "sustained gross margin improvement" because increased customer acquisition costs meant that BetterHelp's current and future margin

would be compressed since it was significantly more costly for BetterHelp to then-currently profitably grow.

189. During the October 2023 Conference, defendant Murthy also stated, in pertinent part, that BetterHelp's "*scale enables us to drive and earn strong returns on our [ad] spend, and that gives us a real advantage*."

190. The statement made by defendants Teladoc and Murthy in ¶189 was an inaccurate statement of material fact because BetterHelp's scale as the largest telehealth advertiser in the social media channel was the reason why BetterHelp's customer acquisition costs had materially increased in that channel. Thus, BetterHelp's scale was not "earn[ing] strong returns" but instead was the reason why BetterHelp was earning weak returns on social media ad spending, which was significantly compressing BetterHelp's adjusted EBITDA.

191. On October 27, 2023, Teladoc filed the 3Q23 Form 10-Q, which stated, in pertinent part, as follows: "[t]here have been *no material changes to the risk factors previously disclosed* in [the 2022 Form 10-K]." The 2022 Form 10-K stated, in pertinent part, that "[w]e spend significant resources marketing [BetterHelp]. Any decrease in the amount or effectiveness of our BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business."

192. The statement by Defendants referenced above in ¶191 regarding "no material changes to the risk factors previously disclosed" was materially false and misleading for the reasons set forth in ¶184.

193. On November 28, 2023, defendant Gorevic participated in the November 2023 Conference, during which defendant Gorevic stated, in pertinent part, that "*we always pull back on ad spend [for BetterHelp] at this time of the year [in 4Q23]*."

194. The statement by defendants Teladoc and Gorevic referenced above in ¶193 was materially false and misleading when made because increased customer acquisition costs in the social media channel was causing compression in BetterHelp's adjusted EBITDA performance for 4Q23. By stating that BetterHelp's ad spending was performing in accordance with the planned seasonal pattern, defendants Teladoc and Gorevic created a materially false impression about the sustainability of BetterHelp's adjusted EBITDA performance in 4Q23 and FY24. In reality, because BetterHelp had saturated the social media advertising channel by the start of 3Q23, BetterHelp no longer had the ability in 4Q23 to grow paying users without sacrificing profit, *i.e.*, adjusted EBITDA growth.

195. In addition, during the November 2023 Conference, defendant Gorevic stated, in pertinent part, that BetterHelp's current customer acquisition costs were "***a little worse than our expectations for the year . . . They're slightly worse than our expectations***."

196. The statements by defendants Teladoc and Gorevic referenced above in ¶195 were materially false and misleading for the reasons set forth in ¶186.

197. On January 9, 2024, following the conclusion of FY23, defendant Gorevic participated in the January 2024 Conference, during which defendant Gorevic stated about BetterHelp, in pertinent part, that "***I've had investors ask me, 'Hey, is [BetterHelp] run out of growing room? Is it going to shrink next year?' I don't think there's any scenario where we believe that that's the case***."

198. The statements made by defendants Teladoc and Gorevic in ¶197 were materially false and misleading when made because they created a materially false impression that there were no roadblocks to BetterHelp's growth as of January 9, 2024. In reality, BetterHelp's ability to grow in FY24 was nonexistent because of the significant material increase in customer acquisition

costs in the social media channel. Indeed, less than two months after making this statement, Defendants provided 1Q24 revenue guidance for BetterHelp of negative revenue growth of (6%) to (3%), meaning that the very "scenario" defendant Gorevic claimed was impossible on January 9, 2024, was precisely what defendants Teladoc and Gorevic told investors to expect during the February 2024 Conference.

## ADDITIONAL SCIENTER ALLEGATIONS

199. As alleged herein, Teladoc and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

200. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Teladoc and BetterHelp, their control over, and/or receipt and/or modification of Teladoc's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Teladoc and BetterHelp, participated in the fraudulent scheme alleged herein.

201. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

202. The Individual Defendants were each executive officers and/or directors of Teladoc during the Class Period. Based on their roles at Teladoc, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on BetterHelp, a material contributor to the Company's revenue and adjusted EBITDA during the Class Period. Customer acquisition costs and yield on ad spend were critical financial metrics for BetterHelp during the Class Period. Thus, BetterHelp's customer acquisition costs and yield on ad spend were core operations during the Class Period, such that Defendants would have had knowledge of material information related to these topics during the Class Period.

203. At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Teladoc and BetterHelp, Defendants knew, or recklessly disregarded, the extent and scope of their statements during the Class Period.

204. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

205. In addition, defendant Murthy's admission that the Individual Defendants "look at this hourly and daily," with "this" meaning BetterHelp's ad spending yield in the social media channel, establishes that Defendants were constantly and carefully monitoring BetterHelp's ad spend yield and related customer acquisition costs in the social media channel at all relevant times during 3Q23 and 4Q23.

206. Moreover, Defendants' admission of "a modest deterioration" in BetterHelp's ad spend yield during the October 2023 Conference confirms that the Individual Defendants were constantly and carefully monitoring BetterHelp's ad spend yield and related customer acquisition costs as of the October 2023 Conference and thereafter through the February 2024 Conference.

207. Further, the allegations set forth in the FTC Complaint regarding BetterHelp, and the findings in the FTC Order regarding BetterHelp, would have, or should have, alerted Defendants to carefully monitor BetterHelp's ad spend and customer acquisition costs in the social media channel during the Class Period because the Company could no longer allegedly illegally steal private health information from its customers to increase the effectiveness, and thereby decrease the cost, of BetterHelp's social media advertising.

