UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL STARY, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 24-CV-3849 (KMK) |
| TELADOC HEALTH, INC., *et al.*, | OPINION & ORDER |
| *Defendants*. | |

Appearances:

Samuel H. Rudman, Esq.
Michael G. Capeci, Esq.
Natalie C. Bono, Esq.
Robbins Geller Rudman & Dowd LLP
Melville, New York
*Counsel for Plaintiffs*

Shannon L. Hopkins, Esq.
Gregory M. Potrepka, Esq.
Levi & Korsinsky, LLP
Stamford, Connecticut
*Counsel for Plaintiffs*

Daniel J. Kramer, Esq.
Audra J. Soloway, Esq.
Daniel Sinnreich, Esq.
Emily Miller, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

This securities class action was brought by persons who purchased Teladoc Health, Inc.

("Teladoc" or "the Company") common stock between July 26, 2023 and February 20, 2024 (the

"Class Period"). (*See* Consolidated Am. Compl. ("FAC") ¶ 1 (Dkt. No. 60).) The Consolidated

Amended Complaint alleges that Teladoc, Jason Gorevic ("Gorevic"), the Company's former

CEO, and Mala Murthy ("Murthy"), the Company's former CFO, (collectively, "Defendants"), violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated thereunder. (*See generally id.*) Defendants move to dismiss the Consolidated Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Notice of Mot. to Dismiss (Dkt. No. 69).) For the reasons set forth below, Defendants' Motion to Dismiss is denied.

## I.  Background

Teladoc is a virtual healthcare company that provides customers with healthcare access through telehealth visits. (FAC ¶ 19.) Prior to and during the Class Period, Gorevic served as Teladoc's Chief Executive Officer ("CEO") and as a director on its board of directors, and Murthy served as the Company's Chief Financial Officer ("CFO"). (*Id.* ¶¶ 20–21.) At all relevant times, Teladoc operated under two business segments, one of which was BetterHelp. (*Id.* ¶ 2.) BetterHelp provides virtual mental health services direct to consumers and primarily generates revenue through user subscription fees. (*Id.* ¶ 3.) To attract users, BetterHelp advertises in various marketing channels, including social media. (*Id.* ¶ 58.) BetterHelp measures the effectiveness of its advertising, or "ad spend yield," by tracking its customer acquisition costs ("CAC"), a financial metric that calculates the amount a company spends on average to acquire a new customer. (*Id.* ¶ 60.) A lower CAC indicates that a company is "obtaining a good yield, or profit, on its advertising or marketing expenditures," (*id.* ¶ 63), while the converse is true for a higher CAC, (*id.* ¶ 64). As explained by Defendants, Teladoc purposely lowers BetterHelp's advertising and marketing expenditure during the fourth quarter ("Q4") of each year to make up for the increased cost of advertising during the holiday season and prevent CAC from increasing. (*Id.* ¶¶ 74–75.)

A. Teladoc's Pre-Class Period Financial History

    1.  Teladoc's FY22 Ad Spending

In fiscal year 2022 ("FY22"), an unusual increase in competitor ad spending in the social media channel caused BetterHelp's CAC to temporarily increase, disrupting its seasonal plan for ad spending.  (*Id.* ¶ 87.)  In response to the rise in CAC, Teladoc had to decrease BetterHelp's ad spending in the first and second quarters of FY22 ("1Q22" and "2Q22") which had a corresponding negative impact on the Company's adjusted EBITDA during those two fiscal quarters.  (*Id.*)

Throughout FY22, Gorevic and Murthy made statements during quarterly investor calls that suggested they were aware of and closely monitoring changes to BetterHelp's CAC in real time.  For example, when presenting Teladoc's 1Q22 financial results to investors on April 27, 2022, Gorevic shared that "in March [2022] . . . [Teladoc] began to see increases in cost per acquisition and a corresponding decline in revenue yield on [its] advertising dollar" and attributed the CAC increase, in part, to changes in the social media channel.  (*Id.* ¶ 88 (alteration omitted).)  During a November 30, 2022 conference, Murthy stated that "[w]e look at this hourly and daily[,]" which Plaintiffs characterize as being a statement about Defendants' monitoring of BetterHelp's ad spend yield across various channels, including social media.  (*Id.* ¶ 117.)  By 3Q22, BetterHelp's CAC had stabilized, leading Defendants to announce that BetterHelp would return to its seasonal ad spending plan by decreasing ad spending in 4Q22.  (*Id.* ¶ 93.)  Analysts reacted favorably to this announcement, with one report stating that Teladoc's "[s]tabilization in [CAC] is a welcome relief.  A relevant topic for BetterHelp in recent quarters has been [CAC]." (*Id.* ¶ 96.)

According to Plaintiffs, the increased CAC BetterHelp experienced during FY22 "confirmed that Defendants were capable of quickly discerning the existence and source of increased [CAC] for BetterHelp in the social media channel during the Class Period" and "caused analysts and investors to be highly focused on BetterHelp's ad spend yield and [CAC] during the Class Period."  (*Id.* ¶ 97.)

2.  BetterHelp's FTC Complaint and Order

Prior to the start of the Class Period, the Federal Trade Commission ("FTC") investigated BetterHelp's advertising practices.  According to the complaint filed by the FTC on March 2, 2023, BetterHelp's website assured customers that their private health information would not be shared with anyone other than their BetterHelp provider, but BetterHelp was actually giving its customers' private health information to social media companies to improve the effectiveness of its advertising and marketing expenditures.  (*See id.* ¶¶ 99–109.)  On July 14, 2023, the FTC finalized an order requiring BetterHelp to pay a monetary penalty to consumers and take additional steps to protect customers' private health information from advertising companies.  (*See id.* ¶¶ 110–14.)

According to Plaintiffs, in light of the FTC complaint and order, by the start of the Class Period, Defendants understood BetterHelp's advertising in the social media channel had become less effective because BetterHelp was no longer improving the effectiveness of its social media advertising by sharing its customers' private health information with social media companies.  (*Id.* ¶ 113.)  Additionally, Plaintiffs contend that the requirements imposed on BetterHelp by the FTC order mean that Defendants had to "increase their already robust oversight and monitoring of the social media advertising channel by the start of the Class Period."  (*Id.*)

 B.  Teladoc's Fiscal Year 2023 Ad Spending

Prior to and during the Class Period, Defendants told investors to expect BetterHelp to perform according to its seasonal ad spending plan throughout fiscal year 2023 ("FY23").  (*See id.* ¶¶ 76–85.)  BetterHelp performed according to this pattern throughout 1Q23 and 2Q23.  (*See id.* ¶¶ 124–28.)  During a July 25, 2023 investor call regarding Teladoc's 2Q23 financial results, Gorevic assured investors that BetterHelp's CAC remained stable, stating that BetterHelp had "seen stable [CAC] through the first half of [FY23]."  (*Id.* ¶ 127.)  During the call, in response to an analyst's question that presumed "stability in [CAC]," (*id.* ¶ 129), Murthy reiterated that BetterHelp would continue to follow its seasonal ad spending plan, stating that "the cadence of ad spending is more balanced across the first 3 quarters of the year . . . [and] the sequential revenue contribution is also going to be more balanced across the quarters[,]" (*id.* ¶ 128). Analyst reports following the 2Q23 investor call echoed Defendants' statements about following the expected seasonal ad spend pattern and BetterHelp's stable CAC.  (*Id.* ¶¶ 130–34.)