208. The Board's decision to fire defendant Gorevic less than two months after the February 2024 Conference also supports a strong inference of scienter because it demonstrates that defendant Gorevic's failure to speak candidly and accurately to analysts and investors during the Class Period about the true extent of the higher customer acquisition costs experienced by BetterHelp in the social media channel, and the related consequences, had caused a materially negative decline in Teladoc's common stock price.

209. The allegations above also establish a strong inference that Teladoc, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and

agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Teladoc's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, Teladoc maintained and/or increased its artificially inflated common stock price throughout the Class Period.

210.    As executives and/or directors of Teladoc, the Individual Defendants are both candidates for imputing corporate scienter to Teladoc.

## LOSS CAUSATION/ECONOMIC LOSS

211.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Teladoc's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Teladoc's common stock fell precipitously as the artificial inflation was removed.

212.    As a result of their purchases of Teladoc common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $29.77 per share on July 31, 2023, less than one week after Defendants made materially false and misleading statements and omissions during the July 2023 Conference.

213.    On October 24, 2023, after the close of the trading day, Defendants announced the Company's financial results for 3Q23, disclosing for the first time that BetterHelp had purportedly experienced "a modest deterioration" in ad spend yield.

214.    In response to this revelation, the price of Teladoc common stock declined from a closing price of $18.12 per share before the announcement on October 24, 2023, to a closing price of $17.41 per share on October 25, a decline of $0.71, or 3.9%.

215.    On February 20, 2024, after the close of the trading day, Defendants announced the Company's financial results for 4Q23 and FY23, disclosing for the first time that BetterHelp had experienced material and significant customer acquisition cost increases in the social media channel in 3Q23 and 4Q23 as a result of saturating this channel, which prevented BetterHelp from making additional advertising and marketing expenditure in this channel in 3Q23 and 4Q23 without sacrificing profit, which would continue during FY24, meaning that BetterHelp had not performed according to the expected seasonal pattern in 3Q23 and 4Q23, and would not in FY24.

216.    In response to this revelation, the price of Teladoc common stock declined from a closing price of $20.49 per share before the announcement on February 20, 2024, to a closing price of $15.64 per share on February 21, a decline of $4.85, or 23.7%.

217.    As shown above, the timing and magnitude of the price declines in Teladoc's common stock negate any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## CLASS ACTION ALLEGATIONS

218.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Teladoc during the Class Period, inclusive, and who were damaged thereby (the "Proposed

Class"). Excluded from the Proposed Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

219. The members of the Proposed Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Teladoc common stock was actively traded on the NYSE. While the exact number of Proposed Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds, if not thousands, of members in the Proposed Class. Record owners and other members of the Proposed Class may be identified from records maintained by Teladoc and/or its transfer agent and may be notified of the pendency of this action by mail or by electronic mail, using the form of notice similar to that customarily used in securities class actions.

220. Lead Plaintiffs' claims are typical of the claims of the members of the Proposed Class as all members of the Proposed Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

221. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Proposed Class and have retained counsel competent and experienced in class and securities litigation.

222. Common questions of law and fact exist as to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class. Among the questions of law and fact common to the Proposed Class are:

(a) whether statements made by Defendants misrepresented material facts about the business, operations, and management of Teladoc;

(b)     whether Defendants failed to disclose material facts in discussing the business, operations, and management of Teladoc, making those statements materially false and misleading;

(c)     whether the federal securities laws were violated by Defendants' acts or omissions as alleged herein;

(d)     whether the price of Teladoc common stock was artificially inflated during the Class Period; and

(e)     to what extent the members of the Proposed Class have sustained damages and the proper measure of damages.

223.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Proposed Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**NO SAFE HARBOR**

224.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements challenged herein.  Many of the statements challenged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was

made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## APPLICATION OF PRESUMPTION OF RELIANCE: THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS

225. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

226. With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b) the misrepresentations and omissions were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Lead Plaintiffs and other members of the Proposed Class purchased Teladoc common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

227. At all relevant times, the market for Teladoc common stock was efficient for the following reasons, among others:

(a) Teladoc common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

- 52 -

(b)     as a regulated issuer, Teladoc filed periodic public reports with the SEC and the NYSE;

(c)     Teladoc regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Teladoc was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

228.   As a result of the foregoing, the market for Teladoc common stock promptly digested current information regarding Teladoc from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Teladoc common stock during the Class Period suffered similar injury through their purchase of Teladoc common stock at artificially inflated prices and a presumption of reliance applies.

229.   In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims of the Proposed Class are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Teladoc's central business operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment

decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

230. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

231. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

232. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Teladoc common stock during the Class Period.

233. Lead Plaintiffs and the Proposed Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Teladoc common stock. Lead Plaintiffs and the Proposed Class would not have purchased Teladoc common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

234.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Proposed Class suffered damages in connection with their purchases of Teladoc common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

235.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

236.    The Individual Defendants acted as controlling persons of Teladoc within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Teladoc, the Individual Defendants had the power and authority to cause Teladoc to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Co-Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the Proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Proposed Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding Lead Plaintiffs and the Proposed Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  February 24, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MICHAEL G. CAPECI
NATALIE C. BONO


                    /s/ Michael G. Capeci
                MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com
nbono@rgrdlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

LEVI & KORSINSKY, LLP
SHANNON HOPKINS
GREGORY POTREPKA
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone:  203/992-4523
212/363-7171 (fax)
shopkins@zlk.com
gpotrepka@zlk.com

*Co-Lead Counsel for Lead Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Michael G. Capeci, hereby certify that on February 24, 2025, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

<i>/s/ Michael G. Capeci</i><br>
MICHAEL G. CAPECI