On October 24, 2023, Murthy and Gorevic held another investor call to discuss Teladoc's 3Q23 financial results.  (*Id.* ¶ 136.)  During this call, Murthy announced "a modest deterioration" in BetterHelp's ad spending yield in 3Q23 and stated that BetterHelp's ad spending yield "was likely to persist in this range through" 4Q23.  (*Id.*)  Additionally, Defendants announced BetterHelp's first decline in paying users in FY22 and FY23 and a decline in BetterHelp's adjusted EBITDA, which surprised analysts.  (*Id.* ¶¶ 137–39.)  Due to these decreases, BetterHelp did not perform in accordance with its planned seasonal performance in 3Q23.  (*Id* ¶ 137.)  The following day, Teladoc's stock price declined approximately $0.71 per share, representing a 3.9% decrease from before the October 24, 2023 investor call.  (*Id.* ¶ 142.)

On November 28, 2023, Gorevic spoke about BetterHelp's performance during an analyst conference.  (*Id.* ¶ 148.)  His remarks indicated that BetterHelp was performing according to its planned seasonal pattern, stating that "we always pull back on ad spend at this time of the year[,] [*i.e.*, in Q4]."  (*Id.*)  Gorevic also discussed BetterHelp's 3Q23 ad spend yield, stating that "[i]t's just stayed a little worse than our expectations for the year . . . . They're slightly worse than our expectations."  (*Id.* ¶ 149.)  Following the conference, at least one analyst report predicted that BetterHelp's CAC would be "approximately flat" throughout 2023, 2024, and 2025.  (*Id.* ¶ 150.)

Following the end of FY23, Gorevic spoke at another analyst conference on January 9, 2024.  (*Id.* ¶ 152.)  During that conference, Gorevic expressed optimism about BetterHelp's future, saying "I've had investors ask me, 'Hey is [BetterHelp] run out of growing room?  Is it going to shrink next year?'  I don't think there's any scenario where we believe that that's the case."  (*Id.*)

During another investor call on February 20, 2024, Defendants announced that BetterHelp's performance had fallen below expectations during 4Q23.  (*See id.* ¶¶ 153–55.) Specifically, Gorevic stated that BetterHelp "experienced returns on [its] social media advertising spend that were below target in the second half of [FY23], which was a departure relative to the first half."  (*Id.* ¶ 155.)  Gorevic also expressed that BetterHelp's decreased advertising yield in the social media channel was expected to persist into fiscal year 2024 ("FY24"), negatively impacting BetterHelp's year-over-year growth rates during the first half of the year.  (*Id.* ¶ 157.)  When asked to pinpoint the time at which Defendants first observed a decline in BetterHelp's ad spend yield, Murthy stated that "[w]e had actually started observing the yields coming in lower than we had expected in the back half of [FY23]."  (*Id.* ¶ 158.)

Defendants also disclosed that BetterHelp's paying users had declined even further in 4Q23, meaning BetterHelp's paying user metric had not followed the planned seasonal performance for 4Q23.  (*Id.* ¶ 162.)

C.  Post-Class Period Events

Following the February 20, 2024 conference, Teladoc common stock declined approximately $4.85 per share, or 23.7%, closing at $15.64 per share on February 21, 2024.  (*Id.* ¶ 165.)  Analysts also reported on the increase in BetterHelp's CAC.  (*See id.* ¶¶ 166–72.)  On April 5, 2025, Teladoc's Board fired Gorevic from his position as CEO, and he resigned from the Board that same day.  (*Id.* ¶ 173.)  At least one report linked Gorevic's firing to BetterHelp's increased CAC and lackluster performance.  (*Id.* ¶ 175.)  Throughout the first three quarters of FY24, BetterHelp continued to experience decreases in revenue, adjusted EBITDA, and number of paying users, marking a departure from the predictable seasonal ad spend pattern.  (*Id.* ¶¶ 176–77.)

D.  Procedural Background

This Action originated as two separate cases, which the Court consolidated on November 14, 2024.  (*See* Order Granting Mot. to Consolidate Cases (Dkt. No. 51).)  On February 24, 2025, Plaintiffs filed their Consolidated Amended Complaint.  (*See* CAC.)

On March 26, 2025, Defendants submitted a pre-motion letter seeking leave to file a Motion to Dismiss.  (*See* Letter from Audra J. Soloway, Esq. to Court (Mar. 26, 2025) (Dkt. No. 63).)  On April 2, 2025, Plaintiffs submitted a response to Defendants' letter.  (*See* Letter from Shannon L. Hopkins, Esq. to Audra J. Soloway, Esq. (Apr. 2, 2025) (Dkt. No. 64).)  On May 30, 2025, the Court held a pre-motion conference and adopted a briefing schedule.  (*See* Dkt. (minute entry for May 30, 2025); Mot. Scheduling Order (Dkt. No. 68).)

On June 20, 2025, Defendants filed the instant Motion. (*See* Defs.' Mot. Dismiss Am. Class Action Compl. (Dkt. No. 69)); Defs.' Mem. Law Supp. Mot. to Dismiss Am. Class Action Compl. ("Defs.' Mem.") (Dkt. No. 70); Decl. Audra Soloway Supp. Mot. Dismiss Am. Class Action Compl. ("Soloway Decl.") (Dkt. No. 71).)  On August 6, 2025, Plaintiffs filed their response in opposition to the Motion to Dismiss.  (Pls.' Mem. Law Opp. Defs.' Mot. Dismiss ("Pls.' Opp.") (Dkt. No. 73); Decl. Shannon L. Hopkins Opp. Mot. Dismiss Am. Class Action Compl. (Dkt. No. 74).)  On September 17, 2025, Defendants filed their Reply.  (Defs.' Reply Mem. Law Supp. Mot. Dismiss ("Defs.' Reply") (Dkt. No. 77); Decl. Audra J. Soloway Supp. Defs.' Reply Supp. Mot. Dismiss Am. Class Action Compl. (Dkt. No. 78).)

## II.  Discussion

### A.  Motion to Dismiss

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a

claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action. Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or

9

reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also ATSI Comc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (same).  The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  To satisfy the strong inference requirement, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007) (internal quotation marks omitted).  Thus, courts analyzing scienter "must engage in a comparative evaluation" of "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."  *Id.*; *see also ATSI*, 493 F.3d at 99 ("[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." (internal quotation marks omitted)). Courts should consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard."  *Tellabs*, 551 U.S. at 323 (emphasis omitted).

B.  Section 10(b) and Rule 10b–5 Claims

Rule 10b-5 states, in relevant part, that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).  To state a claim for relief under § 10(b) and Rule 10b–5, a plaintiff must adequately allege (1) that the defendants made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which

10

plaintiffs relied, and (5) that plaintiff's reliance was the proximate cause of his injury.  *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42 (2005) (outlining elements of cause of action); *see also ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (same).  The requisite state of mind, or scienter, in a securities fraud action is an "intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319 (quotation marks omitted).

Securities fraud claims brought under § 10(b) and Rule 10b–5 are also subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  *See ECA,* 553 F.3d at 196 ("Any complaint alleging securities fraud must satisfy the heightened pleading requirements of . . . Fed[eral] R[ule] [of] Civ[il] P[rocedure] 9(b) . . . .").  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The Second Circuit has established that to state a claim for relief under § 10(b) and Rule 10b–5, Rule 9(b) requires a plaintiff to:  "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99; *see also Golla v. Neovasc, Inc.*, No. 22-361, 2023 WL 2469770, at *2 n.3 (2d Cir. Mar. 13, 2023) (summary order) (same); *Azima v. Dechert LLP*, No. 22-CV-8728, 2024 WL 4665106, at *10 (S.D.N.Y. Sept. 26, 2024) (same).

1.  Material Misstatements and Omissions

Under the pleading requirements, a complaint must explain, with adequate specificity, why the allegedly false or misleading statements were actually false or misleading when made. *See Rombach*, 355 F.3d at 172 (concluding that a complaint did not satisfy Rule 9(b) where it did not describe with specificity why the statements were fraudulent when made).  Further, the

complaint must establish the materiality of the omission or misstatement—"[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988); *see also In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 348 (S.D.N.Y. 2020) ("For a statement of fact to be actionable under Section 10(b), 'the statement must be false, and the statement must be material; neither immaterial false statements nor material true statements are actionable as securities fraud.'" (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014)), *aff'd*, 89 F.4th 408 (2d Cir. 2023). An alleged misrepresentation or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" at the time the misstatement or omission was made. *Basic*, 485 F. U.S. at 231–32 (quotation marks omitted); *see also Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002) (same).

Plaintiffs allege that Defendants made numerous material misstatements about BetterHelp's CAC and financial outlook during the Class Period. For the sake of clarity, the challenged statements will be evaluated chronologically.

### a. Statement 1

Plaintiffs first challenge two statements made during the July 2023 investor call regarding Teladoc's 2Q2023 financial results. In the first challenged statement, Gorevic said that BetterHelp had "seen stable [CAC] through the first half of [2023]" ("Statement 1"). (FAC

¶ 179; Soloway Decl. Ex. 22 at 5 (Dkt. No. 71-22).)[1]  Plaintiffs argue Statement 1 misled investors by creating the impression that BetterHelp had not experienced increased CAC, even though, according to Plaintiffs, CAC had started to rise by July 1, 2023.  (FAC ¶ 180.) Defendants contend that Statement 1 is not misleading because it refers to only the first half of FY2023.  (*See* Defs.' Mem. 10–11.)

Defendants are correct that Statement 1 speaks about only the first half of FY2023—i.e., January 1, 2023, to July 1, 2023.  None of the cases Plaintiffs cite suggests that an accurate statement about past performance becomes actionable just because less desirable results are about to occur or have already started to occur at the time of the statement; they stand for the proposition that a defendant must speak accurately and completely about the topic it chooses to speak on.  *See  Noto v. 22nd Century Grp.*, 35 F.4th 95, 105 (2d Cir. 2022) (affirming defendant's duty to disclose an investigation in light of specific statements it had made on the topic); *Setzer v. Omega HealthCare Invs., Inc.*, 968 F.3d 204, 214–15 (2d Cir. 2020) (affirming defendant's duty to disclose loan it had made to one of its tenants when it made statements about tenant's ability to make rent payments); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (finding the defendant was obligated to disclose senior management's knowledge of "pervasive conflicts [of interest]" and misconduct in producing research when making statements about the defendant company's dedication to complying with the law and integrity and collecting cases)).  Since Statement 1 did not put BetterHelp's post-July 1 performance at issue, Defendants were not required to disclose information pertaining to it, so

---

[1] When available, the Court cites to a document's original pagination.  When a document does not contain page numbers, the Court cites to the ECF page numbers in the upper right-hand corner of the page.

Statement 1 is not actionable. *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 277 (S.D.N.Y. 2021) ("[I]t is black letter law in this Circuit that '[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.'" (quoting *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004)); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) ("As logic dictates, 'disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.'" (quoting *In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade Inc.*, 107 F. App'x 250 (2d Cir. 2004) (internal citation and quotation marks omitted)).

### b. Statement 2

In the second challenged statement from the July 2023 Conference, in response to a question that presumed "stability in [CAC]," Murthy stated that "the cadence of ad spending is more balanced across the first three quarters of [2023] in contrast to the steep ramp over the same period last year" ("Statement 2"). (*Id.* ¶ 181; Soloway Decl. Ex. 22 at 10.) Plaintiffs allege that Statement 2 misled investors by implying that BetterHelp was following its planned seasonal spending pattern when increased CAC in the social media channel was also dictating the cadence of BetterHelp's ad spending in 3Q23. (FAC ¶ 182; *see also* Pls.' Opp. 13.) Defendants counter that Statement 2 is not materially false or misleading because "the cadence of ad spending in [FY]2023 was indisputably more balanced across the first three quarters as compared to [FY]2022 . . . ." (Defs.' Mem. 14 (citation and quotation marks omitted).)

Plaintiffs' argument falters because they do not allege that Statement 2's description of the cadence of ad spending in the first three quarters of FY2023 compared to the same time in

FY2022 is inaccurate.  Statement 2 is inactionable because neither Plaintiffs' Consolidated Amended Complaint nor its Opposition explains how this accurate reporting on the cadence of BetterHelp's CAC is false or misleading, let alone actionable.  *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Dankse Bank*, 11 F.4th 90, 99 (2d Cir. 2021) ("[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." (citation and quotation marks omitted); *In re Grab Holdings Ltd. Sec. Litig.*, No. 22-CV-2189, 2024 WL 1076277, at *19 (S.D.N.Y. Mar. 12, 2024) (collecting cases holding that failure to allege inaccuracy was fatal to claims).

### c.  Statement 3

Plaintiffs next challenge a sentence from Teladoc's 2Q23 Form 10-Q, which was filed on July 28, 2023.  (*See* CAC ¶ 183.)  In it, Defendants claim there were "no material changes to the risk factors previously disclosed" in the Company's 2022 10-K filing ("Statement 3").  (*Id.*) Teladoc's 2022 Form 10-K stated, in pertinent part, that "[Teladoc] spend[s] significant resources marketing [BetterHelp].  Any decrease in the amount or effectiveness of [its] BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business."  (*Id.*)  Plaintiffs assert that Statement 3 is materially false because BetterHelp's CAC in the social media channel had significantly increased by July 28, 2023, negatively impacting BetterHelp's growth and profitability.  (*Id.* ¶ 184.)  By "falsely indicating that this risk . . . remained hypothetical," Plaintiffs contend that Defendants misled analysts and investors to believe that "BetterHelp's risk profile had not materially changed as of the filing of the 2Q3 Form 10-Q when, in fact, it had."  (*Id.*)  Defendants respond that Statement 3 is not misleading because Teladoc's 2022 Form 10-K "warned that CAC variance had and could impact quarterly results" and Defendants had warned investors to expect revenue "deceleration in the second half

15

[of 2023]" and "provided guidance that assumed CAC deterioration" during their July 2023 investor call regarding Teladoc's 2Q23 results.  (Defs.' Mem. 14 (citation, quotation marks, and emphasis omitted); *see also* Soloway Decl. Ex. 4 at 31 (Dkt. No. 71-4) (discussing the potential impact of increased CAC on Teladoc's quarterly results).)  Further, Defendants argue Plaintiffs fail to meet the pleading standard by not "identify[ing] any new and material risk that Teladoc did not [previously] disclose."  (Defs.' Mem. 14.)

While Defendants made some warnings about expected deterioration in CAC prior to Statement 3, these were warnings of potential future risk, so it is reasonable for an investor to infer that those risks have not yet materialized.  *See Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-CV-6978, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) ("[I]f a company is warning investors about future risks and the company's efforts to deal with them, a reasonable investor would infer that those risks have not yet happened.  If the 'risk' has already happened or is then happening, the company has a duty to say so." (internal citations omitted)).  However, "[r]isk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized." *Christiansen v. Spectrum Pharms., Inc.*, No. 22-CV-10292, 2024 WL 246020, at *7 (S.D.N.Y. Jan. 23, 2024) (collecting cases); *see also Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 799 F. Supp. 3d 310, 348 (S.D.N.Y. 2025) ("Moreover, '[c]ourts in this Circuit have held that a company's purported risk disclosures are misleading'—and independently actionable—'where the company warns only that the risk may impact its business when that risk has already materialized.'" (quoting *In re Facebook IPO Sec. Litig. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013)).  Accordingly, despite Defendants' previous statements about expected deterioration in CAC, Statement 3 is actionable if, as Plaintiffs claim, BetterHelp's CAC had

started to deteriorate by the time Statement 3 was made.  *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) ("[C]autionary words about future risk cannot insulate from liability . . . [the] failure to disclose that the risk has, in fact, materialized in the past . . . .." (citations omitted)); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

> d.  Statement 4

During Teladoc's October 2023 3Q23 earnings call, Gorevic stated that BetterHelp's CAC "remain[ed] near the midpoint of our outlook range" ("Statement 4").  (FAC ¶ 185.) According to Plaintiffs, Statement 4 misled analysts and investors by failing to disclose the increase in CAC that BetterHelp had experienced by July 1, 2023, and the impact BetterHelp's increased CAC would have on its adjusted EBITDA in 4Q23 and FY24.  (*Id.* ¶ 186.)  Defendants counter that Plaintiffs fail to plead falsity by not alleging facts that suggest BetterHelp's 3Q23 CAC was not "near the midpoint" of the "unspecified outlook range."  (Defs.' Mem. 15. (citation and quotation marks omitted).)  Additionally, Defendants claim Plaintiffs' theory is "untenable" because, during the same investor call, Murthy disclosed that BetterHelp had experienced a "modest deterioration in [CAC]" that was "likely to persist" such that BetterHelp would meet the lower end of its revenue guidance for FY23.  (*Id.*; Soloway Decl. Ex. 23 at 7 (Dkt. No. 71-23).)

But to state BetterHelp experienced a "slight deterioration" in CAC during 3Q23 is misleading if, as Plaintiffs have alleged, there was a more than "slight" shift in those numbers, even if they remained in an "unspecified outlook range."  (Defs.' Mem. 15 (citation and quotation marks omitted)).  *See In re Salix Pharms., Ltd.*, No. 14-CV-8925, 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016) ("The omission of any information with respect to current

inventory levels is material and misleading, because that omission led analysts to believe that inventory levels were merely slightly outside of the range that Defendants described as 'normal' and could be returned to that level within about three months."); *see also City of Providence v. Aeropostale, Inc.*, No. 11-CV-7132, 2013 WL 1197755, at \*19 (S.D.N.Y. Mar. 25, 2013) ("Defendants . . . merely understated the severity of the problems as a way to avoid revealing the full extent of the problem."). And Plaintiffs have alleged that the "slight deterioration" comment further elided "that social media CAC was saturated and had materially increased," and "that the planned seasonality had been derailed," which they claim was a meaningful omission. (Pls.' Opp. 15 (citing CAC ¶ 136 ("Murthy . . . did not specify the social media channel as being impacted or acknowledge that BetterHelp had reached a point of diminishing returns on ad spend in that channel.")).) Plaintiffs have therefore alleged this statement was misleading because it omitted material information like social media saturation or seasonality disturbances that is "actionable" because it "render[ed] [an]other affirmative statement misleading," *In re Walmart Inc. Sec. Litig.*, 151 F.4th 103, 113 (3d Cir. 2025) (citation omitted), and otherwise understated the true severity of the problem at the time the statement was made, *see In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 306 (S.D.N.Y. 2011) ("[T]he [complaint] . . . adequately alleges misstatements and omissions that overstated [the company's] financial strength, misstated and understated the extent it was leveraged . . . and understated its exposure [to certain markets] . . . it was the materialization of these risks, all minimized by the alleged misstatements and omissions, that . . . [caused] some part of the losses[.]").[2]

---

[2] The market's weak reaction to this statement, as opposed to the more fulsome disclosure in February 2024, (*compare* FAC ¶ 142 *with id.* ¶ 165), further supports the inference a reasonable investor would not have understood it as a thorough disclosure of the extent of BetterHelp's CAC challenges. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506,

e.  Statement 5

During the same October 2023 investor call, Murthy shared that BetterHelp was experiencing a "more stable advertising environment compared to [FY22] as well as sustained gross margin improvement" ("Statement 5").  (FAC ¶ 187.)  Plaintiffs allege this Statement was false because BetterHelp's 4Q23 advertising environment had deteriorated compared to that of FY22 due to the diminishing returns on ad spend caused by BetterHelp's saturation of advertising in the social media channel.  (*Id.* ¶ 188.)  Plaintiffs also argue Statement 5 is misleading because "BetterHelp would not achieve 'sustained gross margin improvement' because increased [CAC] costs meant that BetterHelp's current and future margin would be compressed since it was significantly more costly for BetterHelp to then-currently profitably grow."  (*Id.*)  Defendants counter that Statement 5 is an accurate statement of past performance that has been mischaracterized by Plaintiffs.  (Defs.' Mem. 16.)

Defendants are correct that Plaintiffs inaccurately portray Statement 5 as describing BetterHelp's 4Q23 advertising environment as "more stable" than FY22.  The broader context of the Statement makes clear that Murthy was comparing BetterHelp's 3Q23 advertising environment to FY22.  (*See* Soloway Decl. Ex. 23 at 7 ("Third quarter BetterHelp adjusted EBITDA was $26 million, resulting in a margin of 9.1%.  This represents a 490 basis point increase over the last year's third quarter, a reflection of the more stable advertising environment compared to the prior year as well as sustained gross margin improvement."); Defs.' Mem. 16.)

---

515 (S.D.N.Y. 2010) ("[H]ad the market truly been on notice of the precipitous losses that [the defendant] was suffering, it is doubtful that [the defendant's] share price would have declined so dramatically following the release of the 2007 [registration statement] . . . . The Court is thus unable to hold that there was sufficient information in the marketplace to render [the defendant's]  nondisclosures . . . [i]mmaterial as a matter of law.").

The sentence following Statement 5 confirms that it is a comparison of past results.  In it, Murthy states that she is "turning to forward guidance" before discussing 4Q23 projections, (Soloway Decl. Ex. 23 at 7), which would be an illogical thing for her to say if Statement 5 was about 4Q23.  Based on this broader context, a reasonable investor would understand Statement 5 to be a comparison of past results, not a description of present demand or forecasted future performance.  *See Stadium Cap. LLC*, 2024 WL 456745, at *4 (dismissing securities fraud claim based on a statement comparing EBITDA from 1Q21 and 1Q22 because "[a] reasonable investor would understand that comparison as a historical account, not a description of present demand or a forecast of future performance").  Plaintiffs also do not dispute the accuracy of the information conveyed in Statement 5.  (Defs.' Mem. 16.)  Accordingly, Statement 5 is an inactionable statement of past performance.  *See Plumbers & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 99 ("[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." (quotation marks omitted)); *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 211 (S.D.N.Y. 2019) ("Multitudes of case law in this district foreclose any argument that accurate statements about past performance could be actionable under the securities laws.").

### f.  Statement 6

During the October 2023 investor call, Murthy also stated that BetterHelp's "scale enables [it] to drive and earn strong returns on [its] [ad] spend, and that gives [BetterHelp] a real advantage" ("Statement 6").  (FAC ¶ 189.)  Plaintiffs claim Statement 6 was materially false because BetterHelp's status as the largest advertiser in the social media channel caused it to earn weak returns on social media ad spending, which negatively impacted its adjusted EBITDA. (*Id.* ¶ 190.)  To allege falsity, Plaintiffs cite Gorevic's statements from a February 2024 industry

20

conference as an admission that "BetterHelp's scale was driving lower returns . . . compared to any 'single competitor.'" (*Id.* ¶¶ 160, 190.)  In response, Defendants claim Plaintiffs have failed to plead falsity because "[n]owhere do Plaintiffs allege that scale did not enable BetterHelp to drive strong returns compared to smaller peers." (Defs.' Mem. 16.)  They also contend that Statement 6 is inactionable as a statement of opinion or competitive advantage that is "inactionable puffery because no reasonable investor would rely on [it]." (*Id.* (citation omitted).)

First, Plaintiffs plead falsity by alleging that BetterHelp's scale was the cause of its increased CAC, meaning BetterHelp's scale was not "earn[ing] strong returns" but was actually causing its weak returns on social media ad spending.  (FAC ¶ 190.)  To the extent BetterHelp's scale actually caused CAC increases, it is plausible that Statement 6 is a material misrepresentation.  Further, when viewed in the light most favorable to Plaintiffs, Statement 6 can be interpreted as a factual claim that BetterHelp's scale enabled it to drive earnings, so its scale was the "real advantage" Murthy is referring to.  Since specific factual representations about a company's operations can be actionable, *see In re Dentsply Sirona, Inc. Sec. Litig.*, No. 24-CV-9083, --- F. Supp. 3d ----, 2026 WL 124581, at *13 (S.D.N.Y. Jan. 16, 2026) (finding "statements regarding revenues, growth, and investments in a specific number of treatment planners" to be actionable because they are "specific factual representations regarding the operations of the [defendant] company"), to the extent BetterHelp's scale was causing its weak returns on social media ad spending, Statement 6 is an actionable misrepresentation.

g.  Statement 7

On October 27, 2023, Defendants filed a 3Q23 Form 10-Q which stated that "[t]here have been no material changes to the risk factors previously disclosed in the [2022 Form 10-K]" ("Statement 7").  (FAC ¶ 191.)  The 2022 Form 10-K stated, in pertinent part, that Teladoc

"spend[s] significant resources marketing BetterHelp.  Any decrease in the amount or effectiveness of our BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business."  (*Id.*)  Plaintiffs claim Statement 7 is misleading for the same reason as Statement 3—it did not disclose the then-present risks to Teladoc posed by BetterHelp's significant increase in CAC, which Plaintiffs claim materialized by July 1, 2023.  (*See* CAC ¶¶ 184, 191.)  In response, Defendants point out that Plaintiffs have not identified any "new and material 'changes' that would render the earlier risk disclosures misleading."  (Defs.' Mem. 14, 17).  They also argue that Statement 7 is not misleading because, during the October 2023 3Q23 earnings call, Murthy reminded investors that BetterHelp's FY2023 guidance "assumed a modest deterioration in [CAC] at the low end of the [guidance] range" and disclosed that BetterHelp's recent CAC continued to trend towards "the lower half of [that] range[,]" meaning that CAC had deteriorated throughout 3Q23.  (Soloway Decl. Ex. 23 at 7; Defs.' Mem. 17).

Statement 7 is plausibly false and misleading for the same reasons as Statement 3:  if BetterHelp's CAC had significantly increased by July 1, 2023, Statement 7 did not disclose the materialization of that risk to its investors.  Murthy's statements on the October 2023 3Q23 earnings call do not cure the misleading nature of Statement 7 because they do not affirmatively disclose that the risk had materialized.  *See Christansen v. Spectrum Pharms., Inc.*, No. 22-CV-10292, 2024 WL 246020, at *7 (S.D.N.Y. Jan. 23, 2024) ("Risk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized." (collecting cases)).

h.  Statement 8

On November 28, 2023, Gorevic represented Teladoc at an industry conference during which he shared that BetterHelp's CAC were "a little worse than [Defendants'] expectations for the year . . . . They're slightly worse than our expectations" ("Statement 8").  (FAC ¶ 195; Soloway Decl. Ex. 24 at 10 (Dkt. No. 71-24).)  Plaintiffs allege Statement 8 is misleading because it did not disclose the extent of the increase in BetterHelp's CAC during 3Q23 and omitted Defendants' alleged knowledge that BetterHelp's 4Q23 results would be even worse due to increased CAC in the social media channel and not its planned seasonal ad spending.  (*See* CAC ¶¶ 186, 196.)  Defendants argue Statement 8 is inactionable because Plaintiffs have not plead any facts that suggest CAC was not "a little bit worse" than Defendants' expectations in November 2023 and point to the February 2024 disclosure in which BetterHelp met the bottom end of its FY2023 revenue guidance as an indicator of Statement 8's accuracy.  (Defs.' Mem. 17.)

Similar to Statement 4, Gorevic's representation that BetterHelp's CAC was "a little worse" than expectations is misleading if, as Plaintiffs allege, Defendants did not disclose the full extent of the damage BetterHelp's increasing CAC had on its 3Q23 results and likelihood that its 4Q23 results would be even worse.  *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *10–11 ("The omission of any information with respect to current inventory levels is material and misleading, because that omission led analysts to believe that inventory levels were merely slightly outside of the range that Defendants described as 'normal' and could be returned to that level within about three months."); *Aeropostale*, 2013 WL 1197755, at *19 ("Defendants . . . merely understated the severity of the problems as a way to avoid revealing the full extent of the problem.").  That BetterHelp ended up meeting the lower end of its revenue guidance for

FY2023 does not make Statement 8 inactionable because it does not cure Defendants' non-disclosure of their knowledge about BetterHelp's 3Q23 and 4Q23 results at the time the Statement was made.

### i. Statement 9

During the same November 2023 conference, Gorevic said that Teladoc "always pull[s] back on ad spend [for BetterHelp] at this time of the year" ("Statement 9"). (FAC ¶ 193; Soloway Decl. Ex. 24 at 9.) Plaintiffs argue Statement 9 misled investors because at the time the Statement was made, increased CAC in the social media channel was already driving BetterHelp's 4Q23 performance down, so BetterHelp could not have been performing in accordance with BetterHelp's planned seasonal pattern. (*See* CAC ¶ 194.) Thus, according to Plaintiffs, by implying that BetterHelp was performing in accordance with its planned seasonal pattern, Gorevic misled investors about the nature of BetterHelp's 4Q23 and FY24 performance. (*See id.*) Defendants respond that Statement 9 is factually accurate because Defendants did pull back on BetterHelp's ad spend in 4Q23. (Defs' Mem. 17–18.)

While Statement 9 is factually accurate, Gorevic omitted the fact that BetterHelp's saturation of the social media advertising channel, not just pre-planned seasonal spending adjustments, were the source of Teladoc's decreased ad spend yield in 4Q23. (*See* FAC ¶ 153–54.) This omission makes Statement 9 plausibly actionable. *See In re Estée Lauder Co., Inc. Sec. Litig.*, No. 23-CV-10669, 2025 WL 965686, at *8 (S.D.N.Y. Mar. 31, 2025) (holding statement omitting one cause of defendant-company's sales decline is an actionable half-truth); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 163 (D. Conn. 2019) (holding statement omitting on cause of defendants' profit increases and decreases actionable). Accordingly, Plaintiffs have plausibly alleged that Statement 9 is misleading.

j. Statement 10

On January 9, 2024, Gorevic participated in another industry conference in which he said: "I've had investors ask me, 'Hey, is [BetterHelp] run out of growing room? Is it going to shrink next year?' I don't think there's any scenario where we believe that that's the case" ("Statement 10"). (FAC ¶ 197.) Plaintiffs allege Statement 10 misled investors by implying there were "no roadblocks to BetterHelp's growth as of January 9, 2024" when, in reality, BetterHelp's growth was stymied by its increased CAC in the social media channel. (*Id.* ¶ 198.)

By its terms, Statement 10 is a statement of opinion because it "include[s] qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed . . . ." *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 533 (S.D.N.Y. 2024) (citation omitted); *see also New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2024) (same) *cert. denied sub nom. BDO USA, LLP v. New England Carpenters Guaranteed Annuity & Pension Funds*, 146 S. Ct. 261 (2025); *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) ("[L]anguage like 'we believe' or 'we think' is sufficient . . . to render a statement one of opinion rather than fact." (emphasis omitted)). However, statements of opinion are actionable "if either 'the speaker did not hold the belief []he professed' or 'the supporting facts []he supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)); *see also In re Int'l Bus. Machines Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are . . . supported by specific statements of fact . . . or if the speaker does not genuinely or reasonably believe them." (citations omitted)). Here, Plaintiffs allege that at the time Statement 10 was made, Gorevic already knew that

25

BetterHelp's ability to grow in FY24 was "nonexistent" due to significant increases in CAC in the social media channel. (FAC ¶ 198.) Gorevic's omission of this critical information makes it actionable. *See Bishins v. CleanSpark, Inc.*, No. 21-CV-511, 2023 WL 112558, at *5 (S.D.N.Y. Jan. 5, 2023) ("A statement of belief or opinion is actionably false if '. . . the speaker omits information that makes the statement misleading to a reasonable investor.'" (quoting *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (summary order)).

### 2.  Scienter

Having alleged Defendants misled investors, Plaintiffs must also adequately allege scienter. To do so, the Consolidated Amended Complaint is required to allege facts that give rise to a strong inference of intent to "deceive, manipulate, or defraud." *Ganino v. Citizens Utils. Co.*, 288 F.3d 154, 168 (2d Cir. 2000) (citation and quotation marks omitted). To establish the requisite intent, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000). Lacking evidence of motive, Plaintiffs' Consolidated Amended Complaint relies on the first prong of this test. (FAC ¶ 199; *see also* Pls' Opp. 4 ("As to scienter, Defendants primarily focus on motive, even though the [Consolidated Amended Complaint] contains no motive allegations.").)

"In determining whether a strong inference of scienter has been pleaded, the Court must read the complaint in toto and most favorably to plaintiff." *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03-CV-3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) (quotations, citations, and emphasis omitted). However, when motive is not apparent, as here, (*see* Pls.' Opp. 4 ("[T]he [Consolidated Amended Complaint] contains no motive allegations."), the "strength of the circumstantial allegations must be correspondingly greater" to satisfy the requisite pleading of

26

conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citations and quotation marks omitted).

A strong inference of conscious misbehavior or recklessness arises when defendants (1) engage in deliberate illegal behavior, (2) knew or should have known that they were misrepresenting material facts, or (3) failed to check information they had a duty to monitor. *Novak v. Kasaks*, 216 F.3d 300, 308–09 (2d Cir. 2000) (describing circumstances where allegations were sufficient). In this context, recklessness is not "merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (citation omitted). Rather, at the least, it is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 624–25 (wholly quoting *Kalnit*, 264 F.3d at 142). "The Supreme Court has interpreted the PSLRA's 'strong inference' requirement to involve 'tak[ing] into account plausible opposing inferences' and considering 'plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'" *Emps. Ret. Sys. Gov't Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Tellabs,* 551 U.S. at 323–24). At the motion to dismiss stage, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote omitted).

Like the limitations on materiality, the Second Circuit has identified several limitations on the scienter analysis. First, Plaintiffs cannot satisfy this pleading requirement with allegations of fraud by hindsight. *See Novak,* 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not

27

suffice to make out a claim of securities fraud." (citation omitted)).  Second, "corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.  Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Id.* (citations omitted).  Further, "[s]cienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."  *C.D.T.S. v. UBS AG*, No. 12-CV-4924, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.* 604 F. App'x 5 (2d Cir. 2015); *see also In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) ("[T]he group pleading doctrine has no effect on the PSLRA's scienter requirement.  It merely gives plaintiffs the benefit of presumption that certain kinds of statements were made by certain kinds of defendants.  It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made." (footnote omitted)).

Here, Plaintiffs allege that Defendants knew about BetterHelp's increased CAC by July 1, 2023, so public statements that contradicted or meaningfully understated this information were made knowingly, supporting an inference of scienter.  To support this claim, Plaintiffs first point to Murthy's statement that "[w]e look at this hourly and daily" during a conference at which only Murthy and Gorevic represented Teladoc and characterize "this" as being BetterHelp's ad spend yield and CAC.  (FAC ¶¶ 117, 205.)  Plaintiffs contend this statement "establishes that Defendants were constantly monitoring BetterHelp's ad spend yield in the social media channel" and "knew by July 25, 2023, that BetterHelp's ad spend yield in the social media channel had materially deteriorated starting by July 1, 2023."  (*Id.* ¶ 118.)  Plaintiffs next point to several other statements they argue indicate Defendants were "constantly monitoring" CAC and aware of the cost increases they allegedly concealed.  (*See, e.g., id.* ¶ 206 (alleging Murthy admitted

28

BetterHelp suffered "a modest deterioration" in ad spend yield during the October 2023 conference, thereby confirming that Defendants were constantly monitoring BetterHelp's ad spend yield and CAC); *id.* ¶¶ 155–59, 206 (alleging Gorevic's acknowledgment that BetterHelp's ad yield spend was "below target in the second half of [FY23]" and Murthy's statement that Defendants had started observing below target ad spend yield "in the back half of the year" showed Defendants knew of BetterHelp's deteriorating CAC by July 1, 2023—*i.e.,* the first day of the second half of the fiscal year); *id.* ¶ 160 (alleging Gorevic stated "as we increase our ad spend, we're constantly looking at the marginal return . . . on each incremental dollar"). Finally, Plaintiffs argue the 2023 FTC order would have or should have alerted Defendants to carefully monitor BetterHelp's ad spend yield because, under the order, "the Company could no longer allegedly illegally steal private health information from its customers to increase the effectiveness, and thereby decrease the cost, of BetterHelp's social media advertising." (*Id.* ¶ 207.)

The Court begins with the "hourly and daily" comment. The plain inference of this statement is what it says—that Defendants knew BetterHelp's CAC declined when Plaintiffs alleged it had, because Defendants were monitoring BetterHelp's ad spend yield "hourly and daily," which would add to the inference of scienter. (FAC ¶ 117.) Defendants respond that Plaintiffs misconstrue Murthy's statement. First, they say Murthy was discussing "real-time optimization across advertising channels, not CAC or yield." (Defs.' Mem. 22.) But "optimiz[ing] across advertising channels" can bear on CAC and yield—a channel becoming saturated raises costs and lowers yields, and the Consolidated Amended Complaint specifically alleges as much elsewhere. (*See, e.g.*, CAC ¶ 160.) Second, Defendants say Murthy's "we" could not have possibly meant she and Gorevic were personally monitoring those metrics.

(Defs.' Mem. 22–23.)  While Murthy may not *in fact* have meant that, as plausible an inference as any from the use of "we" on a call where she and Gorevic were Teladoc's two representatives is that it referred to her and Gorevic—a first-person plural pronoun is normally understood to include the speaker.  *See Stadium Cap. LLC*, 2024 WL 456745, at *6 ("[The CEO] said that 'we keep a close eye' on orders and 'we are . . . able to monitor the daily influx of demand.' Although [the CEO] didn't specify that 'we' included [the CFO], that inference is natural—[he] was the CFO and one of the three representatives of [the company] . . . on those calls."); *Servants of Jesus & Mary, Inc. v. Nat'l Comm. for the Nat'l Pilgrim Virgin of Canada*, No. 18-CV-00731, 2022 WL 2438964, at *1 (W.D.N.Y. Jan. 27, 2022) ("Use of the word 'we' clearly includes [the speaker]." (citing Merriam-Webster Unabridged Online Dictionary (defining "we" as "a group that includes me," or "people in general including the speaker or writer")).  That statement therefore adds to the inference that Defendants knew of BetterHelp's CAC through the relevant timeframe.  For the same reason, Gorevic's February 2024 conference statements that Defendants were "constantly looking at the marginal return" on advertising through the relevant period spend add to an inference of scienter.  (FAC ¶ 160.)  And it is clear enough that Murthy and Gorevic's other statements about the state of BetterHelp's CAC, including at the October 2023 conference, allow the inference that they had regular knowledge of it.  (*Id.* ¶ 206.)

Next, the Court turns to the FTC investigation and order.  An enforcement investigation may provide evidence relevant to a securities fraud claim, *see e.g., Set Cap. LLC*, 996 F.3d at 80 (holding that an SEC investigation supports "culpable inferences drawn from stronger allegations"), where the investigation is not "unrelated" to the theory of fraud, *Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) (summary order).  The investigation here offers some limited support for Plaintiffs' scienter arguments.  Defendants

correctly note the FTC's 2023 order concerns conduct long predating the class period, and that the investigated conduct itself—revealing patient data—was "unrelated to the alleged fraud" claimed here—concealing or underplaying CAC-related issues. (Defs.' Mem. 24.)  But Plaintiffs allege the investigated conduct was in service of lowering CAC and improving ad spend yield, because the conduct was in service of lowering BetterHelp's advertising costs. (*See* CAC ¶ 103 ("[A]ccording to the FTC Complaint, BetterHelp gave its customers' private health information to social media companies to improve BetterHelp's ad spend yield in the social media channel . . . "); *id.* ¶ 109 (same).)  While Plaintiffs admit BetterHelp "stopped these . . . practices" before the order, (*id.* ¶ 108), they argue the order, issued shortly before the start of the Class Period, effectively foreclosed one means of lowering CAC and "meant that Defendants had to increase their . . . oversight and monitoring of the social media advertising channel[,]" which would have prompted Defendants to, at the very least, keep social media advertising top of mind and make it likelier they would have had an interest in BetterHelp's advertising metrics through the Class Period, (*id.* ¶ 113).  Accordingly, while far from dispositive considering the timing of the underlying conduct and the partial relevance to the alleged fraud here, the FTC Order adds somewhat to the inference that Defendants would have or should have known about the relevant data. *See In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) ("The Court is of the opinion that, given the directive to consider *all* evidence of scienter, these investigations are not categorically irrelevant.  But they are not tremendously probative." (emphasis in original)).

Gorevic's termination after the February 2024 statements also does some limited work to nudge the inference of scienter further at this early stage.  While courts have held that an executive's departure cannot establish scienter without "independent evidence corroborating" the

inference, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (collecting cases), there is more here than *just* Gorevic's termination, *see In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11-CV-7968, 2013 WL 144041, at *21 n.9 (S.D.N.Y. Jan. 14, 2023) ("Taken together with other facts, resignation may contribute to a strong inference of scienter." (citation omitted)); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) ("Moreover, the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter." (citation omitted); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (noting resignations may add to inferences of fraud "when independent facts indicate that the resignation was somehow tied to the fraud alleged . . . or that defendants' scienter was otherwise evident").  Gorevic could in fact have been terminated for any number of reasons, including, as Defendants note, for the reasons some analysts gave.  (*See* Defs.' Mem. 25.)  But that Gorevic was terminated "shortly after the February 2024 corrective disclosure," (Pls. Opp. 24), considering the context of other statements Plaintiffs have attributed to Gorevic, adds something (if only something small) to the inference of scienter because the allegation suggests Gorevic's role in the claimed conduct was nontrivial and that he was not merely negligent, *see, e.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632–33 (S.D.N.Y. Apr. 28, 2014) ("Although the decision to terminate the defendants does not negate the possibility of mere negligence . . . it more likely suggests a higher level of wrongdoing approaching recklessness or even conscious malfeasance." (footnote omitted)); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (holding CEO's "forced resignation" after an "SEC investigation into the backdating of [defendant corporation's] stock options" would "add to the overall pleading of circumstantial evidence of fraud" (citation and quotation marks omitted)).

Lastly, Plaintiffs invoke the "core operations" doctrine to argue that as "executive officers and/or directors of Teladoc" during the relevant time period, Murthy and Gorevic "would have had knowledge of material information" related to the alleged wrongdoing because BetterHelp's CAC and ad spend yield were "critical financial metrics" for Teladoc during the Class Period.  (FAC ¶ 202.)  "[S]ince the enactment of the PSLRA, the Second Circuit has expressed doubt as to whether the core operations doctrine has survived."  *In re Pretium Rescs. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017) (collecting cases); *see also Swanson v. Danimer Scientific, Inc.*, No. 23-7674, 2024 WL 4315109, at *2 (2d Cir. Sept. 27, 2024) ("We have not expressly determined if [the core operations doctrine] is adequate on its own to allege scienter in the wake of the passage of the PSLRA." (citations omitted)).  In the absence of Circuit guidance, "the majority approach has been to consider such allegations as a 'supplementary but not independently sufficient means to plead scienter.'"  *In re Molycorp, Inc. Sec. Litig.*, No. 13-CV-5697, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) (citations and quotation marks omitted); *see also New Orleans Emps. Retirement Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order) (declining to decide whether alleged misrepresentations related to defendant's core operations was sufficient on its own to establish scienter but noting that the concept that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently" has support in case law); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("[T]he 'core operations' theory at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter." (collecting cases).); *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("[T]he Court considers 'core operations' allegations to constitute supplementary but not independently sufficient means

to plead scienter."). Because Plaintiffs have not pled another basis for finding scienter here, Plaintiffs' core operations argument cannot independently support allegations of scienter. *See In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (declining to allow plaintiffs' core operations argument to independently support scienter when their other scienter arguments had been found to be invalid).

Accordingly, viewed in toto and resolving all ambiguities in Plaintiffs' favor, Plaintiffs have adequately alleged Defendants' comments and other circumstances plausibly plead an inference of scienter for the actionable statements "at least as compelling as any opposing inference one could draw from the facts alleged," even if any of these allegations in isolation might not be enough to allow that inference. *Tellabs*, 551 U.S. at 324.

C. Loss Causation

The final element of a Section 10(b) and Rule 10b-5 claim is loss causation. Loss causation need not be alleged with the particularity that Rule 9(b) or the PSLRA impose on allegations about statements of fraud or scienter. *See Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 343 (S.D.N.Y. 2017) ("Pleading loss causation with particularity is not required."); *accord In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010) (substantially same). One way to prove loss causation is by pointing to a "corrective disclosure"—that is, "an announcement or series of announcements that reveals to the market the falsity of a prior statement"—that causes the value of a security to drop when the market realizes its lower value. *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 480 n.3 (2d Cir. 2018). "[T]o plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition [was] corrected,' and that the market reacted negatively to the corrective disclosure."

34

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (citation omitted) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for the decline in the stock price." *Id.* (emphasis in original).

Plaintiffs point to two corrective disclosures about BetterHelp's challenges with ad spending yield that they argue caused the stock to drop. The first is the October 2023 "partial corrective disclosure," at a conference in which Murthy "admitted that BetterHelp's ad spending yield has experienced 'a modest deterioration' in 3Q23 and that this trend was 'likely to persist in this range through' 4Q23, but did not specify the social media channel as being impacted, or acknowledge that BetterHelp had reached a point of diminishing returns on ad spend in that channel." (FAC ¶ 136; *contra* Defs.' Mem. 27 (suggesting the disclosure merely "revealed disappointing financial results" (citation omitted)).)[3] Teladoc's stock price dropped by about 4% following the statement. (*Id.* ¶ 214.) That sufficiently alleges a partial corrective disclosure. It followed Statement 3, which this Court found Plaintiffs have plausibly alleged is actionable. And the disclosure notes CAC and related metrics had in fact worsened, but not to what

---

[3] Defendants also note Plaintiffs argued at the lead plaintiff appointment hearing that another investor, Waits, should be rejected as lead plaintiff because no securities fraud claim had arisen by October 2023. (Defs.' Mem. 27.) But Waits' Complaint invoked only an October 2023 press release in making his argument, not the conference, and all he quoted from the press release were general statements about Teladoc and BetterHelp's earnings and membership, adding nothing at all about CAC, ad spend yield, or anything related to the alleged fraud here. (*See* Decl. Jeremy A. Lieberman Ex. B ("Waits Compl."), ¶¶ 37–38 (Dkt. No. 31-2).) The Court accordingly found that, as alleged in Waits' Complaint, "[t]o the extent the Q3 announcement does not 'reveal the truth with respect to the specific misrepresentations alleged,' in the Court's view, it does not constitute a corrective disclosure" or "a partial corrective." (Letter from Shannon L. Hopkins, Esq. to Audra J. Soloway, Esq. (Apr. 2, 2025) Ex. A 36:22–37:2 (Dkt. No. 64-1).) The Consolidated Amended Complaint, which supersedes Waits' Complaint and Plaintiffs' original Complaint (which did not allege any corrective disclosures in October 2023), does allege enough as to loss causation for the reasons explained above.

Plaintiffs allege was the true extent, which would come out later (in February 2024).  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 512 (S.D.N.Y. 2009) (holding loss causation "may be pled as a 'truth [that] slowly emerged through a series of partial disclosures'" (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 288 (S.D.N.Y. 2008)); *Take-Two Interactive*, 551 F. Supp. 2d at 283 ("[L]oss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements."); *cf. Galmi v. Teva Pharms. Indus. Inc.*, 302 F. Supp. 3d 485, 501 (D. Conn. 2017) ("'[P]artial corrective disclosures' enable a plaintiff to prove that it was harmed notwithstanding the fact that it sold its shares prior to the complete disclosure of the alleged fraud.").  Finally, Plaintiffs allege that— although not by much—Teladoc stock dropped as a result when markets opened after the disclosure.  (FAC ¶ 142 ("In response to this partial corrective disclosure . . . the price of Teladoc common stock declined approximately . . . 3.9%."); *id.* ¶ 214 (same).)  *See Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 54 (E.D.N.Y. 2011) ("Plaintiffs specifically allege several instances where the defendants made corrective disclosures that led to the immediate decline in the company's stock price.").

The second alleged corrective disclosure is Gorevic's February 2024 statement that "revenue and margins were below our expectations in [4Q23] as we saw lower yields on marketing spend" and "experienced returns on our social media advertising spend that were below target in the second half of the year, which was a departure relative to the first half," thereby, allegedly, "admit[ing] that BetterHelp's decreased advertising yield in the social media channel had begun by July 1, 2023."  (FAC ¶ 155.)  Teladoc's stock price dropped by about 24% in the day following this statement.  (*Id.* ¶ 216.)  Plaintiffs further allege "[a]nalaysts were stunned by" the February 2024 disclosure, with a number of analyst reports calling out "pressure

on BetterHelp['s] [CAC]" in "2H23" and "declining yields in BetterHelp ad spend channels" as reasons for the stock drop, all of which were clearly discussed by Gorevic. (*Id.* ¶¶ 165–72.) This makes out a more fulsome corrective disclosure than the October 2023 statement by—as Plaintiffs allege several independent analysts noted—disclosing the extent of BetterHelp's CAC woes, which Plaintiffs clearly connected to the ensuing stock drop both by their own allegations and by analyst reports. (*See id.*) *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11-CV-3658, 2012 WL 2512280, at \*12 (S.D.N.Y. June 29, 2012) ("Loss causation is buttressed by the well-pled facts demonstrating price drops in response to the analyst reports[.]" (footnote omitted)). Accordingly, Plaintiffs have adequately pled the February 2024 statement was a corrective disclosure, "giv[ing] [D]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (quoting *Dura Pharms.*, 544 U.S. at 347)).

Defendants further contend neither disclosure suffices for loss causation because they both "represent the materialization of disclosed risks," since the October 2023 and February 2024 disclosures both revealed "CAC deterioration in line with earlier projections." (Defs.' Mem. 27–28.) The Court disagrees. As discussed above, certain of the "earlier projections" are simply broad revenue projections for Teladoc and BetterHelp, (*see id.* at 6), and these are too broad to consider disclosures of risks particular to advertising—a public company cannot mislead investors as to any damaging material fact and deem it a known risk as long as they stay within their revenue projections. *See generally Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2011 WL 5170293, at \*12–13 (S.D.N.Y. Oct. 31, 2011) (holding "generalized warnings of risk" were not "sufficient to inoculate Defendants against all allegations of fraud").

37

And other projections—for example, Defendants' "warn[ing]" in October 2023 "that the low end of BetterHelp's revenue guidance reflected CAC deterioration" which was "likely to persist"—did not fully reveal the information that was revealed in February 2024, which Plaintiffs have alleged was a meaningful omission that caused the bigger stock drop in February 2024 and is key to their theory of fraud. (*See* CAC ¶ 136 ("Murthy admitted that BetterHelp's ad spending yield had experienced a 'modest deterioration' . . . [that] was 'likely to persist' . . . *but did not specify the social media channel as being impacted, or acknowledge that BetterHelp had reached a point of diminishing returns on ad spend in that channel*." (emphasis added)).) So, the Court can easily conclude Plaintiffs have alleged the corrective disclosures "reveal[ed] some then-undisclosed fact with regard to the specific misrepresentations alleged" in the Consolidated Amended Complaint. *Omnicom Grp., Inc.*, 597 F.3d at 511.

Accordingly, Plaintiffs have also met the comparatively lower bar of alleging loss causation.

D.  Claims Against Individual Defendants

Plaintiffs also seek to hold individual defendants Gorevic and Murthy liable as "controlling persons" under Section 20(a) of the Exchange Act. (*See* CAC ¶¶ 235–36). Defendants contend only that Plaintiffs "plead no primary violation of Section 10(b)" and "fail to allege either Individual Defendant's 'culpable participation' in the alleged fraud." (Defs.' Mem. 28 (citation omitted).) Because the Court has found Plaintiffs plead primary violations at least as to certain statements, including as to scienter, the Court denies Defendants' Motion as to the Section 20(a) counts.

### III.  Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss is granted as to claims based on Statements 1, 2, and 5, and denied as to claims based on Statements 3, 4, 6, 7, 8, 9, and 10.  The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 69.

SO ORDERED.

Dated:   March  31, 2026
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge